UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CUNEO LAW GROUP, P.C. | ) |
| and | ) |
| JONATHAN W. CUNEO | ) |
| v. | ) Case No. 08-00253 (RBW) |
| JOEL D. JOSEPH, | ) |
| Defendant | ) |

# VERIFIED ANSWER TO THE FIRST AMENDED COMPLAINT AND COUNTERCLAIM:  JURY TRIAL DEMANDED

Defendant answers the allegations in the complaint as follows:

1. Defendant admits plaintiff is seeking a declaratory judgment.

2. Defendant denies committing any breaches of the settlement agreement, denies that any breach was material and denies that he lost his rights under the settlement agreement.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. Deny that venue is proper because the two cases under the settlement agreement that remain unpaid are the *Leatherman* and *Kwikset* cases.  These two cases are pending, or were pending, in the state courts of California.  As the real subject matter of this case, and because defendant resides in California, the forum most convenient is Central District of California.

1

10. Admit.

11. Admit.

12. Defendant was engaged by the Cuneo Law Firm in 1999.

13. Admit.

14. The funds held by Cuneo for Joseph were held in trust for payment of a health insurance policy for Joseph and his three sons. Cuneo had no right not to pay the insurance premium.

15. Joseph didn't ask for the money only that the insurance policy be paid.

16. Denied. Joseph had every right to implement his claims by filing liens and contacting co-counsel.

17. Defendant admits that the case was settled.

18. Admit.

19. Admit.

20. Admit.

21. Admit. In addition the entire settlement agreement, which includes two documents, an Agreement of Release, and Exhibit A thereto. These documents are attached to this answer and counterclaim as Exhibits A and B. Both of these documents were drafted by Jacob Stein, attorney for plaintiffs.

22. Admit.

23. Admit that Cuneo received payment in the Hungarian Gold Train case, but believe that Cuneo received it in December of 2005.

24. Joseph received payment from Cuneo in January, 2006, but was told by David Stanley of the Cuneo firm that the withheld funds would be dispersed within 90 days.

25. Denied.

26. No agreement prevents Joseph from communicating with co-counsel. Paragraph 6 of the Agreement of Release provides:

> Joel Joseph shall make no attempt to interfere with the pending cases or cases that follow, nor shall he attempt to file liens or notices of claim, or correspond with the litigants. If he does he has breached the agreement and waives his percentages.

A litigant is a party. Joseph did not communicate with any party. Joseph did not interfere with any of the pending cases.

27. Denied. The *Gold Train* case was settled. Joseph did not interfere in any way with the administration of that action.

28. Denied.

29. Denied.

30. Denied.

31. Deny that Joseph breached the agreement. Admit that he sued Cuneo's co-counsel.

32. Admit.

33. Joseph has no knowledge that the allegation is true or false.

34. Admit.

35. Admit.

36. Admit that the case was settled. Deny that it was settled to avoid delay and expense.

37. Deny. Defendant sought the balance that was due him as promised by David Stanley.

38. Admit.

39. Deny.

40. Admit.

41. Defendant has no reason to believe that this is not true.  However, Joseph requested that Cuneo keep him informed of the settlement and payment concerning *Leatherman* and *Kwikset* cases, which Cuneo failed to do.

42. Deny.  Defendant did not breach any such obligation and further even if he did, the paragraph in question would constitute an illegal liquidated damages clause and be invalid.

43. Defendant incorporates his answers to paragraphs one through 42.

44. Admit that Cuneo is entitled to declaratory relief, but deny that Joseph breached any part of the settlement agreement.

45. Deny.

45A.  Deny.

45.B.   Defendant cooperated in the prosecution of the *Gold Train* case, and did not disrupt the case in any way.

45.C.  Defendant's case was not baseless, did not cause interference and did not require Cuneo to indemnify.

45.D.  The motion was not frivolous.

I affirm under the penalties for perjury, that the above responses are accurate and truthful.

*/s/ Joel D. Joseph*

_____
JOEL D.  JOSEPH, Pro Se
1717 Fourth Street, Third Floor
Santa Monica, CA 90401
(310) 394-6600

4

# COUNTERCLAIM

## I.

### Factual Allegations

1. Joel D. Joseph came to the Cuneo Law Firm as a client. Cuneo represented Joseph, or more accurately, misrepresented Joseph in this court in *Joseph v. MCI Telecommunications*, 1:98-cv-02919-EGS.

2. The MCI complaint was filed on December 1, 1998 as a class action.

3. The *Joseph v. MCI* case was transferred to the Southern District of Illinois pursuant to an order dated April 26, 1999, pursuant to a ruling of a multi-district litigation panel.

4. Cuneo and his firm breached obligations owed to Joseph as a client as follows:

5. Cuneo violated Rule 1.1 of the District of Columbia Rules of Professional Conduct—Competence. Rule 1.1 provides:

> (a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
>
> (b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

6. Cuneo and his firm did virtually nothing in the Southern District of Illinois to protect the interests of Joseph and the class that he represented, except to collect a substantial legal fee.

7. The MCI case involved MCI charging a fee for telephone calls of approximately $3.00 per minute that was not approved by the Federal Communications Commission (FCC).

8. The total amount of illegal overcharges in that case was approximately $300 million.

5

9. Joseph researched the issues involved, reviewed the FCC's files and drafted a complaint which was ready for filing.

10. Cuneo delayed in filing the action, and this delay caused the case to be transferred from the District of Columbia.

11. Cuneo failed to file a motion for summary judgment that would have resulted in an award of the full $300 million in actual damages, plus attorneys fees.

12. The MCI case was settled for $88 million, including $25 million for attorneys' fees.

13. Consumers lost $212 million as a result of Cuneo's malpractice.

14. Rule 1.4 of the District of Columbia Rules of Professional Conduct — Communication provides:

> (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

15. Cuneo failed to keep Joseph reasonably well informed about the status of his case and expressly and specifically refused to tell Joseph the compensation that Cuneo received.

16. Rule 1.8 of the District of Columbia Rules of Professional Conduct provides:

> (e) A lawyer shall not accept compensation for representing a client from one other than the client unless:
>     (1) The client gives informed consent after consultation;
>     (2) There is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
>     (3) Information relating to representation of a client is protected as required by Rule 1.6. (confidentiality).

17. Cuneo accepted compensation from someone other than his client and the client did not give informed consent.

18. Cuneo did not represent the interests of Joseph in the case, only of interests of his firm;

19. Cuneo received compensation for this case but refused to tell Joseph of the amount of compensation;

20. Joseph did not receive any money for serving as a representative plaintiff in a class action.

21. Joseph created, researched and drafted complaints for the *Gold Train Case*, the *Leatherman* case and the *Kwikset* case.

22. But for Joseph's creation of these cases, Cuneo would have received the large awards that he and his firm did in those cases.

23. Concerning the Gold Train Case Cuneo received approximately $1.5 million.

24. Cuneo mislead the court by failing to provide the amount of money involved in the Leatherman case. Cuneo's fee was approximately $2.5 million. Joseph's share is approximately $500,000, 20% of the award as per the settlement agreement.

25. Cuneo forced me out of his firm in Spring 2002 because Jeff Berman of Hagens Berman stated that "I was trying to make a pig fly" concerning the Hungarian Gold Train case.

26. Cuneo had an arrangement with Hagens Berman and William Lerach of the West Coast division of firm formerly known as Milberg Weiss. At Mr. Cuneo's request Lerach would fire employees, and did fire employees that Cuneo disliked. Hagens Berman was also part of this arrangement.

27. Another reason that Cuneo terminated my employment, or at least forced me to reduce my hours (he offered to pay me $50 per hour for no more than 60 hours per month, or a maximum of $3,000 per month), was because of the firm's tenuous financial situation.

**28.** Jacob Stein, Cuneo's attorney, told me that Cuneo could not afford to pay the settlement as a lump sum, and finances forced him to make installment payments.

7

## II. First Cause of Action

### Breach of Obligations of Attorney to Client

29. Defendant incorporates by reference paragraphs one through 28, inclusive.

30. Cuneo did not keep Joseph informed about status of the MCI case.

31. Cuneo did not represent the interests of Joseph in the MCI case, only of his firm;

32. Cuneo received compensation for this case, but refused to tell Joseph of the amount of compensation,

33. Joseph did not consent to Cuneo receiving money from anyone other than himself concerning the MCI case.

34. Joseph did not receive any money for serving as a representative plaintiff in a class action.

## III. Second Cause of Action:

### Breach of Settlement Agreement

35. Defendant incorporates herein by reference paragraphs one to 33, inclusive

36. Plaintiff willfully and maliciously breached the settlement agreement by failing to promptly pay Joel D. Joseph twenty percent of the amount received regarding the Leatherman case.

37. Defendant did not breach the settlement agreement.

38. Even if defendant breached the settlement agreement, such breach was minor and did not substantially harm plaintiff.

39. Even if plaintiff was harmed by defendant's breach of the settlement agreement, the total forfeiture provision in the settlement agreement was an unreasonable liquidated damages provision that did not bear any reasonable relationship to the harm actually incurred.

    **40.** The settlement agreement, drafted by plaintiffs' counsel, should be construed against plaintiff.

IV.

### IV.  Third Cause of Action:

### Quantum Meruit

    41. Defendant incorporates herein by reference paragraphs one through 40, inclusive.

    42. Defendant is entitled to a fee of one-third of the total amount received by plaintiffs from the *Hungarian Gold Train* case settlement, from the *Leatherman* case and from the *Kwikset* case.

    43.  A referral fee of one-third is customary and typical in the industry.   Joseph did far more than just refer these cases, he did substantial work on them.

    44. But for the efforts of defendant there would have been no *Hungarian Gold Train* case, no *Leatherman* case and no *Kwikset* case.

    45. Plaintiffs earned fees of approximately $1.5 million in the Gold Train case and have earned approximately $2.5 million from the *Leatherman* case.   Plaintiff's fee in the *Kwikset* case will be approximately $2.5 million.  Total fees in these cases will be more than $6 million for the Cuneo firm.

    46. Defendant is entitled to a reasonable referral fee for his work in developing the *Hungarian Gold Train* case, the *Leatherman* case and the *Kwikset* case.

    47.  Defendant referred no less than four of the original clients in the Hungarian Gold Train case to plaintiffs.

    48. Each of the referred clients signed a written retainer agreement that provided that each attorney assumed joint legal responsibility for the representation and would be available for consultation with the client.

49. Defendant provided continuing representation to the clients that he brought into the case and consulted with them and with other members of the class while the case was pending.

50. The fee sought by defendant is in proportion to the work performed by defendant.

V.                 **V.    Fourth Cause of Action:**

**Unjust Enrichment**

51. Defendant incorporates herein paragraphs one through 50, inclusive.

52. Plaintiffs were unjustly enriched by not paying Mr. Joseph a reasonable fee for creating the *Hungarian Gold Train* case, the *Leatherman* case and the *Kwikset* case.

53. Defendant performed substantial services that were performed under circumstances in which the defendants understood and intended that compensation would be paid.

54. Plaintiffs had actual knowledge of the benefit provided to them by defendant.

55. Plaintiffs accepted and retained approximately $4 million in legal fees for work performed on the *Hungarian Gold Train* and *Leatherman* cases.

56. Under the circumstances of the *Hungarian Gold Train* and *Leatherman* cases it would be inequitable for plaintiffs to retain the entire $4 million that they received from these cases without paying plaintiff fair value for the work and services that he provided.

57. Defendant is entitled to one-third of the fees earned by defendants from the settlement of the *Hungarian Gold Train* case, the *Leatherman* case and the *Kwikset* case, or $2.2 million.

**VI.**

**Fifth Cause of Action:**

**Unfair Trade Practices/Consumer Protection Procedures Act**

58. Defendant incorporates by reference paragraphs one through 57, inclusive.

10

59. This cause of action is brought pursuant to D.C. Code Section 28-3905(k)(1).

60. Plaintiffs' action in attempting to enforce an invalid liquidated damages clause is an unfair and improper trade practice.

61. Defendant has suffered injury as a direct and proximate result of plaintiffs' unfair and improper trade practice.

## VII.

### Sixth Cause of Action:  Intentional Infliction of Emotional Distress

62. Defendant incorporates by reference paragraphs one through 61, inclusive.

63. Plaintiffs' conduct in depriving defendant of his share of the proceeds from the *Leatherman* case was intentional, reckless and in deliverate disregard of the high probability that emotional distress would result to defendant.

64. The plaintiffs' conduct was extreme and outrageous and beyond the bounds of decency in society.

65. The conduct of plaintiffs was malicious, willful and intentional.

66. As a result of the plaintiffs' conduct and actions, the defendant has suffered and will continue to suffer, serve and extreme emotional distress.

## VIII.

### Request for Relief

WHEREFORE, defendant demands judgment against plaintiffs, jointly and severally,

A.    Inn the amount of $2.2 million plus costs, interest at the rate of 12% per annum and attorneys' fees and a declaratory judgment that plaintiffs shall pay defendant one-third of all money received regarding the *Kwikset* case within five days of receipt;

    **B.**    An award of treble damages, attorney's fees and punitive damages under D.C. Code Section 28-3905(k)(1)(A);

    **C.**    An award of $1 million for intentional infliction of emotional distress;

    **D.**    Punitive damages of $3 million.

I verify that under the penalty for perjury all factual allegations contained in this counterclaim are accurate and truthful.

_____
JOEL D. JOSEPH, Pro Se
1717 Fourth Street, Third Floor
Santa Monica, CA 90401
(310) 394-6600

12

## JURY DEMAND

Defendant requests a trial by jury.

                                      _____
                                      JOEL D. JOSEPH, Pro Se

Exhibit A

1. Joel Joseph shall receive twenty percent (20%) of Cuneo Law Group, P.C.'s net fees in the Gold Train, Leatherman, and Kwikset cases as well as any directly related litigation. Joel Joseph will release all liens including the MCI lien, will not file any independent fee applications, and will cooperate with the Cuneo Law Group reasonably in the prosecution of these cases.

2. The existing eighty-eight thousand, three hundred twenty dollar ($88,320) loan Joel Joseph owes Jonathan Cuneo, with interest at three percent (3%) from its inception, is to be paid from proceeds of the percentages. Joel Joseph will pay fifty percent (50%) of all received as his share to reduce the loan.

3. In the event that the Joseph 50% does not cover the loan, the balance will be forgiven.

4. Joel Joseph is to receive twenty-thousand dollars ($20,000) on execution with twenty-five percent (25%) to be paid to his cousin through counsel, and as all other funds are to be disbursed to Joseph, 25% of Joseph's total is to be paid to his cousin pursuant to the agreement between Cuneo and his counsel until his cousin's claim is satisfied; the remaining 25% will go to Joseph.

5. Jonathan Cuneo shall pay Joel Joseph another ten-thousand dollars ($10,000) on June 1, 2002, and another ten-thousand dollars ($10,000) on September 1, 2002. No interest will be paid on those two amounts. These payments are subject to the 5% deduction as set forth above.

We agree:

_____
Joel Joseph

_____
Jonathan Cuneo for himself
and the Law Group

## AGREEMENT OF RELEASE

The parties to this release which is to bear the effective date of March 15, 2002, are:

Jonathan Cuneo, the Cuneo Law Group, P.C., firm, its agents, assigns and representatives of any kind

and

Joel Joseph, his agents, assigns and representatives of any kind

The parties intend to make a full and final settlement and release of any and all claims of any type whatsoever that they do or may have against each other and they acknowledge that there is good and valuable consideration for this Agreement, including the mutual promises. They agree as follows:

1. The parties release each other of any and all claims of any type whatsoever including but not limited to the civil action, now pending in the civil division of the United States District Court for the District of Columbia.

2. The parties in the pending action each shall bear their own costs.

3. Upon the execution of this release by the parties they shall immediately file a praecipe dismissing with prejudice all claims against each other.

4. Nothing in this release is intended to be nor shall it be interpreted to mean an admission of any allegation of any kind or breach of an obligation of any kind or wrongdoing of any kind. Furthermore, any such allegation is affirmatively denied.

5. The parties hereto have had the advice of counsel or the opportunity to have consulted with counsel.

6. Joel Joseph shall make no attempt to interfere with the pending cases or cases that follow, nor shall he attempt to file liens or notices of claim, or correspond with the litigants. If he does he has breached the agreement and waives his percentages.

7. The terms set forth in the attached exhibit are part of this release.

8. This agreement is the entire agreement of the parties and all other

agreements are merged herein and this agreement cannot be altered or changed except in writing signed by the parties.

_____
Witness

_____
Witness

_____
Joel Joseph

_____
Jonathan Cuneo