## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

THE CUNEO LAW GROUP, P.C., *et al.*,    )
    )
            Plaintiffs,    )
    )
         v.    )    Case No. 08-00253 (RBW)
    )
JOEL D. JOSEPH,    )
    )
            Defendant.    )
    )

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs The Cuneo Law Group, P.C., and Jonathan W. Cuneo ("Cuneo") oppose Defendant Joel D. Joseph's ("Joseph") motion for preliminary injunction, and in support thereof rely on the following memorandum of points and authorities.

The United States Supreme Court has held that a federal court "injunction freezing assets is only permissible when a party has demonstrated an equitable claim to the assets." *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1160 (D.C.Cir. 2007), citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).    This binding limitation on the jurisdiction of a federal court sitting in equity (discussed in a case cited by Joseph in his brief) precludes the relief Joseph seeks in a case where he seeks only damages.

Even if this were not the case, Joseph still is not entitled to the extraordinary relief of a preliminary injunction freezing $2.5 million because he fails to meet the familiar four-part test the Court must consider in granting a preliminary injunction. As we show below, he cannot prevail on any one of the four parts! Accordingly, his motion for a preliminary injunction must be denied.

## THE COURT LACKS JURISDICTION TO ISSUE
## A PRELIMINARY INJUNCTION

Since 1999 it has been clear that a federal court's equity jurisdiction does not

extend to the issuance of a preliminary injunction freezing or encumbering assets of a

defendant where the plaintiff seeks only damages and demonstrates no equitable claim to

the assets. In *Grupo Mexicano, supra.*, the United States Supreme Court considered the

power of a federal court sitting in equity to issue a preliminary injunction freezing assets.

In that case the lower court had found that the defendant was at risk of insolvency if not

already insolvent, that certain notes were its only substantial asset, that defendant

intended to use the notes to favor other creditors than plaintiffs, that any judgment

plaintiffs obtained would be frustrated due to defendant's financial condition and

dissipation of assets, and that it was almost certain that plaintiffs would prevail on the

merits. Accordingly, the court preliminarily enjoined defendant from, in any way,

disposing of the notes or otherwise affecting plaintiffs' rights in the notes. The Second

Circuit affirmed on interlocutory appeal. *Id.* at 312-13.

The Supreme Court reversed. In an opinion tracing the equity jurisdiction of the

federal courts back to the jurisdiction of the English Court of Chancery at the time of the

Revolution, the Court held that "the District Court has no authority to issue a preliminary

injunction preventing petitioners from disposing of their assets pending adjudication of

respondents' contract claim for money damages," *Id.* at 333, because the Court of

Chancery had no such authority in 1789. Although the Court weighed the pros and cons

of giving a creditor such a "nuclear weapon," it left the "debate concerning this

formidable power over debtors . . . where such issues belong in our democracy: in the

Congress." *Id.* at 329-33.

2

Joseph's claims are indistinguishable from those in *Grupo Mexicano*. This Court, therefore, lacks jurisdiction to grant the extraordinary preliminary injunction Joseph seeks.

## IN ANY EVENT, JOSEPH CANNOT SATISFY THE CRITERIA FOR A PRELIMINARY INJUNCTION

The standard for issuing a preliminary injunction is well-known. "[P]reliminary relief is to be granted only if the moving party establishes that (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction." *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir. 1989) (citations omitted). As the Supreme Court has made clear, "[a]n injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982), quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919).

Although Joseph is correct that the Court must balance these factors, and may grant an injunction if one factor is particularly strong, even if others are relatively weak, (Joseph Brief at 1), a movant must make <u>some</u> showing as to each factor. Here, Joseph fails as to each factor.

## I.    Likelihood of Success on the Merits

Joseph has virtually no chance of succeeding on the merits. To the contrary, it is likely not only that Cuneo will succeed in defeating all Joseph's claims, but also that Cuneo will succeed in the original declaratory judgment action. Indeed, Cuneo intends to move to dismiss or for summary judgment in the near future.

### A.    The Contract at Issue Bars Causes of Action One, Three and Four

Attached to Joseph's counterclaim is a copy of the Agreement of Release (the "Settlement Agreement") dated March 15, 2002, which is the contract at issue in this case. Joseph admits the validity of the Settlement Agreement. Indeed, in Count Two he sues for its alleged breach. The first clause of the Settlement Agreement says that "The parties [i.e., Cuneo and Joseph] release each other of any and all claims of any type whatsoever. . . ." The Settlement Agreement goes on to provide in Exhibit A that Joseph would receive 20% of Cuneo's net recoveries, if any, from three pending contingent fee cases: the *Gold Train* case, the *Leatherman* case and the *Kwikset* case. As to a fourth case, the *MCI* case, no payment is promised but Joseph agreed to release all liens and not file any independent fee applications.

Having entered into a valid and binding Settlement Agreement that releases "any and all claims of any type whatsoever" between him and Cuneo, which clearly includes any and all claims arising out of the four cases specifically mentioned, Joseph is now precluded from bringing new and different claims as to the same four cases. Accordingly, Joseph cannot succeed on Count One (malpractice as to the *MCI* case), Count Three (quantum meruit as to the *Gold Train* case, the *Leatherman* case and the *Kwikset* case) or Count Four (unjust enrichment as to the latter three cases).[1]

### B.    Joseph Is Unlikely to Succeed on Count Two

Exhibit A to the Settlement Agreement provides that Joseph "shall make no attempt to interfere with the pending cases or cases that follow, nor shall he attempt to

---

[1] Joseph cannot prevail on Count One for another reason. The conduct at issue occurred before 2002, the date of the Settlement Agreement. The claim is thus barred by the statute of limitations. See D.C. Code § 12-301(8).

file liens or notices of claim, or correspond with the litigants. If he does he has breached the agreement and waives his percentages."

Joseph contends in Count Two that Cuneo breached the Settlement Agreement by not promptly paying him his percentage for the *Leatherman* case upon receipt of the fee by Cuneo. Joseph denies that he breached the Settlement Agreement despite his undisputed conduct in corresponding with and ultimately suing Cuneo's co-counsel in the *Gold Train* case for additional fees and thereby waiving his entitlement to his percentages under the Settlement Agreement.

First, he baldly contrives an argument stating that the term "litigants" means "parties." Joseph has no support for his assertion. Had the parties to the Settlement Agreement simply meant "parties" they doubtless would have used that more common term. Instead they used a broader term to preclude Joseph from contacting <u>anyone</u> involved in the litigation. Moreover, even if "litigants" does mean "parties," counsel in litigation appear on behalf of and as agents for the parties. Thus contacting attorneys in a litigation is the same as contacting the parties.

In any event, it is too soon to invoke the rule *contra proferentum* which "is traditionally used only in 'cases of doubt . . . [where] other factors are not decisive.'" *United States v. Ins. Co. of North America*, 131 F.3d 1037, 1043, n.11 (D.C.Cir. 1997). In the case of this Settlement Agreement, which was negotiated to settle numerous claims between parties, both of whom are attorneys, it is unlikely the Court will ever be required to rely on this canon of construction.

Joseph next contends that he could not have interfered with the *Gold Train* case because it was terminated before he attempted to extract fees from Cuneo's co-counsel.

5

Therefore he could not have interfered with it. This is a bad argument. Although the case was settled, the District Court for the Southern District of Florida has maintained jurisdiction over the case during the implementation of the settlement over a six year period and counsel for the parties have continuing duties during that implementation period.

For example, Cuneo and his co-counsel recently filed a proposed Amended Detailed Plan of Allocation pursuant to the Court's order of January 22, 2008. *See* Notice of Filing attached hereto as Exhibit A. Thus Joseph is unlikely to prevail on his breach of contract claim.

Finally, Joseph argues that even if he did breach the Settlement Agreement, the waiver provision to which he specifically agreed is an unreasonable liquidated damages clause and void as a penalty. He is wrong. The waiver provision is not a damages clause at all. It does not say that if Joseph does something to Cuneo he owes Cuneo some amount of money. Rather it says that if Joseph does certain things in breach of the Settlement Agreement, Cuneo is then relieved of his future obligation to perform certain acts under the agreement, those acts being the obligation to make certain payments to Joseph, payments he was not obligated to make other than as a result of the Settlement Agreement.

Even if the waiver provision were held to be a liquidated damages provision, it would not likely be held void as a penalty. Joseph's reliance on *District Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714 (D.C. 2003) is misplaced. That case involved "a late fee unilaterally imposed pursuant to an adhesive contract where, notwithstanding that actual damages were ascertainable through historical costs, no effort whatsoever was

made to forecast those costs. . . which was imposed by a licensed monopoly. . . ." *Id.* at

722. On the other hand, "[w]hen a liquidated damages provision is the product of fair

arm's length bargaining, particularly between sophisticated parties, common law

suspicions may be eased and more latitude may be afforded the contracting parties to

agree as they wish on the remedies for breach." *Id.* at 723-24. That is because liquidated

damages clauses "may serve valuable purposes, as where actual damages are likely to be

difficult to quantify in the event that the contract is breached. *Id.* at 723. Here, the clause

in question was negotiated at arm's length by and between lawyers. Moreover, the

damages caused by the conduct which it sought to prevent – interference by Joseph with

pending cases – would be difficult to quantify in advance, although it was foreseeable

that interference at a delicate moment in settlement negotiations in one of the pending

cases might result in the breakdown of those negotiations and no recovery. For these

reasons, it is unlikely that the clause in question will be found void as a penalty.

### C.    Joseph Will Not Likely Succeed on Count Five

Joseph is unlikely to succeed on his claim under the D.C. Consumer

Protection Procedures Act ("CPPA"). That statute permits a person to bring an action to

obtain relief for any "trade practice" unlawful under D.C. law. D.C. Code § 28-

3905(k)(1). A "trade practice" is defined as "any act which does or would create, alter,

repair, furnish, make available, provide information about, or, directly or indirectly,

solicit or offer for or effectuate, a sale, lease or transfer, of <u>consumer goods or services</u>."

D.C. Code § 28-3901(6) (emphasis added). "[A]s an adjective, "consumer" describes

anything, without exception, which is primarily for <u>personal, household, or family use</u>."

D.C. Code § 28-3901(2) (emphasis added). And "'goods and services' means any and all

parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." D.C. Code § 28-3901(7).

Clearly the Settlement Agreement and the provision providing for waiver of Joseph's percentages in case of certain actions has nothing to do with a sale, lease or transfer of goods or services primarily for personal, household or family use. To the contrary, the Settlement Agreement is a contract entered into between professionals and intended to regulate their business and employment relationship. Therefore, Joseph will not likely succeed on this cause of action.

### D.     Joseph Will Not Likely Succeed on Count Six

Joseph is unlikely to succeed on his claim for intentional infliction of emotional distress. The elements of that tort are "extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Tiefenbacher v. AARP*, 2006 U.S.Dist. LEXIS 23629, *6 (D.D.C. 2006) (citations omitted). Moreover, because "there is no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct which causes mental distress," such a claim "must be founded upon acts 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at *7.

Joseph does not even allege all the elements of the tort. He does not allege that he has suffered severe emotional distress. Rather, he merely alleges that Cuneo's conduct raises a "high probability that emotional distress" would occur. Counterclaim, ¶ 63. Nor does he provide anything from which the Court could conclude that a garden-

8

variety breach of contract involving payment of money in a business context, if proven, would give rise to liability for this tort. It is unlikely in the extreme that Joseph will succeed on this cause of action.

## II.    JOSEPH'S SHOWING OF IRREPARABLE HARM IS INADEQUATE

Joseph's allegations of irreparable harm are clearly inadequate. At most, he shows that six years ago, during settlement negotiations, counsel bargained for an extended payment schedule for certain payments based on asserted inability to pay in a lump sum and an off-hand comment regarding the finances of contingent fee lawyers generally. Even if true and admissible (*see* Rule 408, Fed. R. of Evid.), such statements show nothing about the ability of Cuneo to pay a judgment, if obtained, in 2008. By contrast, the district court in *Grupo Mexicano* made extensive findings regarding the insolvency of the defendant, inability to pay and intention to favor other creditors, in support of the subsequently-invalidated preliminary injunction. *Id.* at 312-13. Joseph's showing here does not come close to such a showing. At most he offers speculation regarding his "fears." Joseph Brief at 4. This falls far short of demonstrating irreparable harm.

## III.    JOSEPH FAILS TO SHOW LACK OF HARM TO OTHERS

Joseph claims that Cuneo will suffer no harm if the full *Leatherman* fee of approximately $2.5 million (not simply the 20% he asserts he is entitled to under the Settlement Agreement) is placed in the Court's registry for the duration of this litigation. Joseph Brief at 5. This assertion is demonstrably false on its face. $2.5 million is a substantial sum for any law firm and, as the Court is aware, law firms use fees earned, not only for partner shares, but also to pay employees and other expenses on an ongoing

basis. To claim that no harm would accrue to Cuneo from sequestering this substantial amount of money – far more than is seriously in dispute in this litigation – with the promise that it will be returned – without interest – a year or more in the future is a frivolous contention.

## IV.    <u>JOSEPH SHOWS NO PUBLIC INTEREST IN THIS LITIGATION</u>

Finally, Joseph fails in his showing that there is a public interest in granting the requested preliminary injunction. His reliance on *Bassin* is misplaced. That case involved a class action brought under the CPPA on behalf of subscribers to cable television services provided under a District of Columbia-granted monopoly. As we have shown above, the CPPA has no applicability to this case. The present case involves only business relations between private individuals. Even in the unlikely event that the provision in the Settlement Agreement at issue were found to be void as a penalty, such a finding would affect only the parties to this litigation. The public has no interest in such an outcome.

Wherefore, for all the foregoing reasons, Joseph's motion for a preliminary injunction should be denied.


March 12, 2008                                  Respectfully submitted,


                                               STEIN, MITCHELL & MEZINES, L.L.P.

                                               __/S/_____
                                               Jacob A. Stein (D.C. Bar No. 052233
                                               1100 Connecticut Avenue, N.W., Suite 1100
                                               Washington, DC 20036
                                               (202) 737-7777 * Fax (202) 296-8312
                                               E-Mail: jstein@steinmitchell.com

CUNEO GILBERT & LaDUCA, LLP

_/S/_____
Jonathan W. Cuneo (D.C. Bar No. 939389)
David W. Stanley (D.C. Bar No. 174318)
Michael G. Lenett (D.C. Bar No. 425592)
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960 * Fax (202) 789-1813
E-Mail: jonc@cuneolaw.com

11

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2008, I electronically filed the foregoing Plaintiffs'
Opposition to Defendant's Motion for Preliminary Injunction with the Clerk of the Court using
the CM/ ECF system which will send notification of such filing to any e-mail addresses
denoted on docket.

I certify under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.  Executed on March 12, 2008

s/ David W. Stanley

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-1859-CIV-SEITZ

| | |
|---|---|
| IRVING ROSNER; EDITH KLEIN AMSTER; FRANCISC BASCH; VERONIKA BAUM; ALICE BESSENYEY; ELIZABETH BLEIER; ERWIN DEUTSCH; DR. JOSEPH A. DEVENYI; PETER DREXLER; BARUCH EPSTEIN; MAGDA FEIG; MICHAEL FRIED; PAUL GOTTLIEB; JUDITH KARMI; ETHEL KLEIN; MILDRED KLEIN; TAMÁS MAY; DAVID and IRENE MERMELSTEIN; EDITH MORE; JOHN J. RAKOS; GEORGE RASKO; ANA ROSNER; GEORG MOSHE SCHWARZ, ESTATE OF GEORGE SEBOK; DR. LASZLO SOKOLY and EDITH REINER; AGNES V. SOMJEN; OLGA STEINER; JONAS K. STERN; IRENE and ANDREW TIBOR; AGNES VADASZ; and ZOLTAN S. WEISS,on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| v. | )<br>) |
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| Defendant. | )<br>) |

**NOTICE OF FILING**

Pursuant to this Court's January 22, 2008 Order Requiring the Filing of Amended Detailed Plan of Distribution for 2008, Plaintiffs, through Class Counsel, herewith file the attached "Amended Detailed Plan of Allocation" prepared by the Conference on Jewish Material Claims Against Germany, dated February 15, 2008.

Dated: February 15, 2008

Respectfully submitted,
DUBBIN & KRAVETZ, LLP
701 Brickell Avenue, Suite 701
Miami, Florida 33131
Telephone: 305-357-9004
Facsimile: 305-371-4701

CUNEO GILBERT & LaDUCA, LLP
Jonathan W. Cuneo
David W. Stanley
R. Brent Walton
507 C Street, N.E.
Washington, D.C. 20002
(202) 789-3960

HAGENS BERMAN LLP
Steve W. Berman
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

Attorneys for Plaintiffs and the Class

By: _____
Samuel J. Dubbin, P.A.
Florida Bar No. 328189

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served by electronic mail on Jeffrey Smith, United States Department of Justice, U.S. Department of Justice, P.O. Box 883, Washington, D.C., 20044, Jeanne Geoppinger, Waite, Schneider, Bayless & Chesley, L.P.A., 1513 Fourth & Vine Tower, One West Fourth Street, Cincinnati, Ohio, 45202; and Gideon Taylor, Executive Vice President of the Conference on Jewish Material Claims Against Germany, Inc., the _____ day of February 2008.

By: _____
     Samuel J. Dubbin, P.A.

In Re Hungarian Gold Train Settlement

Case No. 01-1859-CIV

**AMENDED DETAILED PLAN OF ALLOCATION**

**SUBMITTED TO**

**Judge Patricia A. Seitz**

**Prepared by**

**CONFERENCE ON JEWISH MATERIAL CLAIMS AGAINST**

**GERMANY, INC.**

February 15, 2008

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

## Table of Contents

I. Introduction................................................................. 2

II. Funding..................................................................... 5

III. Implementation............................................................ 8

IV. Distribution of Funds...................................................... 11

      Australia............................................................ 12

      Hungary............................................................. 15

      Israel............................................................... 18

      North America........................................................ 21

      United States........................................................ 21

      Canada.............................................................. 33

      Other............................................................... 36

V. Audit Requirement.......................................................... 42

VI. Schedule of Implementation................................................. 43

VII. Conclusion................................................................ 44

Appendix A: Agency List....................................................... 46

Appendix B: Sample Allocation Letter.......................................... 50

Appendix C: Sample Guidelines................................................. 54

Appendix D: Sample Reporting Form............................................. 57

## I. Introduction

A Proposed Detailed Plan of Allocation, dated June 10, 2005, was submitted pursuant to the Court Order dated April 8, 2005 granting preliminary approval to the Settlement Agreement and Plan of Distribution[1] in <u>ROSNER V. UNITED STATES</u>, CASE NO. 01-1859-CIV/SEITZ. On March 12, 2007, the Court amended the Detailed Plan of Allocation for the Special Fund in accordance with the February 21, 2007 letter report submitted by the Conference on Jewish Material Claims Against Germany. On January 22, 2008, the Court once again amended the Detailed Plan of Allocation for the Special fund in accordance with the December 20, 2007 Supplemental Programmatic Report. Pursuant to the Court Order dated January 22, 2008, the Amended Detailed Plan of Allocation follows.

In accordance with the Plan of Distribution, the Conference on Jewish Material Claims Against Germany ("Claims Conference") is responsible for developing a specific proposal for the distribution of the Special Fund to established social service agencies to carry out programs to benefit Hungarian Jewish victims of Nazi persecution in need. The recommended social service agencies are to administer programs benefiting members of the Settlement born before May 8, 1945, who lived in the 1944 borders of Hungary sometime between 1939 and 1945 and who meet criteria of need.

The Claims Conference funds organizations and institutions around the world that provide shelter and essential social services for Jewish victims of Nazi persecution.[2] In 37 countries, the

---

[1] Settlement Agreement, Exhibit B. All documents can be viewed at www.HungarianGoldTrain.org.
[2] The Claims Conference has an over 50 year record of funding social services for Jewish victims of Nazi persecution. Between 1955-1965, the Claims Conference allocated approximately DM 450 million for the relief, resettlement, and rehabilitation of Nazi victims. Between 1980 – 1995, the Claims Conference negotiated agreements with the German and Austrian governments, Daimler-Benz, and Volkswagen enabling allocations to institutions and organizations for the benefit of Nazi victims. Since 1995, through the Claims Conference as Successor Organization, the Claims Conference has allocated over $680 million of proceeds from recovered

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

Claims Conference and local organizations makes the lives of victims easier by providing vital services that range from construction and renovation of sheltered housing and nursing homes in Israel to hunger relief programs in the former Soviet Union, from homecare in North America to emergency assistance programs across Europe.

The Claims Conference has developed relationships with established agencies in communities with substantial numbers of Jewish Nazi victims throughout the world. These agencies, usually the main social service arm of the local Jewish community, have the ability to identify the needs of Nazi victims in their communities and to bring comfort and care to those so deserving.

Social workers employed by these agencies are trained in case management. Case management is a comprehensive approach that includes assessments, entitlements screening and assistance, advocacy with outside agencies and supportive emotional counseling. The intent is to maximize all the benefits to which the client is entitled, obtain the necessary services and care, and provide on-going monitoring and support. It is estimated by agencies with which we have worked that, in the United States, for example, for each $1.00 of funding that goes toward case management services, the client benefits from $3.00 in government services such as Medicaid and Social Security benefits.

Agencies supported by the Claims Conference serve Jewish Nazi victims in need, including Jewish victims of Nazi persecution who are class members. The agencies have the ability to

---

unclaimed property in the former East Germany. In 2001, the Claims Conference negotiated with the German Foundation "Remembrance Responsibility and the Future" to receive $127 million for social programs worldwide. In 2001, the Claims Conference was appointed by Judge Edward R. Korman, Chief Judge, United States District Court, Eastern District of New York, in the Swiss Banks Settlement as an implementing body for over $46 million of social service grants under the looted assets class over a ten year period. In addition, the International Commission on Holocaust Era Insurance Claims ("ICHEIC") appointed the Claims Conference to allocate $132 million for social service allocations over a seven year period. Additional funding for social service grants have been received by the Claims Conference from the governments of Austria, France, Germany, Spain and the United States.

3

conduct outreach in order to serve an increased number of Jewish Hungarian Nazi victims in need as a result of funding from the Hungarian Gold Train Settlement.

The Special Fund will be used for programs administered by social service organizations in the following countries: Australia, Canada, Czech Republic, Hungary, Israel, Romania, Slovakia, and the United States and will be available to benefit Jewish Hungarian Nazi victims throughout Europe, South America and all countries in which Jewish Hungarian Nazi victims who are in need currently reside.

All social service providers recommended herein have previously received grants from the Claims Conference. Each agency has a proven track record of service to Jewish Nazi victims, the ability to fairly and respectfully provide services to the survivor population and the ability to document and report expenditures. The provision of services recommended in this report will be less expensive and more efficient than could otherwise be achieved because we will be building on existing infrastructure.[3]

---

[3] See Appendix A for list of agencies and addresses.

## II. Funding

The Plan is based on outreach commencing immediately after the Settlement becomes final and assumes the program funding would commence on January 1, 2006. Funding would be for years 2006-2010[4]. In this way, the Special Fund will be available to assist Jewish Hungarian Nazi victims who may be healthy now, but may require assistance in the coming years. The exact amount of funding per year is not known at this time.[5] Therefore, we are proposing to use the Special Fund as follows:

| Year | % of Special Fund |
|------|-------------------|
| 2006 | 20% |
| 2007 | 25% |
| 2008 | 33% |
| 2009 | 50% |
| 2010 | 100% |

In the first year of the program, 20% of the Special Fund will be allocated in accordance with this detailed plan. In the second year, 25% of the amount remaining in the Special Fund will be allocated and so forth until the entire amount is allocated for 2010.

Funds will be allocated to agencies on an annual basis for the five year period. Should any funds remain after the annual allocation period, they will be canceled.[6] In such an event, recommended allocations will be reviewed and may be adjusted; should that be necessary, a supplemental Detailed Plan of Allocation will be presented by the Claims Conference for Court review. Furthermore, adjustments can be made to the Detailed Plan of Allocation on a yearly basis

---

[4] See section below on the creation of a sixth year of the HGT program.
[5] There are several factors which are unknown: (i) the rate of interest that may be obtained on unallocated funds; and (ii) the fees of the escrow agent. For 2008, the amount of distribution is $4,200,000.
[6] Order dated January 22, 2008 permitted extension to spend 2007 allocations through March 31, 2008. Reporting on the granted extensions and their subsequent use of funds will be provided to the Court, following the same time periods as outlined in Section V. Audit Requirement and Section VI. Schedule of Implementation. For the Foundation for the Benefit of Holocaust Victims in Israel, both the 2006 and 2007 allocations have been extended through December 31, 2008.

should additional relevant information become available or based on performance of social service agencies. Any supplemental Detailed Plan of Allocation will be submitted in accordance with the procedure in the Plan of Distribution (Exhibit B to the Settlement Agreement, which remains in effect).

In addition, it should be noted that it is impossible to predict with accuracy the number of individuals who will meet the proposed criteria. Therefore the criteria set forth in this proposal are initial ones that are consistent with the criteria established for existing programs implemented by the agencies included in this plan. These criteria have been selected in order to commence operation of the programs and revised criteria have and may continue to be submitted to the Court for approval as agencies continue to operate the programs and the number of eligible persons is known with greater certainty, in accordance with the procedure in the Plan of Distribution (Exhibit B to the Settlement Agreement, which remains in effect).

The Claims Conference is to receive 1% of the program funds for internal administration costs.[7]

## Creation of Sixth Year of Program from Accrued Interest and Cancellations

In order to sustain the essential assistance provided by the Special Fund of the Hungarian Gold Train Settlement to needy Jewish Hungarian Nazi victims worldwide, a sixth year of the program (calendar year 2011) will be created using accumulated interest.[8] In addition to the accumulated interest, funds from cancelled grants will also be available for distribution in year six. When the

---

[7] See Plan of Distribution page 4: "Although an extensive amount of work is involved in supervising the distribution of funds over this five year period, the Claims Conference shall only request 1% of the amount distributed by the Special Fund for its internal administrative expenses." Further, as defined in the Settlement Agreement, all administrative expenses, including those of the Claims Conference and all administrative expenses of all of the social service implementing agencies, shall not exceed $1 million over the five year period.
[8] It is requested that an amount of up to $50,000 from accumulated interest will be available to conduct further outreach to Hungarian Nazi victims in Israel, informing them of the revised criteria for eligibility and the availability of assistance through this Settlement

amount of funds from interest and canceled grants is known, recommendations for distribution among the social welfare agencies will be presented by the Claims Conference for Court review.

**III. Implementation**

The programs supported by funds from this Settlement will, in large part, provide for emergency or short term assistance grants to Jewish Hungarian Nazi victims in need, in addition to services these Nazi victims may already be receiving. Since 1996, the Claims Conference has implemented emergency assistance programs through Successor Organization funds (proceeds from recovered unclaimed property in the former East Germany) as well as through funds awarded in the Swiss Banks Settlement Looted Assets Class. The Hungarian Survivor Assistance Program will be designed, like the existing Claims Conference Emergency Assistance Program, to help prevent or alleviate crises. Through the provision of short-term financial assistance, the program will enable Jewish Hungarian Nazi victims to obtain basic necessities in order to continue to live at home with dignity. The program will benefit Jewish Hungarian Nazi victims not only by providing financial assistance to cope with urgent situations but also by assuring the involvement of social service professionals in their lives.

In addition to providing emergency or short term assistance, some agencies will utilize funds to fill the critical need for ongoing homecare services, which include personal care (for example, assistance with bathing) and chore and housekeeping services. Food services such as meals-on-wheels, food vouchers and food packages are also a part of ongoing services that will be expanded in some areas. For all of the above services to be implemented, qualified case managers are required to perform comprehensive assessments of clients' needs and ensure that clients receive all entitlements and services for which they are eligible. Therefore, case management is a part of several programs included in this proposal.

Eligibility criteria for the assistance program will vary between countries and is based on several factors, including the economic situation, the availability of government funded benefits, and the specific needs of the community as identified by the Advisory Committees. The specific criteria for each country and the administering agencies are listed below.

**Advisory Committee**

A critical element in the implementation and success of the program will be the involvement of a Hungarian Survivor Advisory Committee, which each agency must create as a condition of funding received through the Hungarian Gold Train Settlement. The Committees will review requests for assistance and help publicize the availability of the funds in the Jewish Hungarian Nazi victim communities.  Outreach will also be conducted by the social service agencies through the publication of ads in their newsletters, articles in the local media and through survivor organizations in the community.

The membership of the committees will vary from agency to agency. In some instances, the committee already in place which advises on other Claims Conference funded emergency assistance programs will take on responsibility for overseeing the work related to the Hungarian Gold Train Settlement. In other cases, an entirely new committee will be formed to fill this role. However, each agency funded by the Special Fund will convene a committee comprised, to the best of the agency's ability, of a majority of Jewish Hungarian Nazi victims. The committee will generally meet on a quarterly basis.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**Supplemental Funds**

All funds will be supplemental to programs offered to Jewish Nazi victims in general and will not be diminished should other funds become available. Agencies will track expenditures related to funds received through the Hungarian Gold Train Settlement separately. [9]

**Budget Variation**

In the following section, Distribution of Funds, several organizations include program budgets for the provision of social services supported by the Special Fund. As some degree of budget variation is to be anticipated when actual expenses are reported, a variation of up to 20% of the approved budget will be accepted with the following caveats; 1) the variation may only relate to interline transfers within the approved budget[10] and 2) the variation does not apply to administration which may not exceed 3% of the allocation.

---

[9] Each agency will provide reports to the Claims Conference documenting each service provided and costs thereof, thus ensuring consistency with the Settlement Agreement and Plan of Allocation.
[10] If an organization requests the addition of a new item of service, prior court approval will be sought before the change is accepted.

**IV. Distribution of Funds**

Due to the fact that the exact amount of the Settlement was unknown, the distribution of funds is presented in percentages, rather than actual dollar amounts. The distribution and allocation of funds within a country was determined through analysis of the population distribution of Jewish Hungarian Nazi victims within each location.[11]

---

[11] The Claims Conference maintains several databases of Jewish victims of Nazi persecution for purposes of compensation. From these databases, we have identified Jewish victims of Nazi persecution from Greater Hungary. The geographic distribution of these Nazi victims within their respective countries was the basis for allocation. For instance, the database contained the names of 9,876 Hungarian Nazi victims living in the United States. Of those victims, 385 or 3.9% lived within the catchment area of Broward County, Florida. Therefore, this plan recommends that 3.9% of the funding for services in the United States be allocated to the social service agency serving Broward County. The same system was used for all recommended allocations in this Plan.

## AUSTRALIA

Of the total portion of the Special Fund reserved for Australia, 61.4% will be allocated to Sydney (Jewish Care) and 34.9% to Melbourne (Jewish Care). The additional 3.7% will be reserved for Jewish Hungarian Nazi victims residing in other parts of the country and will be administered jointly by Jewish Care in Sydney and Melbourne.

**Criteria for eligibility**: Eligibility for ongoing support services, such as case management and homecare, will be determined by a comprehensive assessment of the client's need using a recognized and established assessment protocol. Individuals with an annual income lower than AUD 11,258[12] and couples with an annual income below AUD 20,492 will receive services free of charge. A sliding scale consistent with governmental guidelines for home support services is in place to determine contributions to be made by clients.[13]

The maximum award allowable under the emergency assistance program will be USD $4,000 per client, per year.

Sydney, New South Wales

**Jewish Care**

Background: Jewish Care was founded in 1936 and is a registered nonprofit organization in Australia. Its annual budget is approximately USD $4.9 million. Jewish Care provides Nazi victims with a range of services which include an information and referral program, case

---

[12] For informational purposes, as of March 21, 2007, USD $1.00 = AUD $1.25.
[13] Low income individuals (between AUD $11,258 and AUD $27,206) will be asked to contribute AUD $5 per hour; middle income individuals (between AUD $27,206 and AUD $60,803) will be asked to contribute AUD $7.50 per hour.

management, in-home care and support, restitution assistance and advocacy, emergency assistance, and more. Services are provided with the assistance of the Claims Conference, the local Jewish community and the State and Federal government.

Program: Jewish Care plans to increase the provision of in-home care and support services for Hungarian victims of Nazi persecution.  As part of this program, assistance will be provided with all activities of daily living, including personal care, transportation (social and medical), domestic assistance, meal preparation, socialization activities and minor maintenance and home modification.

| Budget: | Service | % Total Budget |
|---|---|---|
| | Case Management | 19% |
| | Homecare | 78% |
| | Administration | 3% |
| | Total | 100% |

Allocation Amount for 2008: $66,412

Melbourne, Victoria

**Jewish Care**

Background: Jewish Care, Victoria, was established in February 2001 and is the result of a merger of Montefiore Homes and Jewish Community Services.  It has an annual budget of USD $20.7 million and is a registered nonprofit organization. Since the inception of its Nazi victim program in the 1930's, Jewish Care continues to provide this population with a range of services, including homecare, housing support, housekeeping, personal care, transport, case management, medical equipment, socialization, and more.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

Program: Jewish Care plans to provide a program of social service assistance tailored to the assessed needs of Jewish Hungarian Nazi victims. The specific services available will include homecare (personal care, respite care, housekeeping), case management, and emergency assistance. The exact mix of services offered to each eligible Jewish Hungarian Nazi victim will depend on their physical health and mental health status, living arrangements and assessed care needs, as well as the available funding.

| Budget:[14] | Service | % Total Budget |
|---|---|---|
| | Homecare | 65% |
| | Case Management | 10% |
| | Emergency Assistance | 22% |
| | Administration | 3% |
| | Total | 100% |

Allocation Amount for 2008: $38,588

---

[14] This revised budget has been approved to retroactively apply to the 2006 allocation.

14

# HUNGARY

The allocation to Hungary will be administered by the Hungarian Jewish Social Support Foundation ("MAZS") in cooperation with the Federation of Hungarian Jewish Communities ("MAZSIHISZ") and Confederation of Holocaust Survivors in Hungary ("MUSZOE & NUB"). MAZS will have overall fiscal responsibility for the allocation. MAZSIHISZ and MUSZOE & NUB will be on the Advisory Committee and participate in outreach and implementation.

**Criteria for eligibility**: Jewish Hungarian Nazi victims will be eligible for services if their income falls below HUF 88,000/month[15] for one person or HUF 132,000/month for a couple. In addition to income, other factors are taken into consideration such as the health condition of the Nazi victim, his/her expenses (such as cost of medication), and the social condition of the individual (such as the level of support available from family members, etc.). A fixed criterion is used to determine the level of entitlement based on all of the above factors. The maximum entitlement for the emergency assistance program will be $1,000 per year per person.

## MAZS

<u>Background</u>:   MAZS is an umbrella group of Jewish organizations that was founded in 1991. It is a registered nonprofit organization and has an annual budget of approximately $2.3 million. The aim of the organization is to support Nazi victims in need by providing social and medical services.

---

[15] For informational purposes, as of March 21, 2007, USD $1.00 = HUF 185.62.

**MAZSIHISZ**

<u>Background</u>: MAZSIHISZ was founded in 1990. It is a registered nonprofit organization and has an annual budget of approximately $7.5 million. The agency provides a variety of services for Nazi victims in need including food programs, medical support, cash assistance, old age homes, day care centers for the elderly, and more.

**MUSZOE and NUB**

<u>Background</u>: MUSZOE and NUB, founded in 1989, represent Hungarian Holocaust survivors and advocates for their needs. It is a registered nonprofit organization with an annual budget of approximately $70,000.

<u>Program</u>: This social service program will include homecare, home nursing, kosher food assistance, post-hospitalization rehabilitation, and emergency assistance. The home nursing program will offer Jewish Hungarian Nazi victims skilled health services such as nursing, therapy, rehabilitation, aid and specialty care in the individual's home. Through the Food Assistance Program, hot kosher meals will be provided daily to Jewish Hungarian Nazi victims who are unable to afford adequate nutrition. Dry food packages will be delivered to those who are still able to cook their own meals. Post hospitalization rehabilitation will be available to Jewish Hungarian Nazi victims at a rehabilitation center owned by MAZSIHISZ located on the shore of Lake Balaton. These services are not covered by health insurance and are provided in a Jewish environment. Funds will be used to provide three kosher meals per day to clients during their stay. Finally, a component of the program will include emergency assistance, such as rent to prevent eviction, medical care not paid for by the government, and certain medical products and medicines.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

| Budget: | Service[16] | % Total Budget |
|---------|-------------|----------------|
| | Food Assistance | 20% |
| | Homecare | 23% |
| | Home Nursing | 22% |
| | Emergency Assistance | 27% |
| | Rehabilitation Program | 5% |
| | Administration | 3% |
| | Total | 100% |

Allocation Amount for 2008: $953,400

---

[16] MAZS will be the fiscal agent and will administer this program except for food assistance and rehabilitation care which will be outsourced to MAZSIHISZ.

17

**ISRAEL**

**Criteria for eligibility**[17]: Jewish Hungarian Nazi victims will be eligible for services through the Hungarian Survivor Assistance/Individual Grants Program if their income falls below ILS 6,650[18] (USD $1,688) per month for an individual. Each request for assistance will be reviewed by the Hungarian Survivor Advisory Committee. Eligible Jewish Hungarian Nazi victims under this program may receive multiple grants up to a maximum of ILS 12,000 (USD $3,046) per person, per year from this Settlement. [19]   That is in addition to grants allocated from other sources.

For Homecare, income level for eligibility is ILS 9,445 (USD $2,397) per month for an individual and ILS 13,050 (USD $3,312) for a couple. The yearly maximum amount per person is ILS 17,316 (USD $4,395).

For Special Medical Cases, the maximum allowable per person is ILS 20,000 (USD $5,076).[20]

**Foundation for the Benefit of Holocaust Victims in Israel**

Background: The Foundation for the Benefit of Holocaust Victims in Israel ("Foundation") was established in 1994 by Nazi victims. It is a registered nonprofit organization with an annual budget of approximately $47 million.[21]  The services provided include short and long term homecare provided by skilled nurses for 14,000 Nazi victims, individual grants for health needs

---

[17] These revised guidelines are retroactively relevant to the program begun during the 2006 calendar year.
[18] For informational purposes, as of November 19, 2007, USD $1.00 = ILS 3.94.
[19] This amount has been changed from the ILS 7,000 per person maximum as per the April 2007 Amended Plan of Allocation.
[20] This amount has been changed from the ILS 5,000 per person maximum as per the April 2007 Amended Plan of Allocation.
[21] The 2006 budget was approximately $47 million, of which $16 million was funded by the Claims Conference, $3 million was funded by the Israeli Ministry of Finance, and an additional $28 was funded by Claims Conference monitored programs such as ICHEIC, Swiss Banks Settlement and German Government In-home Services Fund.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

and medical equipment, emergency response systems for survivors living alone, and a friendly visitor program.

Program:

**Homecare:** In the case of the disabled who are fully dependent on the assistance of others and who have an income exceeding ILS 6,945 (USD $1,763) monthly for the individual and ILS 10,550 (USD $2,678) for a couple, Bituach Leumi (National Insurance Institute of Israel) provides 7.5 hours of homecare.[22] Currently, the Foundation does not provide homecare to such Nazi victims. It is proposed to provide 9 weekly homecare hours for these Jewish Hungarian Nazi victims if their income exceeds the said ceiling by no more than ILS 2,500 (USD $635).

Currently, disabled Jewish Hungarian Nazi victims in Israel who are fully dependent on the assistance of others and who have an income under ILS 6,945 (USD $1,763) monthly for an individual and ILS 10,550 (USD $2,678) for a couple, receive a total of 24 hours per week of homecare. Jewish Hungarian Nazi victims whose incomes are just above the cut-off yet cannot afford this much needed care will receive it, as a result of this allocation from the Special Fund.

**Emergency Assistance/Individual Grants:** The Foundation assists Nazi victims in need by providing emergency assistance grants for the purchase of items such as eyeglasses, hearing aids, dental care and medication through its individual grants program on a one-time basis. With funding from this Settlement, eligible Hungarian survivors will be able to receive grants of up to ILS 12,000 (USD $3,046) annually toward the above mentioned purposes, even if he/she has already received assistance.

---

[22] The international standard of assessment of disability is based on review of impairment of activities of daily living (ADL.) This category referred to herein is impairment of 6 ADL and higher (previously it was 6.5 ADL and higher).

19

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**Special Medical Cases**: A special fund will be available to offer immediate assistance to Jewish Hungarian victims of Nazi persecution who suffer from complex medical problems. For such cases, the maximum allowable per person is ILS 20,000 (USD $5,076).[23]

| 2008 Budget: | Service | % Total Budget[24] |
|---|---|---|
| | Homecare | 25% |
| | Emergency Assistance/Individual Grants | 60% |
| | Special Medical Cases | 12% |
| | Administration | 3% |
| | Total | 100% |

Allocation Amount for 2008: $1,785,000

---

[23] This amount has been changed from the ILS 5,000 per person maximum as per the April 2007 Amended Detailed Plan of Allocation.

[24] Original budget: Homecare 15%, Emergency Assistance/Individual Grants 71%, Special Medical Cases 11%, Administration 3%. Funds from the first two years of the program will be available for any of the lines except administration.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

## NORTH AMERICA

## UNITED STATES

**Program Description**: All agencies in the United States will use funds from the Hungarian Gold Train Settlement to implement a Hungarian Survivor Assistance Program, with the exception of one New York agency which will provide homecare, case management and other services in addition to financial assistance.

Grants from the Hungarian Survivor Assistance Program will go toward:

- Medical/dental care not paid for by government funded programs
- Purchase of medical equipment including wheel chairs, beds, hearing aids
- Heavy-duty house cleaning
- Food assistance
- Prescription drugs
- Dentures
- Homecare
- Temporary payment of rent to prevent eviction
- Emergency utility payment (heat, hot water, electricity)
- Home equipment/repair
- Transportation

Jewish Hungarian Nazi victims in need of assistance will be assessed by a social work professional. The assessment will include medical condition, housing situation, mental health status, financial status, current services being received, and availability of family support. In this way the case worker will be able to identify other services that the individual may need or other benefits for which the individual may be eligible. Once the assessment has been completed, the case will be presented to the members of the Advisory Committee for their review. Wherever possible, cash grants will be paid directly to the vendor in order to assure the proper use of the

21

funds and to maintain the involvement of the social work professional in dealing with the problem.[25]

**Criteria for eligibility**: Jewish Hungarian Nazi victims will be eligible for services through the Hungarian Survivor Assistance Program if their income falls below 200% of the United States Federal poverty level. For 2008, the income levels are $20,800 for one person and $28,000 for a couple.[26]

Grants for services/goods under $350, if needed at once, may be approved by the case worker of the social service agency. These grants must be submitted to the Advisory Committee for review in due course. For grants over $350, the case worker must first consult with the Hungarian Survivor Advisory Committee for approval. No client may receive more than $2,500 in awards per year.[27]

The $2,500 limit per person per year is consistent with other Emergency Assistance Programs. Historically, this guideline has been effective. In many cases, indeed, emergency assistance grants amount to less than $2,500 per person per year (sometimes resulting from lack of funding). Advisory Committees also have the ability to decide in cases where an individual is in need of services amounting to more than $2,500. Every community must weigh the unique needs of the individuals being served; therefore variability is to be expected and the critical role of the Advisory Committee is underscored.

---

[25] Currently, for all Emergency Assistance Programs in the US and Canada, (such as those funded by Successor Organization and Swiss Banks Settlement Looted Assets Class) quarterly reports are sent to Selfhelp Community Services for initial review. Selfhelp provides these services on a pro bono basis. Reports are then forwarded to the Claims Conference for final review and reimbursement. The same process will be used for the Hungarian Assistance Program.

[26] See Appendix C for Assistance Program Guidelines.

[27] The $2500 cap per person is from funds of this Settlement only. Therefore, a survivor who is receiving emergency assistance grants from other funds (even those from the Claims Conference but not the Hungarian Gold Train Settlement) will be entitled to up to an additional $2,500 from this Settlement.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

Of the total portion of the Special Fund reserved for the United States, the plan for distribution is as follows:

| % | Location | Agency |
|---|---|---|
| 8.0% | Los Angeles, California | Jewish Family Service of Los Angeles |
| 1.4% | Hartford, Connecticut | Jewish Family Services of Greater Hartford |
| 3.9% | Ft. Lauderdale, Florida | Jewish Family Service of Broward County |
| 3.6% | Miami, Florida | Jewish Community Services of South Florida |
| 1.8% | Boca Raton, Florida | Ruth Rales Jewish Family Service of South Palm Beach County |
| 1.0% | West Palm Beach, Florida | Alpert Jewish Family & Children's Service of Palm Beach County |
| 1.4% | Chicago, Illinois | Jewish Federation of Metropolitan Chicago |
| 1.2% | Boston, Massachusetts | Jewish Family and Children's Service of Greater Boston |
| 1.8% | Detroit, Michigan | Jewish Family Service for Southeast Michigan |
| 4.0% | New Jersey (Statewide) | Association of Jewish Family Service Agencies |
| 16.5% | New York City, New York | Selfhelp Community Services |
| 9.5% | Brooklyn, New York | Pesach Tikvah / United Jewish Organizations of Williamsburg |
| 23.0% | Brooklyn, New York | Guardians of the Sick/Bikur Cholim of Boro Park |
| 2.4% | Monsey, New York | Bikur Cholim of Rockland County |
| 2.6% | Cleveland, Ohio | Jewish Family Service Association of Cleveland |
| 1.3% | Philadelphia, Pennsylvania | Jewish Family and Children's Service of Greater Philadelphia |
| 16.6% | United States (outside of above delineated areas) | Blue Card |

Each of the agencies listed below will operate a Hungarian Survivor Assistance Program (HSAP) for Jewish Hungarian Nazi victims (see Appendices B - D for sample allocation letter, guidelines, and reporting form).

23

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

California

**Jewish Family Service of Los Angeles**

Background: Jewish Family Service of Los Angeles ("JFS-LA") was established in 1935. It is a nonprofit 501c(3) organization with an annual budget of approximately $23.9 million. JFS-LA maintains a community-based, long-term care delivery system dedicated to providing essential health, mental health and social services for older adult populations. The range of programs include counseling, case management, nutrition programs, adult day health care, Alzheimer's day care, transportation, older adult education, congregate and home-delivered meals, homecare, advocacy, crisis intervention services and more. It has operated a designated program for Nazi victims since 1995.

Allocation Amount for 2008: $67,536

Connecticut

**Jewish Family Services of Greater Hartford**

Background: Jewish Family Services of Greater Hartford, founded in 1912, is a non-sectarian licensed mental health facility that provides mental health and social services to adults and children. It is a nonprofit 501c(3) organization with an annual budget of approximately $1.3 million. The agency provides a range of services including children and adolescent-centered therapies, caregivers, case management, parenting classes, individual and couples counseling, and programs for seniors. Jewish Family Services of Greater Hartford has operated a designated program for Nazi victims living throughout Connecticut since 1999 in partnership with Jewish Family Service of New Haven and Jewish Family Service of Bridgeport.

Allocation Amount for 2008: $11,818.80

Florida

**Jewish Family Service of Broward County**

Background:  Jewish Family Service, Inc of Broward County was established in 1963. It is a nonprofit 501c(3) organization with an annual budget of approximately $2.4 million. The primary services provided include counseling, support groups, crisis intervention, emergency financial assistance, case management, and information and referral.  Jewish Family Service, Inc of Broward County's Holocaust Survivor Assistance Program has been providing services to survivors living in Broward County for over ten years.

Allocation Amount for 2008: $32,923.80

**Jewish Community Services of South Florida**

Background: Jewish Community Services of South Florida, established in 1920, is a nonprofit 501c(3) organization with an annual budget of approximately $17 million. The agency provides a wide range of services including case management, home health care, counseling, transportation and 24-hour emergency services.  It has been operating a program specifically for Nazi victims for over 10 years.

Allocation Amount for 2008: $30,391.20

**Ruth Rales Jewish Family Service of South Palm Beach County**

Background:  Ruth Rales Jewish Family Service was established in 1979.  It is a nonprofit 501c(3) organization with an annual budget of approximately $4.9 million. The agency provides a wide range of services including counseling, psychotherapy and support groups, geriatric care management, kosher food pantry, youth support and education, and programs for the mentally ill. The specialized program for Nazi victims has been operating for over 10 years.

Allocation Amount for 2008: $15,195.60

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**Alpert Jewish Family & Children's Service of Palm Beach County**

Background:    Alpert Jewish Family & Children's Service of Palm Beach County, Inc., ("AJFCS") was established in 1972. It is a nonprofit 501c(3) organization with an annual budget of approximately $4 million.    The agency provides a wide range of social services including career counseling, children's therapy and support groups, domestic abuse outreach and support, and residential services for the mentally and physically disabled.    AJFCS has been providing specialized social services for over 10 years.

Allocation Amount for 2008: $8,442

Illinois

**Jewish Federation of Metropolitan Chicago**

Background: The Jewish Federation of Metropolitan Chicago was founded in 1900. It is a nonprofit 501c(3) organization with an annual budget of approximately $4.2 million. Holocaust Community Services ("HCS") was created in 1999 to provide resources and support to aging Nazi victims living in the Chicago metropolitan area. HCS is a collaborative effort of the Jewish Federation of Metropolitan Chicago, Jewish Family and Community Service, HIAS Chicago, and the Council for Jewish Elderly. HCS provides a range of in-home services, counseling, care management, emergency financial assistance, and group support services, as well as education and training for professionals and paraprofessionals who work with survivors in the larger community.

Allocation Amount for 2008: $11,818.80

Massachusetts

**Jewish Family and Children's Service of Greater Boston**

**(with Jewish Family Service of Metrowest and Jewish Family Service of the North Shore)**

Background: The Jewish Family and Children's Service of Greater Boston was established in 1865. It is a nonprofit 501c(3) organization with an annual budget of approximately $16.7 million. Services provided by the agency include geriatric care management, homecare, guardianship, adoption resources, individual, family and couples therapy, end of life and bereavement services, refugee resettlement, and domestic violence counseling. Since 1996, the agency, in collaboration with Jewish Family Service of Metrowest and Jewish Family Service of the North Shore, has been operating a program for Nazi victims that services most of eastern Massachusetts.

Allocation Amount for 2008: $10,130.40

Michigan

**Jewish Family Service for Southeast Michigan**

Background: Jewish Family Service was established in 1928. It is a nonprofit 501c(3) organization with an annual budget of approximately $5.6 million. The agency provides geriatric care management, counseling, homecare, transportation for seniors, counseling service for adults and families, adoption assistance, programs for victims of domestic violence, hospice and healing centers, and immigration and citizenship services. It has been operating a program for Nazi victims since 1997.

Allocation Amount for 2008: $15,195.60

New Jersey

**Association of Jewish Family Service Agencies/Jewish Family Service of Central NJ**

Background:   Jewish Family Service of Central N.J., founded in 1912, is the lead agency for the fourteen Jewish Family Service ("JFS") agencies in the state of New Jersey.[28] It is a nonprofit 501c(3) organization with an annual budget of approximately $3.2 million. Throughout the state, JFS agencies provide individual and family counseling, home health care, transportation, kosher meals-on-wheels, caregiving support, geriatric psychiatry, and volunteer services.     The Association has been operating a program specifically for Nazi victims since 1996.

Allocation Amount for 2008: $33,768

New York

**Selfhelp Community Services**

Background: Selfhelp Community Services ("Selfhelp") was established in 1936.   It is a nonprofit 501c(3) organization with an annual budget of approximately $44 million.   Last year, Selfhelp assisted nearly 5,000 Nazi victims through extensive community-based programs such as senior centers, case management, housing, and homecare in four boroughs of New York City and Nassau County. 3% of the allocation will be used for administrative costs.[29]

Allocation Amount for 2008: $139,293

---

[28] Please note that the Claims Conference will continue to work with the Association to identify which specific communities in New Jersey have a high concentration of Jewish Hungarian victims of Nazi persecution to be assisted through the Hungarian Survivor Assistance Program.
[29] The 2006 budget has been revised as follows: Case Management 10%, Emergency Assistance 87%, and administration 3%. Starting with the 2007 allocation, Selfhelp will be providing emergency assistance services only.

**Pesach Tikvah/Door of Hope**

**United Jewish Organizations of Williamsburg, Inc. ("UJO")**

Background: UJO was founded in 1966 and has been serving Nazi victims since the inception of the agency.  It is a nonprofit 501c(3) organization with an annual budget of approximately $975,000. Services provided include meals-on-wheels, entitlement assistance, case management, telephone support, housekeeping services, as well as workforce development, housing, health and nutrition education and immigration services.

Pesach Tikvah/Door of Hope was established in 1986.  It is a nonprofit 501c(3) organization with an annual budget of approximately $4.7 million.  Services provided include homecare, case management, emergency assistance, mental health counseling, respite programs for handicapped children and residential facilities for emotionally disturbed and physically handicapped men and women.  Pesach Tikvah/Door of Hope has been operating a program for Nazi victims since 2001.  Beginning in 2005, with the active involvement and support of the Claims Conference, the UJO and Pesach Tikvah have joined in a collaborative effort to ensure that the needs of Williamsburg survivors are met in a cohesive and comprehensive manner.

Program: UJO and Pesach Tikvah propose to use funds from the Hungarian Gold Train Settlement to expand personal care and chore services, enlarge the meals-on-wheels program, increase outreach and visits to homebound clients, and provide emergency cash assistance.

| Budget: | Service | % Total Budget |
|---------|---------|----------------|
| | Homecare | 17% |
| | Meals-on-Wheels | 17% |
| | Case Management | 10% |
| | Emergency Assistance | 53% |

29

| Administration | 3% |
|---|---|
| Total | 100% |

Allocation Amount for 2008: $80,199

**Guardians of the Sick/Bikur Cholim of Boro Park**

Background: Guardians of the Sick/Bikur Cholim of Boro Park was established in 1953. It is a nonprofit 501c(3) organization with an annual budget of approximately $3.4 million.  The Ezer L'Cholim Project for Holocaust Survivors, funded by the Claims Conference, began in 1999. Under the leadership of Guardians of the Sick, Ezer L'Cholim, is a consortium of five participating agencies which currently delivers services to over 1,000 Holocaust survivors residing primarily throughout Brooklyn. Participating agencies are COJO of Flatbush, Nefesh Chaya Bikur Cholim of Flatbush, Bikur Cholim Rena V'Yeshua of Staten Island, Pesha Elias Bikur Choilm D'Bobov and N'shei Ahavas Chesed.   Ezer L'Cholim services include: case management, friendly visits, medical alert systems, homecare and housekeeping, supportive counseling, medical relief services, medical equipment loans, social gatherings, restitution assistance, adult day health program, "University Without Walls" and emergency assistance. The Ezer L'Cholim project will work in close contact with the Bikur Cholim organizations of the Hungarian Hassidic groups such as Satmar, Munkatch, Vinitz, Spinka, Vien, Bobov and Pupa. 3% of the allocation will be used for administrative costs.

Allocation Amount for 2008: $194,166

**Bikur Cholim of Rockland County**

Background: Bikur Cholim of Rockland County, founded in 1981, is a nonprofit 501c(3) organization with an annual budget of approximately $1.8 million.  Services provided include

transportation, hospital visitation, cancer and fertility support programs, medical referrals, and the delivery of kosher food to hospital patients. The Holocaust Education and Relief Team (H.E.A.R.T.) program, which provides case management, counseling, homecare and housekeeping services to Nazi victims, began operating in 1999.

<u>Allocation Amount for 2008: $20,260.80</u>

<u>Ohio</u>

**Jewish Family Service Association of Cleveland**

<u>Background</u>: The Jewish Family Service Association of Cleveland ("JFSA") was established in 1875. It is a nonprofit 501c(3) organization with an annual budget of approximately $20 million. Services include counseling, case management, homecare services, in-home supports for seniors and more.  Since 1996, JFSA has operated a Nazi victim program.

<u>Allocation Amount for 2008: $21,949.20</u>

<u>Pennsylvania</u>

**Jewish Family and Children's Service of Greater Philadelphia**

<u>Background</u>: Jewish Family and Children's Service of Greater Philadelphia was founded in 1855.  It is a nonprofit 501c(3) organization with an annual budget of approximately $8.2 million. Services provided include care management, counseling, resettlement programs, substance abuse prevention programs, homemaker services, chore services, respite services and transportation. It has been operating a program for Nazi victims since 1995.

<u>Allocation Amount for 2008: $10,974.60</u>

Other

**Blue Card**

Background: The Blue Card was established in 1940.  It is a nonprofit 501c(3) organization with an annual budget of approximately $800,000. It provides financial aid to those who fled the Nazis as well as Nazi victims.  For over 10 years it has worked with the Claims Conference to provide emergency assistance grants to Nazi victims throughout the United States, particularly in communities that do not have specialized social service programs for survivors.

Program: Blue Card will administer a Hungarian Survivor Assistance Program to assist Jewish Hungarian Nazi victims in need residing in places throughout the United States that are not serviced by the social service agencies listed above. The agency will consult with direct service providers (Jewish Family Services) throughout the United States to allocate emergency assistance grants to Jewish Hungarian Nazi victims in need on a case by case basis.

Allocation Amount for 2008:  $140,137.20

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

## CANADA

Of the total portion of the Special Fund reserved for Canada, 58.1% will be allocated to Toronto (Circle of Care) and 35.9% to Montreal (Cummings Jewish Centre for Seniors). The additional 6.0% will be reserved for Jewish Hungarian Nazi victims residing in other parts of the country and will be administered by Cummings Jewish Centre for Seniors.

**Criteria for eligibility**: (same as above for the United States)

Toronto

**Circle of Care**

Background: Circle of Care was founded in 1974 as a nonprofit charitable organization to provide social services to the elderly. It has an annual budget of approximately CAD $12.1 million.[30] Its mission has expanded and it now serves clients from birth to the end of life. Circle of Care has been providing services to Nazi victims since 1996.

Program: Circle of Care plans to use Hungarian Gold Train funds for home support services, nutritional support, transportation and emergency assistance. Home support services include assistance with personal care, temporary relief from care giving, meal preparation and light housework to vulnerable, at risk seniors with long term care needs. Nutritional support will be provided to Jewish Hungarian Nazi victims through the kosher meals-on-wheels program. The Emergency Assistance Program will provide emergency financial assistance to Jewish Hungarian Nazi victims in need. These funds will be utilized at a time of crisis or when all other sources have been exhausted.

---

[30] For informational purposes, as of March 21, 2007, USD $1.00 = CAD $1.17.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

Budget:[31]

| Service | % Total Budget |
|---|---|
| Homecare | 40% |
| Meals-on-Wheels | 10% |
| Transportation | 10% |
| Emergency Assistance | 37% |
| Administration | 3% |
| Total | 100% |

Allocation Amount for 2008: $148,852.20

Montreal

**Cummings Jewish Centre for Seniors**

Background: Cummings Jewish Centre for Seniors ("CJCS") was founded in 1965 and is a registered nonprofit organization in Canada. Its annual budget is approximately CAD $4.5 million. For over 15 years, CJCS has received funding from the Claims Conference to provide services for Nazi victims. CJCS provides survivors with extensive social services including case management, homecare, emergency assistance programs, medication subsidies, transportation services and subsidies. CJCS also has day programs for those with cognitive impairment as well as socialization programs for isolated seniors.

Program: CJCS plans to hire a professional case manager (social worker) to implement this program. This individual will be responsible for outreach to Hungarian Survivors, acquainting them with available services (e.g., homecare), conducting needs assessments, developing care plans, and arranging services. Once individual care plans are developed, CJCS will use the

---

[31] The program for 2006 was implemented according to the budget in the Proposed Detailed Plan of Allocation, June 10, 2005. Starting with the 2007 allocation, Circle of Care will follow this revised budget.

34

emergency assistance funds to cover the costs of providing needed services (e.g., homecare, medication, etc.)

| Budget: | Service | % Total Budget |
|---|---|---|
| | Case Management | 15% |
| | Emergency Assistance | 82% |
| | Administration | 3% |
| | Total | 100% |

Allocation Amount for 2008: $91,975.80

Other

**Cummings Jewish Centre for Seniors**

Program: Cummings Jewish Centre for Seniors (CJCS) will administer an emergency assistance program to assist Jewish Hungarian Nazi victims in need living outside of Toronto and Montreal. The agency will consult with direct service providers (Jewish Family Services) throughout Canada to allocate emergency assistance grants to Jewish Hungarian Nazi victims in need on a case by case basis.

Allocation Amount for 2008: $15,372

**OTHER**

Of the total portion of the Special Fund reserved for the rest of the world, 13.8% will be allocated to Romania, 7% will be allocated to Slovakia, 2.1% will be allocated to the Czech Republic and 77.1% will be allocated to a program which will provide assistance to Jewish Hungarian Nazi victims in all other countries.[32]

**ROMANIA**

The allocation to Romania will be administered by the Association of Romanian Jews Victims of Holocaust ("ARJVH") in cooperation with the Social and Medical Assistance Department ("SMAD") of the Federation of Romanian Jewish Communities ("FEDROM").

**Criteria for eligibility**: Jewish Hungarian Nazi victims will be eligible for services through the Hungarian Survivor Emergency Assistance program if their income falls below $2,160 for one person or $2,808 for a couple.

Grants for services/goods under $75 may be approved by the social worker/professional of the social service agency. For grants over $75, the social worker must consult with the Hungarian Survivor Advisory Committee for approval. No client may receive more than $750 in awards per year.

---

[32] Based on the Braham Report of February 15, 2005, Annex 1 to the Plan of Distribution, Exhibit B to the Settlement Agreement, it is estimated that 13.8% of Jewish Hungarian Nazi victims (outside of those who currently reside in Australia, Canada, Israel, Hungary, or the United States) live in Romania.
In the Proposed Detailed Plan of Allocation, June 10, 2005, Czech Republic and Slovakia were part of the Rest of World category with services to be provided through the Jewish Community of Stockholm Social Department. Since portions of these countries were part of the 1944 borders of Greater Hungary, it was requested that these communities implement emergency assistance programs directly. Therefore, a portion of the 2006 allocation to the Jewish Community of Stockholm has been cancelled and reallocated to organizations in the Czech Republic and Slovakia. Future allocations will also be made to these organizations according to the percentages listed herein.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**ARJVH**

**FEDROM**

<u>Background</u>: ARJVH is a nonprofit, non-political association of Romanian victims of the Holocaust. It was established in 1990 and has an annual budget of approximately $24,000. ARJVH has about 1000 members and it implements emergency assistance programs for Romanian survivors.

FEDROM's Social and Medical Assistance Department ("SMAD") provides social and medical assistance to Nazi victims. Social assistance includes cash assistance, meals-on-wheels, homecare, and socialization activities. Medical assistance includes treatments and examinations at the medical center in Bucharest, distribution of medicine and medical devices, and home assistance provided by physicians and nurses.

<u>Program</u>: Funds will be used toward emergency assistance for Jewish Hungarian Nazi victims in Romania. ARJVH will provide cash assistance for medicine, dental needs, glasses, medical equipment, and other necessities such as the purchase of heaters in the winter and minor repairs to the home to ensure the safety and wellbeing of the survivor. Special care will be accorded to persons without family and living alone. Generally, quarterly meetings will take place in one of the larger towns in Transylvania (Cluj, Oradea, Baia Mare, Sighet, etc.). 3% of the allocation will be used for administrative costs.

<u>Allocation Amount for 2008: $35,355.60</u>

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**SLOVAKIA**

The allocation to Slovakia will be administered by the Central Union of Jewish Religious Communities (UZZNO).

**Criteria for eligibility**: Jewish Hungarian Nazi victims will be eligible for services through the Hungarian Survivor Emergency Assistance program if their income falls below $4,900 for one person or $9,000 for a couple. All grants must first be approved by the local Hungarian Holocaust Survivor Advisory Committee. Exceptions can be made in emergency situations. No client may receive more than 20,000 SKK[33] in awards per year.

Background: UZZNO is an umbrella organization that represents 11 Jewish communities throughout the Slovak Republic. This not-for-profit organization was established in 1945. The annual budget is approximately $850,000. The organization has established the *Or Chaim* program that provides comprehensive social welfare services to Nazi victims and maintains an old age home in Bratislava.

Program: The agency will implement an emergency assistance program for needy Jewish Hungarian Nazi victims. It has requested that 3% of the allocation will be used to support administrative costs.

Allocation Amount for 2008: $17,957.30

---

[33] For informational purposes, as of March 21, 2007, USD $1.00 = SKK 24.98.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**CZECH REPUBLIC**

The allocation to the Czech Republic will be administered by the KDP EZRA/Complex Homecare Agency in conjunction with the Federation of Jewish Communities in the Czech Republic.

**Criteria for eligibility**: Hungarian Nazi victims will be eligible for services through the Hungarian Survivor Emergency Assistance program if their income falls below $5,500 for one person or $10,700 for a couple. All grants must first be approved by the local Hungarian Holocaust Survivor Advisory Committee. Exceptions can be made in emergency situations. No client may receive more than 60,000 CZK[34] in awards per year.

Background: KDP EZRA/Complex Homecare Agency is a professional agency founded in 2002 by the Federation of Jewish Communities and the Prague Jewish Community to provide integrated healthcare and social services to needy Holocaust survivors and other Jewish clients throughout the Czech Republic. It is a registered non-governmental healthcare institution and has an annual budget of more than $320,000.

Program: The agency will implement an emergency assistance program for needy Jewish Hungarian Nazi victims. It has requested that 3% of the allocation will be used to support administrative costs.

Allocation Amount for 2008: $5,483.15

---

[34] For informational purposes, as of March 21, 2007, USD $1.00 = CZK 20.94.

**REST OF WORLD**

The Assistance Program for Jewish Hungarian Nazi victims residing in all other countries will be coordinated by the Jewish Community of Stockholm Social Department ("STSD"). Sweden is home to one of the largest number of Jewish Hungarian Nazi victims in the Rest of World category.[35] The program will be centralized in one location in order to maintain fiscal control and minimize expenses. STSD has many years of experience implementing programs with funding from the Claims Conference. Claims Conference will continue to work closely with this agency to administer this international assistance program for Jewish Hungarian Nazi victims.

Jewish Hungarian Nazi victims will be informed that they can contact STSD to receive assistance. Once contacted, a Hungarian/English speaking case manager will work with the client to determine financial situation, Nazi victim status, and type of need.

As needed, the case manager will work with local social service organizations (in most cases, those already part of the Claims Conference network of funded agencies worldwide) in cases in which more in depth assessment or service provision may be needed. Once the intake information is approved, financial assistance will be granted. This system will be reviewed for efficiency and effectiveness during the first year of the program. If adjustments are deemed necessary a revised program will be submitted to the Court for approval.

| Budget: | Service | % Total Budget |
|---------|---------|----------------|
| | Case Management | 17% |
| | Emergency Assistance | 80% |
| | Administration | 3% |
| | Total | 100% |

---

[35] Other countries include but are not limited to: Argentina, Austria, Belgium, Brazil, Chile, France, Germany, Great Britain, Serbia-Montenegro, Switzerland, Ukraine, Uruguay, Venezuela.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

<u>Allocation Amount for 2008:  $197,403.95</u>

## V. Audit Requirement

Agencies receiving an annual allocation under $250,000 will be required to maintain accurate books and records concerning the program for the term of the agreement and for three years from the expiration or earlier termination of the agreement. The agency must make those books and records available to the Claims Conference, its agents, officers, and employees upon reasonable request. The Claims Conference reserves the right, upon reasonable notice, to conduct, or cause to be conducted, one or more audits, including field inspections of the agency to assure that the agency is in compliance with the agreement. This right to audit shall continue for three years following the expiration or earlier termination of the agreement.

Agencies receiving an annual allocation over $250,000 will be required to conduct, in the framework of its audited financial statements, a <u>separate audit</u> of the funds received from this Settlement so that the funds are easily identifiable. In addition, the agency must provide an auditors statement confirming that the funds made available were applied exclusively for the purposes for which they were granted. In addition, all agencies must submit to any audit as ordered by Court.

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**VI. Schedule of Implementation**

Beginning December 15, 2005 and continuing on that date for each year for four years thereafter, the escrow agent will transfer the stipulated amount to the Claims Conference for allocation to the specified service providers.  No later than June 30 of the year following the completion of service, the Claims Conference shall submit to the Court financial and programmatic reports.[36] Programmatic reports shall include the type of service, number of beneficiaries for each, a description of those services and the total amount spent for each category of service – emergency assistance, home care, case management, food, etc.  For case management, the reports should also indicate, to the extent practicable, benefits obtained as a result.

---

[36] Agency audit reports shall be submitted no later than 9 months after the close of the fiscal year of the agency.

43

**VII. Conclusion**

In designing these recommendations for social service programs, we were cognizant of several features of this Settlement:

- There is a limited amount of funding available, which when distributed among such a large number of class members necessitates priority of critical services;

- As needs are diverse among regions and even within communities, we felt it was important to recommend programs which provide the greatest amount of flexibility to help meet individual needs;

- All programs funded under this Settlement must be open, transparent, and provide the highest level of accountability;

- Given the limited funding, these programs must be operated with the lowest possible administrative expenses;

- Accessibility by eligible class members – even with diverse geographic or sociological groupings is essential;

And probably most importantly:

- Given the nature of this Settlement, it is critical that Hungarian Jewish victims of Nazi persecution feel empowered to seek help from this Settlement. Often, in meetings with class members, we heard the concern that the social service agencies need to be compassionate and respectful, understanding that beneficiaries need to be made to feel that they are not beggars or supplicants. As this Settlement is from funds that are being "returned" to class members, every effort must be made to understand that this issue is fraught with emotion.

44

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

In fashioning this plan, we have taken these critical factors into account.   We believe that the plan presented herein, addresses these fundamental issues.   Each of the agencies recommended is cognizant of the challenges, has a proven track record, especially with social service programs targeted for Jewish victims of Nazi persecution, and is devoted to their wellbeing.

We are grateful to the class members worldwide, social service professionals, community leaders, and numerous others who volunteered untold hours with us: consulting, sharing, and graciously trying to help create the best possible outcome.   It is with that spirit that we respectfully submit this Amended Detailed Plan of Allocation.

45

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**Appendix A**

**Agency List**

**Australia**

Sydney:    Jewish Care
P.O.B 647
Bondi Junction,
Australia NSW 1355

Melbourne:    Jewish Care (Victoria) Inc.
Smorgon Family Building
25-27 Alma Road
St. Kilda, Victoria Australia 03182

**Hungary**

Budapest:    Hungarian Jewish Social Support Foundation
Magyar Zsidó Szociális Segély Alapitvány (MAZS)
Budapest, 1075 Síp u. 12.

Federation of Jewish Communities in Hungary
Magyarországi Zsidó Hitközségek Szövetsége (MAZSIHISZ)
Budapest, 1075 Síp u. 12.

Confederation of Holocaust Survivors in Hungary
MUSZOE and NUB
Budapest, 1062 Aradi u. 62

**Israel**

Tel Aviv:    Foundation for the Benefit of Holocaust Victims in Israel
17 Kaplan Street
Tel Aviv 64734
Israel

**North America**

**United States**

California:    Jewish Family Service of Los Angeles
6505 Wilshire Blvd., 5th Floor
Los Angeles, CA 90048

Connecticut:    Jewish Family Services of Greater Hartford
740 North Main Street
West Hartford, CT 06117

Florida:    Jewish Family Service, Inc of Broward County
100 S. Pine Island Road, Suite 230
Plantation, FL 33324

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

           Jewish Community Services of South Florida, Inc.
           735 NE 125th Street
           North Miami, Fl 33161

           Ruth Rales Jewish Family Service of South Palm Beach County, Inc.
           21300 Coleman Blvd.
           Boca Raton, Fl 33428

           Alpert Jewish Family & Children's Service of Palm Beach County, Inc.
           4605 Community Drive
           West Palm Beach, Fl 33417

Illinois:      Jewish Federation of Metropolitan Chicago
           One South Franklin Street
           Chicago, IL 60606

Massachusetts: Jewish Family and Children's Service of Greater Boston
           1430 Main Street
           Waltham, MA 02451

Michigan:     Jewish Family Service for Southeast Michigan
           6555 W. Maple
           West Bloomfield, MI 48232

New Jersey:   Association of Jewish Family Service Agencies
           655 Westfield Avenue
           Elizabeth, NJ 07208

New York:    Selfhelp Community Services, Inc.
           520 Eighth Avenue, 5th floor
           New York, NY 10018

           Pesach Tikvah/Door of Hope
           18 Middleton Street
           Brooklyn, NY 11206

           United Jewish Organizations of Williamsburg, Inc. (UJO)
           32 Penn Street
           Brooklyn, NY 11211

           Guardians of the Sick/Bikur Cholim of Boro Park
           5216 Eleventh Avenue
           Brooklyn, NY  11219

           Bikur Cholim of Rockland County
           25 Robert Pitt Drive, Suite 1011
           Monsey, NY 10952

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

Ohio:                Jewish Family Service Association of Cleveland
                     24075 Commerce Park Road
                     Beachwood, OH 44122

Pennsylvania: Jewish Family and Children's Service of Greater Philadelphia
                     2100 Arch Street, 5th Floor
                     Philadelphia, PA 19103

Other:               Blue Card, Inc.
                     171 Madison Avenue, Suite 1405
                     New York, NY 10016

**Canada**
Toronto:             Circle of Care
                     530 Wilson Avenue, 4th Floor
                     Toronto, Ontario M3H 1T6

Montreal:            Cummings Jewish Centre for Seniors
                     5700 Westbury Avenue,
                     Montreal, Quebec H3W 3E8

Other:               Cummings Jewish Centre for Seniors
                     5700 Westbury Avenue,
                     Montreal, Quebec H3W 3E8

**Other**
Romania:             Association of Romanian Jews Victims of Holocaust (ARJVH)
                     11 Vasile Adamache str
                     Bucharest 030783
                     Romania

                     Federation of Romanian Jewish Communities (FEDROM)
                     Str. Sf. Vineri Nr. 9-11
                     Sector 3
                     Bucharest 70478
                     Romania

Slovakia:            Central Union of Jewish Religious Communities in the Slovak Republic
                     Kozia ul. 21
                     Bratislava, 814 47
                     Slovakia

Czech Republic: Federation of Jewish Communities
                     KDP EZRA/Complex Homecare Agency
                     Maiselova 18, P.O. Box 297
                     Praha 1, 110 01
                     Czech Republic

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

Sweden:          Jewish Community of Stockholm
                 P.O. Box 7427
                 Stockholm 10391
                 Sweden

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**Appendix B**

### Sample Allocation Letter for Assistance Program in North America

[Date]

[Agency Name]
[Address]

Attn:  [Contact Name], [Title]

**<u>Fund</u>: HGT3**
**<u>Application Number</u>: XXXX**

Dear [Contact Name],

I am pleased to inform you that your organization has been granted an allocation of $XX,XXX toward an emergency assistance program for Jewish Hungarian Nazi victims for the period of January 1, 2008 through December 31, 2008.

These funds are from the Settlement of a class action regarding the Hungarian Gold Train (Rosner v. United States) under the jurisdiction of Judge Patricia A. Seitz, and are to be used to benefit **<u>only</u>** needy Jewish Hungarian Nazi victims born before May 8, 1945 who lived within the 1944 borders of Hungary between 1939 and 1945.  The Conference on Jewish Material Claims Against Germany has made this allocation pursuant to the terms of the Settlement Agreement under Court jurisdiction.

Funds will be released as required according to the actual progress of the program.  Please note that no funds will be disbursed unless the agency is in compliance with the terms and conditions of this agreement.

This allocation is being made on the condition that you will do the following:

(1)    complete the attached acceptance of grant terms and submit it to the Claims Conference within 30 days of receipt of this letter, along with the attached banking form;

(2)    distribute funds provided to you through this grant for the benefit of Jewish Hungarian victims of Nazi persecution in accordance with the attached guidelines;

(3)    continue your current emergency assistance program, and use these funds as supplemental assistance to Jewish Hungarian Nazi victims as defined above;

(4)    continue consulting with your Hungarian Holocaust Survivor Advisory Committee which shall approve grants under this program. This committee is to be comprised of a majority of Jewish Hungarian Nazi victims. Please submit a current list of Advisory Committee members within 30 days of receipt of this letter and provide minutes of the committee's meetings on a quarterly basis;

(5)    maintain accurate books and records concerning the program for the term of this

50

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

agreement and for three years from the expiration or earlier termination of this agreement, and make those books and records available to the Claims Conference and its agents, officers, and employees upon reasonable request. The Claims Conference shall have the right, upon reasonable notice, to conduct or cause to be conducted one or more audits, including field inspections, to ensure that your organization is in compliance with this agreement. This right to audit shall continue for three years following the expiration or earlier termination of this agreement;

(6)    furnish quarterly reports on the utilization of funds for this program in accordance with the forms provided;

(7)    allow access to the Claims Conference General Controller or any other duly authorized Claims Conference representative to review your financial and programmatic records as they relate to this allocation;

(8)    include a statement in your promotional material for this program, as well as in your annual reports, website and other publications, to the effect that you received funds from the Settlement of a class action regarding the Hungarian Gold Train (Rosner v. United States) under the jurisdiction of Judge Patricia A. Seitz, administered by the Conference on Jewish Material Claims Against Germany for the benefit of needy Jewish Hungarian Nazi victims. Please send us copies of the reports for our files;

(9)    notify each beneficiary of this program that funds were made available by the Hungarian Gold Train Settlement. Please send a sample copy of the notification to our office within 30 days of receipt of this letter;

(10)  agree that you will not enter into any subcontract with any person, corporation or other legal entity in any jurisdiction to provide work, labor or services in respect to your undertakings related to this allocation, unless it contains assurances that none of your directors, officers, or employees have or will have a financial relationship with the proposed subcontractor. Any subcontract not meeting these criteria must be submitted for approval to the Claims Conference at least 30 days prior to concluding such subcontract and must contain full particulars, including a copy of the proposed agreement;

(11)  agree to the cancellation of the balance of this allocation if these funds have not been depleted by December 31, 2008. All reimbursement requests must be submitted no later than March 31, 2009 or funds will be forfeited, unless an extended time schedule for implementation has been requested in writing and agreed to in writing in advance by the Claims Conference;

(12)  submit to the jurisdiction of the state of New York and agree that any disputes that may arise from the implementation of this allocation shall be settled under the laws of the state of New York and in the courts of that state;

51

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

(13) return any funds paid to you in the event that the above conditions are not fulfilled or if the funds are not used for the purposes for which they were allocated.

Should any of the above conditions not be met, in all or part, the Claims Conference reserves the right to terminate any grant to your organization in whole or in part.

Where possible, you are strongly encouraged to conduct outreach to Jewish Hungarian Nazi victims to ensure that eligible individuals are aware of the programs funded by this settlement.

In order to accept the terms of this allocation, you must complete the form at the bottom of this letter and return it to our office within 30 days of receipt along with all documentation as stated in the conditions above. Only completed forms will be accepted.

To expedite communication, please refer to Application Number XXXX in all future correspondence.

The Claims Conference is pleased to assist you in your efforts to extend care to elderly Jewish Nazi victims and wishes you continued success in your undertakings.


Sincerely,



Greg Schneider
Chief Operating Officer


GS/xx

---

## ACCEPTANCE OF GRANT TERMS

I, the undersigned, certify that I am duly authorized by [Agency Name] to execute contracts on behalf of and binding on the organization. I further certify and declare that the above terms of the allocation by the Conference on Jewish Material Claims Against Germany for Application Number XXXX are hereby accepted.    Attached please find **one** of the currently valid documents, authorizing me to execute this contract and thereby bind the organization to it:

1. An auditor's confirmation that I, the signatory, have power of attorney from the organization, dated _____, and in full effect, authorizing me to execute contracts on its behalf; OR

2. Minutes of the Board meeting, dated _____, duly attested by the Corporate Secretary, Chairman of the Board, or President, authorizing me, the undersigned, to execute contracts on behalf of and with binding effect on the organization; OR

52

3. A Board resolution, dated _____, authorizing me, the signatory, to execute contracts on behalf of the organization, certified by the Corporate Secretary, Chairman of the Board, or President of the organization and presently in full effect.

Seal of the Corporation (if applicable):


Print name and title: _____

Signature: _____

Date: _____

53

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

**Appendix C**
**Sample Guidelines for an Emergency Assistance Program for Hungarian Nazi Victims in the US and Canada**

A local Hungarian Holocaust Survivor Advisory Committee shall be formed to oversee the implementation of programs for needy Jewish Hungarian Nazi victims. At least a majority of the members of this committee must be Hungarian Nazi victims. If an Advisory Committee is already in place, it may be used for this program as well, however a majority of its members must be Hungarian Nazi victims. Outreach for the Emergency Assistance Program for Hungarian Nazi victims should occur through the social service agency and the Advisory Committee.

Evaluation of grant requests and recommendations - positive and negative - shall be made by the Jewish social service agency and presented to the Hungarian Holocaust Survivor Advisory Committee.

Eligibility Guidelines:
1.     Income Level - Grants may be given to Jewish Hungarian Nazi victims whose income is below 200% of the United States Federal poverty level.

> 1 person:    $20,800 USD
> 2 people:    $28,000 USD

2.     Assets - Preference shall be given to those Jewish Hungarian Nazi victims whose assets do not exceed $20,000 USD for individuals and $30,000 USD for couples (excluding automobile).

3.     Expenses - An applicant's expenses, in relation to their income, should be taken into account. When income, even if over the level listed above, is insufficient to meet basic living expenses, the applicant may be considered for assistance.

4.     In addition to checking the actual financial need of the applicant, great care should be given to their physical and mental condition. This is particularly true when such condition prohibits the applicant from looking for other sources of income or assistance, which may be available.

5.     Purposes for which grants may be considered include:
     (a)  Emergency rent to prevent eviction
     (b)  Emergency relocation
     (c)  Emergency medical care not paid by Medicare and/or Medicaid
     (d)  Certain medical products such as wheel chairs, special seating and beds, hearing aids, etc.
     (e)  Heavy duty house cleaning
     (f)  Medically-related assistance such as air conditioner for emphysema patient
     (g)  Funds to prevent utility shut-off
     (h)  Clothing needed for winter
     (i)  Emergency food assistance
     (j)  Funeral expenses, where there is no other community resource available

54

Of course, the above are just examples, since there is no way to foresee all circumstances which will require assistance. Therefore, it is necessary to evaluate each case individually. Supervision is the responsibility of the local Hungarian Holocaust Survivor Advisory Committee, which must work closely with the Jewish social service agency.

Required Documentation:

1.    Applicants must provide documentation regarding income and assets; if unwilling, then assessment/home visit by a social worker will be necessary to determine need.

2.    Applicants must provide basic information (i.e., where they were born, where they were during the Holocaust, when they left Europe, etc.) to establish their status as a Hungarian Nazi victim. This should be obtained verbally and should not require onerous documentation on the part of the applicant.

3.    Applicants should provide documentation whenever possible to justify the need for emergency funds, such as a letter from a doctor regarding health situation, eviction notice, bill from pharmacy, etc.

Procedure for decision-making:

1.    Meetings of the Hungarian Holocaust Survivor Advisory Committee shall be convened according to the need of the program.

2.    Emergency funds of up to $350 USD, if needed at once, may be granted immediately by the local social service agency. The Hungarian Holocaust Survivor Advisory Committee shall review these grants in due course.

3.    Grants over $350 USD must first be approved by the local Hungarian Holocaust Survivor Advisory Committee. Exceptions can be made, for example in situations when additional amounts are needed for rent to prevent eviction or other similar emergencies of a critical nature.

4.    An applicant may receive no more than a total of $2,500 USD in any 12- month period.[37] The Hungarian Holocaust Survivor Advisory Committee has discretionary authority to recommend amounts exceeding $2,500 in exceptional cases.

5.    Confidentiality of applicants shall be maintained by the local social service agency. All identifying information (e.g. name, address, etc.) shall be deleted from documents that are presented to the Hungarian Holocaust Survivor Advisory Committee.

Implementation of the Program:

1.    Grant checks should be payable to a vendor or service provider, not to the applicant (except if the amount is minimal and for food, etc.).

---

[37] The $2,500 cap per person for this program is in addition to the maximum amount per person for existing Claims Conference emergency assistance programs. Therefore a survivor who is receiving emergency assistance grants from Claims Conference administered funds other than the Hungarian Gold Train (HGT) will be entitled to up to an additional $2,500 from this Settlement.

55

*Claims Conference – Amended Detailed Plan of Allocation – February 15, 2008*

2.      Notification must be sent to the applicant that funds for this program were made available by the Hungarian Gold Train Settlement.

3.      To request reimbursement submit quarterly statistical reports using the enclosed reporting forms.  Please report only on disbursed funds, not on funds designated for individuals but not yet paid.  These reports should be sent to:

**Hungarian Gold Train Assistance Program**
**c/o Mr. Elihu Kover**
**Vice President, Nazi Victim Services**
**Selfhelp Community Services, Inc.**
**520 8th Avenue**
**New York, New York  10018**

# Appendix D: Sample Reporting Form, Assistance Program for Hungarian Nazi Victims

**Hungarian Gold Train (HGT)**
**Emergency Assistance Program for Hungarian Nazi Victims**
**Detailed Reporting Form – US**

Agency Name: _____

Quarter: _____ to _____     Grant Number: _____

| Date of Grant | Initials of Grantee | Purpose of grant | Amount (US Dollar $) | *Details of Nazi Persecution TYPE | PLACE | DATE | Residence in Greater Hungary 1939-1945** CITY/TOWN | DATE |
|---|---|---|---|---|---|---|---|---|
| 1 | | | $ | | | | | |
| 2 | | | $ | | | | | |
| 3 | | | $ | | | | | |
| 4 | | | $ | | | | | |
| 5 | | | $ | | | | | |
| 6 | | | $ | | | | | |
| 7 | | | $ | | | | | |
| 8 | | | $ | | | | | |
| 9 | | | $ | | | | | |
| | | Total: | $ | | | | | |

Date Submitted: _____               Report Prepared by: _____

*Example - Ghetto (Type), Budapest (Place), 1944 (Date)
**When listing the place of residence please include the name of the closest city/town that appears on the "Definition of a Hungarian Nazi Victim" form.
To be eligible the client must have lived within the 1944 borders of Greater Hungary between 1939 and 1945.

**Submit this form with Holocaust Survivor Advisory Committee minutes to Mr. Elihu Kover, Vice President of Nazi Victim Services, Selfhelp Community Services, 520 Eighth Ave, NY, NY 10018**

For an electronic copy of this form go to: http://www.claimscon.org/allocolocationsrf/emergency/HGT-rf.asp
Username: allocationsrf, Password: socialvrc1, Click on Detailed Reporting Form - US

Updated 3/21/2007