## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE CUNEO LAW GROUP, P.C., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08-00253 (RBW) |
| | ) | |
| JOEL D. JOSEPH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO THEIR ACTION FOR DECLARATORY JUDGMENT AND MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT AS TO DEFENDANT JOSEPH'S COUNTERCLAIMS

Plaintiffs Jonathan W. Cuneo and The Cuneo Law Group, P.C., (collectively "Cuneo") respectfully submit this reply memorandum in support of (1) their motion for summary judgment as to their Declaratory Judgment action and Defendant Joel D. Joseph's ("Joseph") Second Cause of Action; and (2) their motion to dismiss Defendant's First, Third, Fourth, Fifth and Sixth Causes of Action for failure to state a claim upon which relief may be granted.

### I.    JOSEPH HAS NOT MET HIS BURDEN TO SHOW THAT THERE IS A GENUINE ISSUE FOR TRIAL AS TO THE DECLARATORY JUDGMENT ACTION AND THE BREACH OF CONTRACT COUNTERCLAIM

In opposing Cuneo's motion for summary judgment as to its declaratory judgment claim and against Joseph's breach of contract counterclaim, Joseph adds nothing new and largely ignores Cuneo's arguments.   He utterly fails in his burden of showing the existence of a genuine, material issue for trial.

### A.    The *Gold Train* Case Is Still Pending

As to the central issue – whether he interfered with one of the "pending cases" -- Joseph persists in his wrong-headed argument that because the *Gold Train* case was "settled," it was no longer "pending" in the meaning of the Settlement Agreement when he sued Cuneo's co-counsel in that case.  He simply ignores the proffered evidence of continuing court jurisdiction over that case and substantial continuing activity by the court and counsel up until the present time, all of which establish that the case is still "pending" despite its administrative closure.

Indeed, Joseph ignores even his own prior recognition of the pending status of that case.  When Joseph sued Cuneo's *Gold Train* co-counsel in Miami, the defendants there requested the court to transfer the case to the docket of the Honorable Patricia Seitz, the judge presiding over the *Gold Train* case, pursuant to Local General Rule 3.9D of the United States District Court for the Southern District of Florida.  That rule provides that:

> [w]henever an action or proceeding is filed in the Court which involves subject matter which is a material part of the subject matter of another action or proceeding <u>then pending before this Court</u>, or for other reasons the disposition thereof would appear to entail the unnecessary duplication of judicial labor if heard by a different Judge, the Judges involved shall determine whether the newly filed action or proceeding shall be transferred to the Judge to whom the earlier filed action or proceeding is assigned. (emphasis added).

In their motion, defendants argued that:

> [a]lthough the [*Gold Train*] case is closed for administrative purposes, Judge Seitz "retain[ed] exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, conditions and obligations of this Final Order and Judgment, including all matters relating to the consummation, performance and enforcement of the Settlement Agreement ."  Thus, the [*Gold Train*] case, despite its administrative closure, remains "pending" before Judge Seitz.  Indeed, Judge Seitz continues to preside over

the case and issue orders, including orders regarding the allocation and distribution of attorneys fees.

Defendants' S.D. Fla. Local General Rule 3.9D Notice of Similar Action, attached as Exhibit A to the Declaration of David W. Stanley ("Stanley Decl.") (citations omitted).

Not only did Joseph not dispute defendants' characterization of the *Gold Train* case as "pending," he filed no opposition at all to the transfer request and the case was subsequently transferred to Judge Seitz. *See* Order Transferring Case and Civil Docket, # 11, Case No. 1:06-cv-20465-PAS, S.D. Fla., attached to Stanley Decl. as Exhibits B and C Joseph's silence then strongly indicates his understanding that the *Gold Train* case was in fact "pending." He should not be heard now to say the contrary.

### B.    The Term "Litigants" Includes Attorneys

In similar fashion, Joseph persists in his mantra-like assertion that "litigants" means "parties," and since he only corresponded with lawyers he didn't breach the Settlement Agreement. He cites a single dictionary definition for this proposition, but other dictionaries are to the contrary. *See, e.g.*, The New Shorter Oxford English Dictionary, Vol. 1 (1993), p. 1606: "litigant ... *n.* A person engaged in a lawsuit or dispute."; Random House Webster's College Dictionary (1991), p. 793: "litigant *n.* 1. a person engaged in a lawsuit." Such broader definitions clearly encompass not only a party, but counsel serving on a party's behalf.

This does not mean, as Joseph appears to argue, that the term "litigant" is ambiguous. It simply means that the Court must interpret the term as a question of law, honoring the intentions of the parties and not torturing terms to create ambiguity where none exists. *Unfoldment, Inc. v. District of Columbia Contract Appeals Board*, 909 A.2d

3

204, 209 (D.C. 2006). As Cuneo argued in its initial brief, the context here – class actions against the United States and two corporations – clearly shows that the mischief primarily intended to be prevented was correspondence or other interference with *counsel* for the parties, not the parties themselves. Joseph has no response to this point.

C.    **Joseph Interfered With the *Gold Train* Case**

Even if Joseph were correct as to the meaning of the term "litigant," it avails him nothing. The thrust of Cuneo's claim of breach is not simply that Joseph corresponded with litigants, but that his conduct constituted the filing of a lien or notice of claim and that he otherwise interfered in a substantial way with the *Gold Train* case and thereby materially breached the Settlement Agreement. Joseph does not dispute, except by bald assertion to the contrary, that he interfered with the *Gold Train* case. The affidavits of Jonathan W. Cuneo and Samuel J. Dubbin describing in detail how Joseph's conduct interfered with the settlement administration of the *Gold Train* case thus stand uncontradicted and Joseph has failed in his burden to raise a genuine, material issue of fact sufficient to avoid summary judgment. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

D.    **The Waiver Provision Is Not a Liquidated Damages Clause, But Even If It Were, It Is Not a Penalty**

Joseph also ignores Cuneo's argument that the waiver provision in the Settlement Agreement is not a damages provision at all, but simply a provision that relieves Cuneo of the obligation to further perform in the event of certain conduct by Joseph, including interference with a pending case. Instead he simply continues to rely on the same inapplicable consumer cable television case, *District Cablevision Ltd. Partnership v.*

4

*Bassin*, 828 A.2d 714 (D.C. 2003). But even if Joseph were correct that the provision at issue is a liquidated damages clause, the *Bassin* case is unhelpful to his position.

Joseph argues that Cuneo's damage is slight,[1] whereas his loss of a $460,000[2] payment is so disproportionate as to constitute a penalty. This retrospective analysis is simply wrong, as the language he quotes from *Bassin* makes clear. Rather, the analysis is forward looking: "liquidated damages must not be disproportionate to the level of damages <u>reasonably foreseeable at the time of the making of the contract</u>." 828 A.2d at 725 (citation omitted; emphasis added). At the time the Settlement Agreement was negotiated neither the amount Joseph would receive or waive in the event of breach, nor the damage which might be incurred as a result of his breach, were reasonably foreseeable. All were based on contingencies that had not yet and might never occur and which could not be quantified. What was foreseeable, however, was that interference by Joseph could have a negative effect on the outcome of the cases. Thus this is exactly the type of situation considered "particularly appropriate" under D.C. law for a liquidated damages clause, because "the damages to be ascertained are uncertain in amount and cannot be easily ascertained." *S. Brooke Purll v. Vailes*, 850 A.2d 1135, 1138 (D.C. 2004). Indeed, as the *Bassin* case makes clear, "[w]hen a liquidated damages provision is the product of fair arm's length bargaining, particularly between sophisticated parties, common law suspicions may be eased and more latitude may be afforded the contracting parties...." 828 A.2d at 723-24. This provision, negotiated by and between attorneys, where the damages which might be sustained were essentially unknowable, is a classic

---

[1] Joseph contends that Cuneo's damage is at most $12,500, the amount of the settlement he received in the case in Miami. He ignores Cuneo's affidavit in which he states that his out of pocket costs to indemnify his co-counsel were in excess of $35,000, not counting unquantified time and firm overhead.

[2] The correct amount would be $438,196. *See* Affidavit of Jonathan W. Cuneo, ¶ 12.

case for such latitude and Joseph cannot meet his burden of establishing that the clause

was an impermissible penalty. *See Vailes*, 850 A.2d at 1138.

## II.    JOSEPH'S MALPRACTICE, *QUANTUM MERUIT* AND UNJUST ENRICHMENT CLAIMS FAIL TO STATE A CLAIM

### A.    The Claims Are Not "Reopened"

In a vain attempt to save his claims for malpractice, *quantum meruit* and unjust

enrichment, which he implicitly concedes were released by the Settlement Agreement,

Joseph argues that Cuneo's alleged failure to pay him what he is due under the Settlement

Agreement reopens the underlying claims.  If Joseph wishes to pursue this route he is free

to do so, though it would vitiate his breach of contract claim and waive his right, if any

remains, to 20% of the recoveries in the *Leatherman* and *Kwikset* cases.  But he cannot

do it here.  Rather, as the very case he cites makes clear, he must do so by moving the

Court in the original case (*Joseph v. Cuneo Law Group, P.C., et al.*, Civil Action No. 01-

CV01755) to reopen that case and set aside the Settlement Agreement.  Until and unless

he successfully accomplishes that result, the subject claims remain released and he cannot

proceed on them here.

### B.    The Malpractice Claim Is Barred By the Statute of Limitations

In an apparent attempt to get around Cuneo's argument that his malpractice claim

is also barred by the D.C. three year statute of limitations, Joseph asserts that he has in

the past two years been the subject of collection efforts in connection with debts that

were the subject of the *MCI* case.  Even if true, this fact cannot revive his claim.

In the District of Columbia, the statute of limitations for legal malpractice claims

is governed by the discovery rule, as modified by the continuous representation rule.  As

explained by the D.C. Court of Appeals:

The discovery rule provides that a claim does not accrue until a plaintiff knows, or by the exercise of reasonable diligence should know, of (1) an injury, (2) its cause, and (3) some evidence of wrongdoing. The statute of limitations will not begin to run until the plaintiff either has actual notice of the cause of action or – given the obligation to discover the discoverable – has 'inquiry notice' as of the time a reasonable investigation would have led to actual notice. Thus the plaintiff need not be fully informed about the injury for the statute to begin running; she need only have *some* knowledge of *some* injury. In short, knowledge is deemed sufficient if the plaintiff has reason to suspect that the defendant did something wrong, even if the full extent of the wrongdoing is not yet known.

As a modification of the discovery rule this court, for policy reasons, has adopted the 'continuous representation rule' under which a legal malpractice will not accrue until the representation is terminated, even though the client's knowledge might otherwise have triggered the statute earlier.

*Wagner v. Sellinger*, 847 A.2d 1151, 1154-55 (D.C. 2004) (citations omitted; emphasis in original).

A review of facts of record and of which the Court may take judicial notice clearly establishes that any legal malpractice claim Joseph may have had is time-barred. Joseph's claim seems to be composed of the following elements: Cuneo did not keep him informed about the status of the *MCI* case; Cuneo did not represent Joseph's interests in that case; Cuneo received compensation from other than Joseph in that case without Joseph's consent and refused to inform him of the amount; and Joseph himself did not receive an incentive fee as a representative plaintiff in that case. Counterclaim, ¶¶ 30-34.

Without commenting on the dubious merits of Joseph's malpractice claim, it is abundantly clear that Joseph was well aware of all these concerns almost five years ago, at the latest. On September 30, 2002, Joseph filed a *pro se* motion in the U.S. District Court for the Southern District of Illinois in *In re: MCI Non-Subscriber Telephone Rates*

7

*Litigation*, MDL No. 1275 (S.D. Ill. 2002), seeking an award of attorney's fees and/or a

representative plaintiff fee for himself. A copy of Joseph's motion is attached to the

Stanley Decl. as Exhibit D. In denying the motion, Judge Herndon wrote:

> Joseph's main argument in support of his motion for attorney's
> fees appears to be that his attorneys' work was sub-par. Joseph
> argues that his attorneys, as well as other attorneys representing
> the Class, invested a 'minimal amount of time' in this case and
> engaged in 'minimal labor.' However, as the Class points out, a
> review of the docket sheet substantiates the amount of time Class
> Counsel spent litigating this case. Additionally, Joseph attacks
> the settlement recovery that Class Counsel obtained on behalf of
> the Class. This is hardly a basis for claiming entitlement to share
> in attorneys' fees.
>
> Further, Joseph takes issue with the fact that Class Counsel did not
> move for summary judgment. This is not a proper forum to address
> such an issue. <u>If Joseph is dissatisfied with his attorney's
> representation during this case, perhaps Joseph should take that up in
> a malpractice action.</u>

Memorandum and Order, October 28, 2002, attached to Stanley Decl. as Exhibit E, at

p.2-3 (emphasis added). Judge Herndon also rejected Joseph's request for a

representative plaintiff award, holding that because Joseph was not a named plaintiff in

the consolidated complaint he assumed none of the responsibilities of a representative

plaintiff. Indeed, "[a]fter the Class was consolidated, Joseph took no actions to protect

the interests of the Class and participated very little, if any, in the actual ongoing

litigation." *Id.* at 4.

As for his concerns about Cuneo's receipt of fees, this too was the subject of an

unsuccessful motion by Joseph before Judge Herndon. Joseph moved for an order

requiring disclosure of the allocation of the court-approved fee award among Class

Counsel. The court rejected this request on July 17, 2003, noting that it had "authorized

and directed Class Counsel to distribute the fee award to Class Counsel in accordance

8

with the agreement among them" and that that allocation was not required to be made public, including to Joseph. Memorandum and Order, attached to Stanley Decl. as Exhibit F, at 2.

In short, it is beyond dispute that by July 17, 2003, at the very latest, and probably much earlier, Joseph was on notice of all the claims he seeks to raise here. Since this is more than three years prior to when Joseph filed the instant malpractice claim,[3] the only remaining issue is whether the continuous representation rule would toll the period. It clearly does not. Cuneo's representation of Joseph with respect to the *MCI* case had indisputably come to an end at least as early as September 30, 2002, if not sooner, when Joseph filed a *pro se* motion in the *MCI* case alleging that he had been "nominally represented by" Cuneo and seeking an award of attorneys' fees and/or a representative plaintiff award for himself. Because Joseph was on notice of his purported claims against Cuneo more than three years ago and because Cuneo's representation had ended more than three years ago as well, Joseph's legal malpractice claim is time-barred and must be dismissed.[4]

## III.   THE CONSUMER PROTECTION PROCEDURES ACT IS INAPPLICABLE

Joseph's vain attempt to save his claim under the D.C. Consumer Protection Procedures Act ("CPPA") is unavailing. His quotation from the case of *DeBerry v. First Gov't Mortg. & Investors Corp.*, 743 A.2d 699, 702 (D.C. 1999), which he misleadingly augments by his insertion of the bracketed word "[broad]" is of no help. Even if the case

---

[3] The statute of limitations for legal malpractice claims is three years. *Weissberg v. Williams, Connolly & Califano*, 390 A.2d 992, 994 (D.C. 1978).

[4] It is irrelevant that Joseph may have continued to suffer effects from the alleged malpractice within three years. The alleged malpractice itself was complete more than three years ago. Moreover, even if Joseph alleged a continuing tort, which he does not, the continuing tort doctrine has been rejected by the D.C. Court of Appeals. *Hendel v. World Plan Exec. Council*, 705 A.2d 541, 546 (D.C. 1997).

did say the definition of trade practices was broad, broad does not mean without limitation. While it may be true that Cuneo is in the business of providing consumer legal services, the dispute between Joseph and Cuneo which the Settlement Agreement resolved concerned the employment relation between Joseph and Cuneo and only indirectly the provision of those legal services.

If Joseph's interpretation were correct, a shelf stocker in a grocery store who had an employment dispute with the store owner could sue under the CPPA because his work of stocking shelves was "incidental" to the consumers' purchase of groceries off the shelves. That this cannot be so is demonstrated by the case of *Mazanderan v. Independent Taxi Owners' Ass'n, Inc.*, 700 F. Supp.588 (D.D.C. 1988). The plaintiff there, an independent taxi operator, sued his association under the CPPA concerning the association's requirement that he purchase fuel and other supplies from the association and contribute to an insurance fund. In rejecting plaintiff's CPPA claim, Judge Harris stated:

> Plaintiff is not providing the economic demand for a trade practice, that is, the offering of consumer services – he is providing the service itself. Nor is he on the 'demand' side of the ledger with respect to [the association], despite his purchase of gasoline and his contributions to the organization for group services. There is simply no basis for treating plaintiff as a consumer...."

700 F. Supp. At 591. Joseph's relationship is just as attenuated, if not more so, and his CPPA claim cannot stand.

## IV.    JOSEPH STILL FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, Joseph's attempt to rescue his intentional infliction of emotional distress claim fails. Having filed a woefully deficient claim for this tort, and having those

deficiencies pointed out, Joseph now seeks – without leave of Court -- to remedy these shortcomings by filing an affidavit with supplemental factual assertions. Such an affidavit may not be considered on a Fed. R. Civ. P. 12 (b) (6) motion to dismiss for failure to state a claim. Only if the Court were to determine that the motion should be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56 may such an affidavit be considered. However, the Court has the discretion to disregard the affidavit and decide the motion on the pleadings. *Dial a Car v. Transportation, Inc.*, 1994 WL 902774 (D.D.C.).

The Court should disregard the affidavit here. Joseph offers no explanation why the proffered supplemental facts were not included in the counterclaim. The proffered supplemental facts were clearly known to Joseph when he filed his counterclaim. He simply omitted them. As an attorney, he should be presumed to know what the law required to support such a claim and his unexplained failure timely to offer such support should not be rewarded by letting him attempt to cure his claim through the back door.[5]

However, even if the Court were to consider Joseph's affidavit, his claim is still deficient. Conduct alleged to constitute intentional infliction of emotional distress must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (quoting Restatement (Second) of Torts §46 (1965)). And it is for the court, in the first instance, to determine whether the defendant's conduct is so extreme and outrageous as to permit recovery. *Id.* at 38.

---

[5] If the Court considers Joseph's affidavit, it should grant Cuneo the right to also file an affidavit before deciding the motion as to this claim.

The conduct alleged here does not come close to meeting that standard. The facts show that Cuneo and Joseph, both lawyers, entered into a contract to settle a lawsuit Joseph filed against Cuneo over an employment dispute. Cuneo promised to pay Joseph 20% percent of three contingent fees from certain pending cases, if received, in return for which Joseph promised, among other things, not to interfere with the cases upon pain of waiving his right to further percentages. Cuneo paid Joseph $240,895.00 when he received a fee in the first case. Thereafter, Joseph engaged in conduct which Cuneo believed violated the non-interference clause. He promptly warned Joseph through counsel to desist or risk waiver of future percentages. Joseph persisted in the conduct which Cuneo asserted constituted interference and Cuneo was damaged thereby. Cuneo then received a fee in a second case and, rather than pay Joseph, promptly sought a judicial determination whether Joseph's conduct constituted such an interference as to result in a waiver of his percentages.

If Cuneo is correct that Joseph violated the non-interference clause, then Joseph is not entitled to any payment, Cuneo's conduct was proper and it cannot be deemed tortious. Any emotional harm Joseph may have suffered is due to his own misconduct. But even if the Court ultimately rules that Cuneo misinterpreted the contract and is wrong as a matter of law, then Joseph will receive what he is owed and he has no reason to worry about his retirement. In any case, Cuneo's conduct cannot be characterized as outrageous, extreme, beyond the bounds of decency, atrocious or intolerable. Accordingly, his claim fails to state a claim.

Joseph's claim fails for another reason as well. To recover for the tort of intentional infliction of emotional distress, "the defendant's actions must proximately

12

cause the plaintiff emotional upset 'of so extreme a nature that harmful physical consequences might be not unlikely to result.'" *Sere*, 443 A.2d at 37 (citation omitted). Here, Joseph's affidavit, if considered, at most indicates that he has suffered some sleeplessness and anxiety such as anyone living in the modern, stressful world might suffer. This does not constitute the extreme emotional upset required. For this reason as well, Joseph fails to state a claim.

*        *        *        *

Wherefore, for the foregoing reasons, as well as those stated in Cuneo's opening brief and affidavits, the Court should (1) enter summary judgment granting Cuneo's declaratory judgment and dismissing Joseph's breach of contract claim and (2) dismissing Joseph's malpractice, *quantum meruit*, unjust enrichment, D.C. CPPA and intentional infliction of emotional harm claims for failure to state a claim.

April 21, 2008                    Respectfully submitted,


STEIN, MITCHELL & MEZINES, L.L.P.

    /s/
JACOB A. STEIN (D.C. Bar No. 052233
1100 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
(202) 737-7777 * Fax (202) 296-8312
E-Mail: jstein@steinmitchell.com



CUNEO GILBERT & LaDUCA, LLP

    /s/
JONATHAN W. CUNEO (D.C. Bar No. 39389)
David W. Stanley (D.C. Bar No.174318)
Michael G. Lenett (D.C. Bar No. 425592)
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960 * Fax (202) 789-1813
E-Mail: jonc@cuneolaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Memorandum of Points and
Authorities in Support of Plaintiffs' Motion for Summary Judgment as to their Action for
Declaratory Judgment and Plaintiffs' Motion to Dismiss and/or for Summary Judgment
as to Defendant Joseph's Counterclaims and Declaration of David W. Stanley were
electronically served by the Court's ECF system upon Defendant Joel D. Joseph this 21st
day of April, 2008.

David W. Stanley

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CUNEO LAW GROUP, P.C., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Case No. 08-00253 (RBW) |
| | ) |
| JOEL D. JOSEPH, | ) |
| | ) |
| Defendant. | ) |
| | ) |

DECLARATION OF DAVID W. STANLEY

I, DAVID W. STANLEY, make the following statement under penalty of perjury:

1.    I am a lawyer licensed to practice in the District of Columbia and elsewhere and am of counsel to the firm Cuneo Gilbert & LaDuca, LLP.  I am over the age of 21, have personal knowledge of the facts and events recited below and could, if called to testify, attest to the same.

2.    Attached hereto as Exhibit A is a true and correct copy of Defendants' S.D. Fla. Local General Rule 3.9D Notice of Similar Action, filed in the case of *Joseph v. Dubbin et al.*, No. 06-20464 (S.D. Fla.).

3.    Attached hereto as Exhibit B is a true and correct copy of Order Transferring Case in the case of *Joseph v. Dubbin et al.*, No. 06-20464 (S.D. Fla.).

4.    Attached hereto as Exhibit C is a true and correct copy of the docket in *Joseph v. Dubbin et al.*, No. 06-20464 (S.D. Fla.).

5.    Attached hereto as Exhibit D is a true and correct copy of Joel Joseph's Motion for an Award of Attorney's Fees and/or a Representative Plaintiff Fee filed in *In re: MCI Non-Subscriber Telephone Rates Litigation*, No. MDL 1275 (S.D. Ill.).

6.      Attached hereto as Exhibit E is a true and correct copy of a Memorandum
and Order in *In re: MCI Non-Subscriber Telephone Rates Litigation*, No. MDL 1275
(S.D. Ill.).

7.      Attached hereto as Exhibit F is a true and correct copy of a Memorandum
and Order in *In re: MCI Non-Subscriber Telephone Rates Litigation*, No. MDL 1275
(S.D. Ill.).

I make the foregoing statement under the penalty of perjury.

April 21, 2008

DAVID W. STANLEY

2

# EXHIBIT A

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 1 of 42    D.C.

FILED by
ELECTRONIC

**Apr 14 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 06-20464-Civ-Graham/O'Sullivan

JOEL D. JOSEPH,

    **Plaintiff,**

vs.

SAMUEL J. DUBBIN, et al.,

    **Defendants.**

_____/

## DEFENDANTS' S.D. FLA. LOCAL
## GENERAL RULE 3.9.D NOTICE OF SIMILAR ACTION

    Defendants Samuel J. Dubbin, Samuel J. Dubbin, P.A., Dubbin & Kravetz, LLP, Steve W.

Berman and Hagens Berman Sobol Shapiro, LLP ("Defendants") respectfully notify the Court of the

pendency of a similar action as required by S.D. Fla. Local General Rule 3.9.D and hereby request

the Court transfer this action to the docket of The Honorable Patricia A. Seitz, who has reserved

jurisdiction over the case of *Rosner v. United States*, Case No. 01-1859-Civ-Seitz, out of which this

case arises.

    Local General Rule 3.9.C provides that :

> [w]henever an action or proceeding is filed in the Court which
> involves subject matter which is a material part of the subject matter
> of another action or proceeding then pending before this Court, or for
> other reasons the disposition thereof would appear to entail the
> unnecessary duplication of judicial labor if heard by a different Judge,
> the Judges involved shall determine whether the newly filed action or
> proceeding shall be transferred to the Judge to whom the earlier filed
> action or proceeding is assigned.

Case No. 06-20464-Civ-Graham/O'Sullivan

As set forth in paragraph 1 of his Complaint, Plaintiff alleges that this case is "an action for damages for quantum meruit and unjust enrichment for failure to pay a referral fee for a lawsuit [allegedly] created by plaintiff." The lawsuit to which Plaintiff refers in paragraph 1 of his Complaint is identified in paragraph 11 and, in fact, is *Rosner v. United States*, Case No. 01-1859-Civ-Seitz.

Judge Seitz has presided over the *Rosner* case from its inception in May 2001 until final approval of its settlement in September 2005, and is intimately familiar with the details of all aspects of the litigation, including the role and contributions of the various counsel involved. Indeed, as part of the final settlement approval, Judge Seitz reviewed the attorneys' fee request and approved the requested fee award pursuant to Fed.R.Civ.P. 23(h). *See* Final Order and Judgment, *Rosner v. United States*, Case No. 01-1859, entered September 30, 2005, at 20-22 (attached hereto as Exhibit A).

Although the *Rosner* case is closed for administrative purposes, Judge Seitz "retain[ed] exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, conditions and obligations of this Final Order and Judgment, including all matters relating to the consummation, performance and enforcement of the Settlement Agreement." *Id.* at 22. Thus, the *Rosner* case, despite its administrative closure, remains "pending" before Judge Seitz. Indeed, Judge Seitz continues to preside over the case and issue orders, including orders regarding the allocation and distribution of attorneys fees. *See* Order Granting Joint Motion for Order on Settlement Implementation, *Rosner*

- 2 -

Case No. 06-20464-Civ-Graham/O'Sullivan

*v. United States*, Case No. 01-1859, entered on December 22, 2005, at 2 (attached hereto as Exhibit B).

Even if the *Rosner* case were not considered "pending" for purposes of Local Rule 3.9.C, there is no question that Judge Seitz's familiarity with that case, including the role and contributions of the various counsel involved and the attorneys' fee award, would result in the avoidance of unnecessary duplication of judicial labor if this case were to be transferred to Judge Seitz's docket.

Consequently, Defendants respectfully request this case be transferred to Judge Seitz's docket. A proposed order is attached as Exhibit C for the Court's consideration and convenience.

Dated: April 14, 2006
        Miami, Florida

Respectfully submitted,

        s/    Brian F. Spector
Brian F. Spector (Florida Bar No. 261254)
E-mail: bspector@kennynachwalter.com
Ismael Diaz (Florida Bar No. 575771)
E-mail: id@kennynachwalter.com
**KENNY NACHWALTER, P.A.**
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
**Attorneys for Defendants Samuel J. Dubbin, Samuel J. Dubbin, P.A., Dubbin & Kravetz, LLP, Steve W. Berman and Hagens Berman Sobol Shapiro, LLP**

**Certificate of Service**

**I hereby certify** that a true and correct copy of the foregoing was served by United States mail on April 14, 2006 on all counsel or parties of record on the attached Service List.

                                    s/    Brian F. Spector
249352.1                                  Brian F. Spector

- 3 -

# SERVICE LIST

**Joseph v. Dubbin, et al.**
**Case No. 06-20464-Civ-Graham/O'Sullivan**
**U.S. District Court, Southern District of Florida**

Plaintiff Joel D. Joseph
7272 Wisconsin Avenue
Suite 300
Bethesda, Maryland 20814
Telephone: (301) 941-1989

Brian F. Spector, Esq.
E-mail: bspector@kennynachwalter.com
Ismael Diaz (Florida Bar No. 575771)
E-mail: id@kennynachwalter.com
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
**Attorneys for Defendants Samuel J.
Dubbin, Samuel J. Dubbin, P.A., Dubbin &
Kravetz, LLP, Steve W. Berman and
Hagens Berman Sobol Shapiro, LLP**

- 4 -



# EXHIBIT A

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 6 of 42

**CLOSED**
**CIVIL**
**CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-1859-CIV-SEITZ



FILED by ___ D.C.

OE 0ﾠﾠ0

CLARENCE MADDOX
CLERK, U.S. DIST. CT.
S. D. OF ...

IRVING ROSNER; EDITH KLEIN AMSTER;
FRANCISC BASCH; VERONIKA BAUM; ALICE
BESSENYEY; ELIZABETH BLEIER; ERWIN
DEUTSCH; DR. JOSEPH A. DEVENYI; PETER
DREXLER; BARUCH EPSTEIN; MAGDA FEIG;
MICHAEL FRIED; PAUL GOTTLIEB; JUDITH
KARMI; ETHEL KLEIN; MILDRED KLEIN;
TAMÁS MAY; DAVID and IRENE
MERMELSTEIN; EDITH MORE; JOHN J.
RAKOS; GEORGE RASKO; ANA ROSNER;
GEORG MOSHE SCHWARZ, ESTATE OF
GEORGE SEBOK; DR. LASZLO SOKOLY and
EDITH REINER; AGNES V. SOMJEN; OLGA
STEINER; JONAS K. STERN; IRENE and
ANDREW TIBOR; AGNES VADASZ; and
ZOLTAN S. WEISS, on behalf of themselves and all
others similarly situated,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Plaintiffs,    )
)
·v.    )
)
UNITED STATES OF AMERICA,    )
)
Defendant.    )
)
)

_____

<u>**FINAL ORDER AND JUDGMENT**</u>

This matter is before the Court on the Motion for Final Approval of the Class Action Settlement (the

"Motion for Final Approval") [DE 228] and the Verified Joint Petition for an Award of Attorneys' Fees and

Expenses and Motion for Modest Incentive Payments to Plaintiffs (the "Fee Petition") [DE 212]. On April

8, 2005, the Court issued an order preliminarily approving the Settlement Agreement[1] and scheduling a Final

Fairness Hearing for September 26, 2005, to determine whether the Settlement Agreement with the United

States ("Defendant") is fair, reasonable, and adequate and to determine an award of attorneys' fees and

_____

[1] The Settlement Agreement's provisions are incorporated herein by reference.

246/08

expenses and incentive payments to Plaintiffs.[2]

At the Final Fairness Hearing, the Court heard argument and/or comments from Class Counsel, Defendant, the Notice Provider, interested parties, and several Class Members, either personally or through counsel. Furthermore, the Court has read and considered the Settlement Agreement, the Notice Plan, the Plan of Distribution and Proposed Detailed Plan of Allocation (the "Plan of Distribution" and "Plan of Allocation"), the Fee Petition, the Motion for Final Approval, the Declaration of Gideon Taylor, on behalf of the Notice Provider, and the objections and comments to the Settlement filed by various Class Members. Thus, upon review of these documents and all other relevant portions of the record, and for the reasons stated at the Final Fairness Hearing and as set forth below, the Court grants the Motion for Final Approval and the Fee Petition.

## I.    BRIEF PROCEDURAL BACKGROUND OF THE CASE

Plaintiffs filed their initial Complaint in this Court on May 7, 2001. The Court sustained the Complaint, in part, on August 28, 2002. After conducting extensive jurisdictional discovery, Plaintiffs then filed their First Amended Complaint on October 31, 2003. After Defendant moved to dismiss the First Amended Complaint and after Plaintiffs moved for class certification, on December 20, 2004, the parties announced that they had reached an agreement in principle to settle the case. Thereafter, on April 8, 2005, the Court preliminarily approved the Settlement, certified a settlement class, and directed notice of the settlement to the class worldwide.

## II.    BRIEF FACTUAL BACKGROUND OF THE CASE[3]

Beginning in April 1944, valuable personal property belonging to the Jewish population of Hungary was confiscated by the Hungarian government. In late 1944, a portion of the confiscated property was loaded

---

[2] Capitalized terms used in this Order have the meaning assigned to them in the Settlement Agreement, Preliminary Approval Order, and Class Notice.

[3] The Brief Factual Background is based generally upon the allegations in the First Amended Complaint.

2

on a train and taken to Austria where it ultimately fell into the hands of the U.S. Army on May 11, 1945.

Before arriving in Austria, however, a significant portion of the valuable property from the train was

off-loaded to trucks and taken to French-occupied Austria. This portion of the Gold Train Property never

came into U.S. custody. The property on the train that did come under U.S. custody was placed in a

warehouse under U.S. Army control in Salzburg, Austria, where some of it was "requisitioned" by senior U.S.

Army officers and stolen by U.S. Army enlisted personnel and others. Subsequently, the U.S. Government

claimed that the property could not be identified as to ownership or national origin, and thereafter turned the

bulk of the remaining property over to the Inter-Governmental Committee on Refugees which auctioned some

of the property in New York City in 1948-1949. Despite the efforts of the Hungarian Jewish community to

secure the return of the Gold Train Property, none of the property was ever returned by the United States to

its rightful owners. On October 7, 1999, the Presidential Advisory Commission on Holocaust Assets in the

United States published its Progress Report On: The Mystery of the Hungarian "Gold Train," in which the

United States, for the first time, publicly revealed its role in the receipt, handling, and disposition of the Gold

Train Property.

## III.    JURISDICTION AND CLASS CERTIFICATION

This Court has subject matter and personal jurisdiction over this case and the Parties. The Court

finds, and holds, that one or more of the Class Representatives has Article III standing. Thus, based on the

foregoing, the Court has jurisdiction to enter a final order and judgment adjudicating the claims of the entire

Class. See Newberg on Class Actions, § 2:5, at 75 (4th ed. 2002).

In addition, pursuant to Fed. R. Civ. P. 23, the following Settlement Class is certified for purposes

of final settlement:

> all Persons who have claimed or at any time could claim any
> interest in the Gold Train Property, as defined in the Settlement
> Agreement, including without limitation, all Persons whose
> personal property was taken, seized, confiscated, or stolen by the
> Hungarian government and/or its officers, employees, or agents
> pursuant to Decree 1600 of 1944, Decree 8306 of 1944, or any

3

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 9 of 42

similar law, policy, or practice, and all heirs, estates, assigns, and survivors of such Persons.

Moreover, for the reasons stated in the Court's April 8, 2005, Order, which are incorporated herein by reference, the Court finds that, for the purpose of the Settlement Agreement, the requirements of Fed. R. Civ. P. 23 are satisfied, and that a Class Action is an appropriate method for resolving the disputes in this litigation.

## IV.    THE SETTLEMENT AGREEMENT

Plaintiffs have presented to the Court a global settlement on behalf of all people who have claimed or in the future do claim any interest in the Gold Train Property, including all Hungarian Holocaust survivors and their heirs. The terms of the Settlement Agreement are set forth below.

### A.    The Settlement Fund

The Settlement creates a Settlement Fund of $25.5 million which shall be deposited by Defendant into an interest bearing escrow account within 30 days of Final Approval of the Settlement, including resolution of all appeals of the Final Order and Judgment. Of this amount, approximately $21 million will be disbursed as described in the Plan of Allocation, under the Court's supervision and control. The Settlement does not call for individual distributions to all Class Members as compensation. Rather, the funds will be used for the direct provision of social services and humanitarian relief to eligible Victims of Nazi Persecution who are in need as defined in the Settlement Agreement. The Special Fund will be allocated to countries pro rata based on Professor Randolph Braham's estimate of the numbers of Hungarian Holocaust survivors residing in each particular country today.[4]

### B.    Non-Monetary Benefits

In addition to the monetary distributions through humanitarian and welfare agencies, the Settlement contains substantial non-monetary relief which will benefit all Class Members. For example, $500,000 from the Settlement Fund shall be designated for an entity chosen by a panel of experts to collect papers and

---

[4] In addition to the creation of the Settlement Fund, the Defendant also agreed to bear all costs of notice to the Class up to $1 million.

4

materials related to the receipt, handling, and disposition of the Gold Train Property. Moreover, the Settlement also calls for an acknowledgment from the United States relating to its role in the handling of the Gold Train Property.

## V.    CLASS NOTICE AND SETTLEMENT ADMINISTRATION

On April 8, 2005, the Court approved the Notice Plan. That plan, as the Court has found. See April 8 Order at 14-15, comports with all the requirements of applicable law. Rule 23, and due process. See Declaration of the Notice Provider, filed on or about September 15, 2005; Submission of Claims Conference Comments on Items to be Considered at the Final Fairness Hearing on September 26, 2005. filed on or about September 23, 2005.

Specifically, on or about May 2, 2005, the Notice Provider sent by direct mail to over 49.600 individual addresses a copy of the Long-Form Notice. These 49,600 individuals reflect all members of the Settlement Class for whom the Notice Provider and Class Counsel possessed addresses (or whose addresses were reasonably obtainable). Additionally, there were approximately 825 re-mails of notices returned by reason of an incorrect address. Notice was also be given by publication in 25 countries in 125 different publications. According to Professor Braham, the countries where notice was published are the countries where eligible victims and other Class Members are reasonably believed to reside. See Braham Report. attached to Plan of Distribution. Exhibit B to Settlement Agreement. Additionally, a multi-language website provided Class Members with notice of the Settlement, the Settlement Fund. the Special Fund. the Plan of Allocation, the Non-Monetary Relief, the date of the Fairness Hearing. the requested attorney fees and incentive awards, and other essential information that would enable a Class Member to make an informed decision regarding his or her rights. Moreover, the Notice Provider manned specified 1-800 numbers (or the international equivalent thereof) to answer questions and provided additional written materials (including the

5

Court-approved FAQ) to an additional 3,500 individuals.[5]

Thus, the Court finds that the published notice, direct mailing of notice, and Internet posting constituted the best notice practicable under the circumstances regarding the Settlement, Class Counsel's Fee Petition, the Plan of Distribution and Plan of Allocation, the date of the Fairness Hearing, and other matters set forth in the Class Notice and the Summary Notice. The notice constituted valid, due, and sufficient notice to all members of the Settlement Class, and complied fully with the requirements of Fed. R. Civ. P. 23(c)(2)(B), the Constitution of the United States, and other applicable laws.

## VI.    OPT-OUTS AND OBJECTORS

Under the Settlement Agreement, any persons who wished to be excluded from this Settlement were provided a 90-day opportunity to "opt out" pursuant to the Notice, which was executed in accordance with the Court's direction and Order. The Court finds that those individuals whose names (a total of 100 Nazi Victims and 62 Heirs ) are listed in Exhibit A to this Final Order and Judgment have validly excluded themselves from this Action, and accordingly, they have no rights under the Settlement Agreement, and shall not be bound by either the Settlement Agreement or the final judgment herein.  Despite the number of Nazi Victims who excluded themselves from the Settlement, Defendant has chosen not to exercise its rights to withdraw from or reduce its cash payment to the Settlement Fund under Paragraph XI of the Settlement Agreement.[6]

In addition, the Court received a total of 356 objections to the Settlement.  Any Class Member who did not timely file and serve an objection in writing to the Settlement Agreement, or to Class Counsels' Fee

---

[5] In addition, the Court notes that the Notice Provider generated additional notice through earned media, organizational outreach, and e-mail bulletins, and that Class Counsel and the Plaintiffs provided further notice through their efforts to meet and speak with the media and other potential Class Members.

[6] The Court has reviewed the Request to Reject the Joint Motion for Order of the Plaintiffs and the Defendant and to Confirm the Rejection of Settlement by the Members of the Organization for the Assertion of Rights of Hungarian Jews filed by Mr. Barak Ben-Amos, Chairman of the Organization for the Assertion of Rights of Hungarian Jews.  For the reasons stated in the parties' Joint Motion for Order Addressing Certain Correspondence Received by Notice Provider and the Court's September 12, 2005, Order, Mr. Barak Ben-Amos *only* is excluded from the Settlement.

6

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 12 of 42

Petition, in accordance with the procedure set forth in the Class Notice and mandated in the Preliminary Approval Order, is deemed to have waived any such objections by appeal, collateral attack, or otherwise.

**VII.    STANDARD OF REVIEW**

The settlement of a class action requires court approval. Fed. R. Civ. P. 23(e). The Federal Rules of Civil Procedure contemplate a multi-step process for approving a class settlement. The Court is now at the second stage in that process, as the Court already made a preliminary fairness determination, found that the settlement class satisfies the requirements of Rule 23 and certified the class, and approved the dissemination of notice, which has occurred. In this step, the Court must determine whether the interests of the Class will be better served by the proposed resolution or by continuation of the litigation.

There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex. Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977);[7] Ass'n for Disabled Ams., Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002). A class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). Moreover, where the settlement previously has been preliminarily approved, the settlement is "presumptively reasonable," and an objector must overcome a "heavy burden" to prove the settlement is unreasonable. Williams v. Vukovich, 720 F.2d 909, 921 (6th Cir.1983) (citations omitted). In determining whether the settlement is fair, adequate, and reasonable, the Court must consider all relevant factors, including (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the state of proceedings at which the settlement was achieved. Bennett, 737 F.2d at 986; Cotton, 559 F.2d at 1330-31.

---

[7] The Eleventh Circuit, in the en banc decision of Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent all decisions of the Fifth Circuit rendered before October 1, 1981.

7

In evaluating these considerations, the Court must not try the case on the merits.  Cotton, 559 F.2d at 1330. Rather, the Court must rely upon the judgment of experienced counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel." Id. (citation omitted).  In evaluating a settlement's fairness, "it should [not] be forgotten that compromise is the essence of a settlement.  The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might [be] gained.'" Id. (quotation omitted). Moreover, a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness.  See id. at 1331.  "Above all, the court must be mindful that 'inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" Ruiz v. McKaskle, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting Cotton, 559 F.2d at 1330).

VIII.    ANALYSIS

As discussed below and at the Final Fairness Hearing, a review of the relevant factors leads to the conclusion that this Settlement is fair, reasonable, and adequate and is not the product of overreaching by, or collusion between, the negotiating parties.  Therefore, the Court grants the Motion for Final Approval.

A.    All Relevant Factors Weigh In Favor Of Approval

1.    The likelihood of success at trial:  The strength of the case and the risk, expense, complexity and likely duration of further litigation militate in favor of final approval

The parties vigorously disputed the factual and legal merits of the instant case, and thus the uncertainties and litigation risks weigh strongly in favor of a finding that the Settlement is fair, adequate, and reasonable. Indeed, Plaintiffs faced considerable risks with respect to Defendant's 12(b)(6) arguments in their Motion to Dismiss as well as with class certification for litigation purposes.  Thus, the uncertainties of litigation and the risk of not certifying a litigation class weigh in favor of a compromise settlement.  See West Virginia v. Chas. Pfizer & Co., Inc., 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."), aff'd, 440 F.2d 1079 (2d Cir. 1971).

8

Additionally, avoiding the delay and risk of protracted litigation is itself a legitimate reason for counsel to recommend, and the courts to approve, a settlement. <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968). This is especially true in this case, as many Class Members are elderly and infirm and in need of the benefits offered by the Settlement now. After already four years of pre-trial motion practice and jurisdictional discovery, it is difficult to imagine that the Class Members would have obtained a significantly greater recovery at trial, and to the extent one might be obtained, the expense of doing so would be great. Further, the voluminous record and the papers and pleadings already developed in this case speak loudly to the likelihood of added layers of complexity and the concomitant time required to press the case all the way to trial.

Lastly, had the matter gone to trial, additional post-trial appeals likely would have delayed recovery and thereby reduced the benefits of an ultimate victory for the Class, many of whom are elderly and in need of money, closure, and a historical reckoning now. Thus, in the end, the value of the Settlement is enhanced greatly by the fact that the relief will be provided to Class Members now, without the delay, burden, and risks of further litigation. This factor weighs heavily in favor of final approval.

> 2.    <u>$25.5 million is a reasonable recovery for the value of the property on the Gold Train when the United States accepted custody</u>

With respect to the second factor, the Court finds that the Settlement provides substantial monetary benefits and is therefore a reasonable recovery. Although there have been many widely-varying estimates of the value of the property on the Gold Train, both contemporaneous and recent, the fact is that no inventory was ever made of the property, much less a detailed appraisal, and therefore any estimate of value is somewhat speculative. According to Plaintiff's expert, Gábor Kádár, the value of the train at the time the U.S. obtained custody was approximately $4.5 to $9 million dollars, or approximately $45 to $90 million today. Taking the mid-point of his range, or $67.5 million, the Settlement represents a return of more than 37% of the total value

9

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 15 of 42

of the property on the train at the time the U.S. obtained custody.[8]  Such a settlement is fair and reasonable.

See Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 543 (S.D. Fla. 1988) (approving settlement of 5.7%

desired recovery); Strube v. Am. Equity Investment Life Ins. Co., 226 F.R.D. 688, 698 (M.D. Fla. 2005)

(approving settlement equal to 2% of estimated potential recovery).[9]  Accordingly, given the substantial

factual and legal hurdles that Class Members needed to overcome before any recovery, the discounted

compromise figure of $25.5 million represents a fair and reasonable, indeed outstanding, result.

> 3.    The reaction of Class Members indicates overwhelming approval for the Settlement

A vast majority of Class Members have expressed a willingness to approve the Settlement, which

weighs heavily toward this Court's decision to approve the settlement.   Cotton, 559 F.2d at 1331 (holding

that a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's

fairness and reasonableness).  In a class numbering approximately 60,000 Victims of Nazi Persecution (as

defined in the Agreement) and tens if not hundreds of thousand additional heirs, approximately 100 victims

of Nazi persecution and 62 heirs timely requested exclusion and only 356 separate objections were received

by the Notice Provider.  Accordingly, this factor also weighs heavily in favor of final approval.

> 4.    The stage at which Settlement was obtained:  The extensive independent and formal
> discovery conducted by Class Counsel indicate that Counsel was well-versed and
> sufficiently informed to enter into this Settlement

Class Counsel negotiated the instant Settlement with wide knowledge of the relevant facts and law.

See generally Decl. of Jonathan W. Cuneo in Support of Fee Petition.  Indeed, the Settlement was only

reached after four years of litigation, including extensive jurisdictional discovery.  The fact that Class Counsel

was well acquainted with the facts and law, the strengths and weaknesses of the case, and had undertaken

---

[8]  Moreover, according to Defendant, the recovery here might come close to 100%.  See e.g., Letter from Daniel Meron to Moshe Sanbar, July 11, 2005 (noting that most of the property the U.S. obtained was auctioned for approximately $2.17 million (1948 dollars), or $21.7 million in today's dollars).

[9]  For the same reasons, the Court rejects the arguments of certain objectors that contend that the settlement amount was insufficient.  See e.g. Objectors/Commentators Nos. 10, 11, 20, 48, 132, 154, 179, 255, 297, and 298.

10

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 16 of 42

substantial discovery, strongly supports the conclusion that the Settlement is fair and reasonable.

> ### 5. Good faith, arms-length negotiations between experienced counsel and the absence of collusion also support final approval of the Settlement

As noted above, courts also examine the process by which a class action settlement was reached in order to determine that it was not the product of fraud or overreaching by, or collusion between, the negotiating parties. Cotton, 559 F.2d at 1330. Here, the absence of evidence that the Settlement is the product of anything other than arm's-length negotiations among counsel for the parties, and was not the product of collusion or any improper influences, clearly supports approval of the Settlement as final. See September 23, 2005, Letter from Mediator Fred F. Fielding. In point of fact, the Settlement was reached only after intensive negotiations conducted over the course of several months, extensive document discovery, and expert consultations that refined the parties' respective assessments of the risks of the litigation. See Preliminary Approval Memorandum at 8; Decl. of Jonathan W. Cuneo in Support of Fee Petition ¶¶ 77-90. Until the settlement papers were finally signed, counsel for both parties zealously represented their clients' interests every step of the way. Accordingly, the non-collusive negotiation and advantageous Settlement obtained also strongly militate in favor of final approval.

### B. No Objection Establishes That The Settlement Is Anything But Fair And Reasonable

Although the Court preliminarily approved the Settlement, and though the Settlement is presumptively reasonable, under Rule 23 class members have a right to object and/or comment on the settlement and try to convince the Court otherwise, if they are so inclined. After reviewing the approximately 356 objections, however, the Court finds that the Settlement is fair and reasonable.

> ### 1. The lack of direct payments to all Class Members does not render the Settlement unfair as a cy pres remedy is proper

The most prevalent objection made by Class Members is that individuals should receive direct payments, rather than have the funds distributed for the benefit of Hungarian Nazi victims in need through

11

designated social service agencies. This objection is mentioned by more than 300 of the 356 objections,[10] and is by far the principal objection asserted. Some of the objectors urged that they be compensated for all of the specific property that they lost, while most recommended that the funds be divided equally and distributed pro rata to each Hungarian survivor. Though this objection has strong emotional and logical attraction, the failure to include individual payments as part of the Settlement does not render it legally unfair or unreasonable.

        a.     *Compensation for Specific Property*

      The question of which Class Members might receive a direct payment is a complex question without an easy answer. Some of the objections urged direct compensation "for those who possess official documents." See e.g. Objections/Comments Nos. 125, 140, 189, 307. The shortcoming to this process is that it penalizes those who after 60 years lack documentation. Given the horrific hardship and dislocation suffered by those who survived the Holocaust, requiring such documentation to share in the proceeds of the Settlement justifiably would invite a large degree of fair criticism. Furthermore, to complicate the issue, Decree 1600 receipts and other forms of official documentation do not necessarily evidence that the property was on the Gold Train when the U.S. obtained custody. Thus, possession today of such documentation does not, by itself, differentiate those who had property on the Gold Train when the U.S. accepted custody from those who did not.

      Finally, the last, and perhaps most glaring problem with this process is that according to Plaintiffs' experts, most if not all of the Decree 1600 receipts issued are still retained in the Hungarian archives; an archive that has severely restricted access. See Affidavit of Gábor Kádár ¶66. Therefore, giving priority (either in order of payment or amount) to victims who could produce receipts today, or who had other

---

[10] See e.g. Objections/Comments 1, 2, 4-8, 11-19, 21-25, 27-30, 32-47, 49-60, 62-68, 72-73, 75-108, 111, 113-124, 126-133, 135-138, 140-143, 146-150, 152-161, 166, 168, 172-182, 184-201, 203-213, 215-228, 230-240, 243-248, 250-268, 270-300, 302-306, 308-315, 318-327, 329-330, 333-335, 337-340, 342-344, 346-348, 350, 354-356.

contemporaneous evidence of their families' belongings in Hungary, would make recovery under the

Settlement too dependent on the happenstance of record availability, and under the circumstances would be

unjust.

b.    *Equal Payments To All Class Members*

Perhaps recognizing the shortcomings of relying on documentation, other objectors – indeed most

objectors – argued for a process of equal payment to each Class Member.  While this option has the

appearance of simplicity and ease of administration, upon closer scrutiny this approach in a case based upon

a bailment theory is problematic.  For example, Class Members include heirs who are theoretically entitled

under the law to share in any restitution given for property unlawfully taken from their fathers and mothers.

Unfortunately, however, the cost of ascertaining who is entitled to payment under the laws of inheritance

might well deplete the Settlement Fund or result in mere token payments to Class Members, and/or take years

to accomplish.  See In re Holocaust Victim Assets Litig. ("Swiss Bank"), 2005 WL 2175955 (2d Cir. Sept.

9, 2005) (citation omitted) (noting that a cy pres allocation was proper because a case-by-case valuation of

claims to the looted assets "would have resulted in an unwieldy and enormously expensive apparatus," and

"[a] pro rata distribution would have resulted in the payment of literally pennies to each of the millions of

individuals who would fall into' the Looted Assets Class.").[11]

Indeed, the overwhelming proportion of the Class supported the choice made and the Settlement.

The rationale was eloquently expressed by Mr. Rosner, Mr. Moskovic, Mr. Schwarz, Mr. Rubin, and Mr.

Mermelstein who addressed this Court at the Preliminary Approval Hearing.  The prevailing view of Plaintiffs

and other members of the Settlement Class, including heirs, was that this cy pres distribution would provide

more meaningful benefits than one that delivered a truly token and trivial amount to all.  As Irving Rosner

---

[11] In addition, this objection assumes that $25.5 million is available to distribute.  However, the United
States has made clear that it was not necessarily prepared to offer such amount of money if the parties utilized a
different allocation method.  See Tr. from September 26, 2005, Final Fairness Hearing ("Final Fairness Hearing Tr.")
at  79 (stating, "there is no basis for an assumption that the amount would have been 25 million had this been a pro
rata distribution as opposed to one that is for the benefit of the needy survivors").

explained:

> We are satisfied that this settlement with the United States is the kind of result that
> many of us needed. I hope that the funds from this settlement will be distributed as
> fast and efficiently as possible. There are too many Holocaust survivors alive today
> who cannot take care of themselves with their own resources. That is why I support
> the settlement so Hungarian survivors can get much-needed help before it is too late.
> Many of us do not need the help, Your Honor, and are glad to see that the funds will
> be used for those who are truly in need today or will slip into this condition. Given
> the difficulties of the case and the time it would take to continue, we believe this
> outcome does the most good for the class.

See Tr. from March 17, 2005, Preliminary Approval Hearing ("Preliminary Approval Hearing Tr.") at 19.

In sum, considering all of the practical problems and proof problems associated with direct payments,

as well as the indignity associated with token payments, the Plan of Allocation is a fair and reasonable method

of achieving a meaningful payment with the Settlement Funds. Indeed, the Settlement and the negotiated Plan

of Allocation is fair, and in the best interests of the class as a whole.

2.      <u>Objections to $500,000 for archival purposes do not indicate that the Settlement is unfair</u>

A small number of Class Members objected to use of any funds for the creation of an archive to

document the Gold Train episode. As Plaintiffs explained at length in their Preliminary Approval

Memorandum, the archive to be created from this case advances in a vital way the Plaintiffs' goals of

obtaining a historic reckoning of the United States' conduct in regard to the Gold Train. The Class Members

who spoke at the Hearing on Preliminary Approval also mentioned the significance of this archive.[12] See

Preliminary Approval Hearing Tr. at 17, 24. Moreover, there is no evidence or precedent to suggest that

---

[12] As Mr. Schwarz stated:
> I support this settlement to honor my family's memory and the memory of the Hungarian Jews who
> suffered so much, to assist those who survived but find themselves in need, and to benefit those
> who were not there but should not forget. The archiving and dissemination of information about
> the Hungarian Holocaust is vitally important. . . . I do not wish to receive any monetary gains. All
> I want is that the proceeds of this settlement will assure the historical truth about the participation
> of various nations in my people's tragedy, so when we say NEVER AGAIN, those words will bear
> their full meaning, weight and warning, and will resonate around the world to people of all races
> creed and color.

See Declaration of Georg Moshe Schwarz, March 16, 2005, at 5.

14

attributing $500,000 of this Settlement toward an archival endeavor is unfair or unreasonable. To the contrary, the Swiss, Austrian, and German Holocaust settlements all devoted settlement funds to the enhancement of the historical record or creation of lasting memorials for the victims of the dead, or for education of future generations about the Holocaust.[13] Here, the $500,000 set aside for such a purpose is reasonable.

> **3.** **Objections to any Claims Conference involvement in the administration of the Settlement do not illustrate any unfairness**

There are approximately four objections to the Claims Conference's playing any role in the administration of the Settlement Fund. These objections state that the Claims Conference is irresponsive to the needs of victims and that the Settlement Fund will be used to pay administrative expenses. See e.g. Objection No. 3. The Plan of Allocation, however, identifies the specific agencies through which the settlement benefits will be distributed; specifies the exact amounts that each agency will have at its disposal; explains that a local Advisory Committee will determine which humanitarian and/or emergency needs grants submitted by eligible victims will be honored; provides for annual reports of expenditures; allows Class Counsel to seek an audit of the Special Fund's administration; and places the organization under the jurisdiction of this Court, which is empowered to address any problems that may arise. Thus, these objections do not demonstrate that the Settlement is either unfair or unreasonable.

---

[13] In the Swiss Bank case, for example, the court approved an allocation of $10 million for the creation of a "victim list" through Yad Vashem to augment the existing database of Jews who perished in the Holocaust. See 2005 WL 2175955, at *5 n.11. The German Foundation Agreement provided DM 700 million for a "Future Fund" for education and remembrance projects to be determined by the German Foundation Trustees. See In re Nazi Era Cases Against German Defendants Litig., 198 F.R.D. 429, 434 (D.N.J. 2000). The Austrian Bank settlement provided for $2 million for an archive. In re Austrian and German Bank Litig., 80 F. Supp.2d 164, 170 (S.D.N.Y. 2000).

15

4.    Objections to percentage distributions contained in the Plan of Allocation

Two objectors ask the Court to reallocate a portion of the Special Fund so that Nazi victims in Hungary receive a greater share than was agreed to by the parties. See Objections Nos. 242 & 252.[14] Both contend in general terms, and without any supporting evidence or documentation, that the population of Nazi victims in Hungary are "needier" than those living in the United States and Israel. These objections will hereafter be referred to as "Reallocation Proposals."

Initially it must be noted that the Reallocation Proposals do not call into question the underlying fairness of the settlement, but rather suggest an alternate method for distributing the Settlement Fund among the relevant countries.[15] First, Moshe Sanbar proposes re-allocating 10% of the Settlement Fund, or approximately $2.1 million, to Hungary. See Objection No. 242. This number, however, is not based upon any evidence, but rather was negotiated between the Confederation of Holocaust Survivors in Hungary, the Federation of Jewish Communities in Hungary, and the Association of Former Hungarian Jews in Israel under Mr. Sanbar's skilled leadership and guidance. See Final Fairness Hearing Tr. at 20. Similarly, Burt Neubone, on behalf of eleven class members residing in Budapest, objected to the "flawed allocation formula" that "should be modified to account for the disproportionately high concentration of needy class members in Hungary." See Objection No. 252. Mr. Neuborne initially suggested that the Court order the Notice Provider to conduct an investigation into the economic circumstances of the Class Members, as such information is not currently available, in order to determine the appropriate redistribution. However, as he did not know with any degree of certainty the time or costs associated with his proposed investigation, and because he did not want to delay the settlement, Mr. Neuborne later supported the proposal of Mr. Sanbar. See Final Fairness Hearing Tr. at 37.

---

[14] Additionally, objections 171 and 323 argue that the Settlement should all go to Hungary, but do so for reasons that seem to misapprehend that the case is on behalf of the owners of the property who reside world-wide.

[15] As stated by Moshe Sanbar at the Final Fairness Hearing, "I cannot challenge the fairness of the agreement because I was an initiator here." Final Fairness Hearing Tr. at 14.

16

There are multiple problems with both Mr. Neuborne's initial proposal and the 10% re-allocation plan suggested by Mr. Sanbar. First, as to Mr. Neuborne's initial proposal, Mr. Neuborne himself conceded that, "this is not a case where you want to spend scarce funds doing a person-by-person survey and census of every poor Hungarian victim around the world. That would be . . . an inefficient use of scarce funds." See id. at 38. Indeed, the Court finds that the time and costs associated with requiring an investigation into the economic status of the Class Members would outweigh any benefits to be gained by the Class Members living in Hungary.[16]

There are similar problems with Mr. Sanbar's 10% re-allocation plan. First, although Mr. Sanbar urges the Court to adopt his proposal, the Court cannot re-write the terms of the Settlement Agreement negotiated between the parties; rather, the Court's only option would be to condition its approval of the Settlement upon the parties' adoption of the 10% re-allocation plan. Thus, Mr. Sanbar's objection fails to consider the real possibility that the parties would not agree to such amendment. See Statement of Daniel Meron, Final Fairness Hearing Tr. at 83 (stating, "Now, I don't know what we would have done as a government if this would have been presented to us before we had an agreement, as we were negotiating the agreement."). Second, the Court hesitates to adopt a proposal not based on an evaluation of need, but on a percentage that was negotiated without the input of Class Counsel or Defendant, as such a plan would be vulnerable to intense criticism from the adversely affected members of the Class.

Finally, and perhaps most significantly, if the Court were to adopt Mr. Sanbar's plan, it would be required to provide re-notice to those Class Members adversely affected by the change, which is approximately 77% of the Class. See Nilsen v. York County, 382 F. Supp. 2d 206, 221 n.9 (D. Me. 2005) (stating, "[i]f the parties decide to amend the settlement to remove the cause for my disapproval, I would

---

[16] In addition, as discussed in the Final Approval Motion, any study designed to determine the "relative neediest" among the needy would be difficult, if not impossible, and fraught with subjectivity. At a minimum, such a study would have to take into account the cost of the specific services that would be subsidized by the Special Fund in each country, the kind, quality, and universal availability and utilization of social safety nets in the various countries, the general cost of living, currency exchange rates, and the like.

17

require a new opportunity for female class members who have filed claims to opt out. . . . I would require notice of the amendment and the opt-out right only to female class members who have already filed claims, because they are the only class members who would be negatively affected by such an amendment."); White v. Nat'l Football League, 836 F. Supp. 1458, 1468-69 (D. Minn. 1993) (requiring re-notice to those class members adversely affected by an amendment to the settlement agreement).  Thus, in order to provide approximately $2.1 million dollars of additional social services to Class Members living in Hungary, the Court would first have to provide for re-notice and a second opt-out period, which would not only be costly and delay the ultimate distribution of the Settlement Fund to the Class, but could also potentially defeat the entire Settlement.  As expressed by Class Counsel, "[n]ow, any rejection of the settlement could . . . make the process go backwards.  We could lose, to the extent we have a consensus, that which we have. . . . And, of course, the consensus that we have been able to build so far has been very difficult, it has been fragile."[17] Final Fairness Hearing Tr. at 107-08.  Thus, although Mr. Sanbar's proposal has appeal, the Court finds that it would be unfair and unreasonable to require the parties to adopt it at this stage of the proceedings.

In addition to the costly problems associated with the Reallocation Proposals, the Court finds that the current allocation system, based upon population, is fair and reasonable, as it is consistent with Plaintiffs' theory of the case.[18]  As the gravamen of the First Amended Complaint is essentially a property claim, the parties chose to allocate the Settlement Fund equally among all living Class Members today.  Notably, other courts have adopted cy pres allocations based on population proxies designed to benefit class members when individual damage determinations are too difficult or too costly.  See West Va. v. Chas. Pfizer & Co., 314

_____

[17] Indeed, it is not even clear whether all of the named Plaintiffs would approve of an amended Settlement, as a number of them spoke eloquently at the Final Fairness Hearing in favor of the Settlement in its current form.

[18] That the Second Circuit approved the trial court's discretionary use of a different formula proposed by a Special Master in the Swiss Banks case does not compel a different result than the one agreed to by the Parties and preliminarily approved by this Court on April 8, 2005.  While the Second Circuit did express dissatisfaction with an allocation system based upon population, the factual and procedural posture of that case varies greatly from the issues pertinent here.

18

F.Supp. 179, 185 (S.D.N.Y. 1970), aff'd. 440 F.2d 1079(2d Cir. 1970) (allocating an anti-trust settlement pro rata among the states); In re Toys "r" Us Antitrust Litig., 191 F.R.D. 347 (E.D.N.Y. 2000) (distributing settlement funds uniformly throughout the country for toys and educational programs). Moreover, none of the allocated money will go to waste under the Plan of Allocation, as there is tremendous need all over the world. In fact, the Court has before it proof that the funds allocated from the Settlement will, at best, address only a portion of the needs of eligible Hungarian Nazi Victims in the United States, Hungary, Israel and the rest of the world.[19]

In addition, the Plan of Allocation itself provides for an internal process for annual reconsideration of the allocations made to the various agencies in specific locales. Funds are allocated to agencies on an annual basis. If any funds remain after the annual allocation period, they are canceled. "In such an event, recommended allocations will be reviewed and may be adjusted; should that be necessary, a supplemental Detailed Plan of Allocation will be presented" to the Court for its review and approval. See Plan of Allocation, at 5. Thus, should the facts bear out that some of the money cannot be used in one locale because there is not sufficient need among eligible victims, those monies will be reallocated but done so with Court approval and proof that the money is not in fact needed in the particular locale. Thus, the Settlement and Plan of Allocation contemplated and provided for a method of addressing the concerns raised by the Reallocation Proposals.

Finally, to the extent that it is even applicable, the Court finds that the Settlement does not violate Amchem Prods. v. Windsor, 521 U.S. 591 (1997), as there is no evidence to suggest that Class Counsel subordinated the needs of Class Members living in Hungary to the interests of Class Members living in other countries. First, the Confederation of Holocaust Survivors in Hungary, the Federation of Jewish Communities

---

[19] See e.g. Letter from Stuart E. Eizenstat to the Honorable Edward R. Korman, December 30, 2003, attached as Exhibit A to Declaration of Samuel J. Dubbin in Support of Plaintiffs' Motion for Final Approval of the Class Action Settlement and Supporting Memorandum of Law ("Dubbin Declaration"); Declaration of David Saltman, Jewish Community Services of South Florida (Miami-Dade County programs) and Ken Moskowitz, Jewish Family Services, Inc. of Broward County, Florida, Exhibits B and C to Dubbin Declaration; Submission of United Jewish Appeal/Federation of New York City to Swiss Bank Special Master, Exhibit F to Dubbin Declaration; and Brodsky and Della Pergola study, Exhibit E to Dubbin Declaration.

19

in Hungary, and the Association of Former Hungarian Jews in Israel all participated in the mediation through counsel. Furthermore, no objector has suggested that the 10% allocation plan was suggested during the mediation process. See Objections 242, 252; Final Fairness Hearing Tr. at 111. Third, although the parties did not select an allocation method that will favor Hungary over the other countries, Class Members living in Hungary will receive approximately $900,000 a year in financial assistance under the Settlement, which is a greater amount than that achieved under any other Holocaust restitution case. See Final Fairness Hearing Tr. at 114. Accordingly, upon careful consideration of the objections and the oral argument of the Objectors, the Court finds that the current Plan of Allocation is fair, reasonable, and not the product of collusion.

## IX    FEE REQUEST

Class Counsel seeks an award for fees and reimbursable expenses of $3.85 million. When expenses are deducted, the fees requested represent less than 12% of the total monetary value of the Settlement, which is far below the Eleventh and Federal Circuits' standards for awarding attorneys fees in common fund class actions. Class Counsel litigated this case against a highly sophisticated and extremely powerful adversary with vast resources and an impressive arsenal of legal defenses not available to all defendants. It took five years of determined and creative lawyering before a settlement could be reached. Considering the extraordinary time and effort expended by Class Counsel, the difficulty of the case and the risks undertaken, the fact that not a single lawyer stepped forward to assist Class Counsel on a pro bono basis or at reduced-fee rates, as well as the quality and historical importance of the results, the fees requested are amply supported.[20] Accordingly, the Court confirms the appointment of Class Counsel and finds that Class Counsel have fairly and adequately represented the interests of the Class. In addition, for the reasons set forth herein and articulated at the Fairness Hearing, the Court finds that attorneys' fees and expenses in the amount of $3.85

---

[20]  For the same reasons, and given that there is extremely minimal opposition to Counsel's fee request among the over 60,000 class members, the Court finds that this objection does not render the Settlement either unfair or unreasonable. See Objections Nos. 16, 34, 96, 211, 230, 246, 294, and 347 (suggesting that the attorneys' fees are too high). But see Objections/Comments Nos. 25, 67 & 138 (commenting on the high quality of legal work).

20

million is fair and reasonable.

Turning to the request for modest incentive awards, the Court finds that such request is also fair and reasonable. Incentive or service awards, such as those sought here, are readily approved by courts within the Eleventh Circuit. As one district court recently noted, "Courts routinely give incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action litigation." Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (citation omitted) (approving incentive award payments of $300,000 per representative, and $3,000 per non-representative class member who provided affidavit). Here, based upon the information submitted by Class Counsel, and noting that no objections were filed, the Court finds that the modest incentive awards requested for certain Plaintiffs are fair, reasonable, and appropriate.

## X.    CONCLUSION

Based upon the foregoing reasons, as well as the oral findings of fact and conclusions of law reflected in the transcript of the Final Fairness Hearing on September 26, 2005, as well as the arguments made in Plaintiff's Final Approval Motion and Class Counsel's Fee Petition, it is hereby

ORDERED that

1.    The Final Approval Motion [DE 228] is GRANTED. The Settlement Agreement, including the Plan of Distribution and Plan of Allocation, is a fair, reasonable and adequate compromise of the claims against the Defendant in the Action, pursuant to Fed. R. Civ. P. 23.   Judgment is entered dismissing the claims except to the extent of the relief provided in the Settlement Agreement, which is incorporated herein by reference.

2.    Defendant and Settlement Class Members are bound by the Settlement Agreement, including all releases contained therein, and this Final Order and Judgment, and Settlement Class Members do not have any further opportunity to exclude themselves from the Action.

3.    All Class members who have not timely filed a Request for Exclusion are permanently barred

21

and enjoined from commencing and/or prosecuting any Settled Claim against the Defendant in any forum.

4.      Class Counsel's Petition for attorney's fees [DE 212] is GRANTED.  The fees and expenses requested by Class Counsel are approved in the total amount of $3.85 million and the Escrow Agent is directed hereby to pay such fees and expenses from the Settlement Fund to Cuneo Gilbert & LaDuca, LLP. which shall allocate such fees and expenses to other Class Counsel in a fair and equitable manner.

5.      The Plaintiffs are awarded incentive payments totaling $150,000, as set forth on the Schedule of Plaintiff Incentive Payments, attached hereto as Exhibit B, in recognition of the efforts they have undertaken and the risk they have incurred in connection with this Action.  The Escrow Agent is hereby directed to make such payments to the said Plaintiffs from the Settlement Fund.

6.      Without affecting the finality of this Final Order and Judgment, this Court shall retain exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, conditions and obligations of this Final Order and Judgment, including all matters relating to the consummation, performance, and enforcement of the Settlement Agreement.

7.      Class Counsel may move this Court for any Order necessary to implement this Judgment or the Settlement Agreement or to assist in the administration of the Settlement Agreement.

8.      Pursuant to the Settlement Agreement, the Settlement Fund and Special Fund shall be maintained by the Escrow Agent under the continuing jurisdiction and supervision of the Court and shall earn interest, which shall become part of the Special Fund.

9.      For administrative purposes, this case is CLOSED.

DONE AND ORDERED in Miami, Florida this 30 day of September, 2005.

Patricia A. Seitz
United States District Court

cc:
Counsel of Record

22

## Exhibit A

### List of Individuals Excluded from the Settlement

| | |
|---|---|
| 1 | MOSHKOVICH, LENI |
| 2 | MOSHKOVICH, SAMUEL |
| 3 | NELSON, ALAN |
| 4 | FULOP, GEORGE |
| 5 | NEUMAN, VIOLA |
| 6 | PERL, JENE |
| 7 | KOVACS, ILONA |
| 8 | KOVACS, JOHN |
| 9 | LUKACS, CHARLES |
| 10 | SAMET, PIROSKA PEARL |
| 11 | KALLUS, ELSA |
| 12 | RUDAS, IREN |
| 13 | SAND, RONNIE |
| 14 | SCHOSSBERGER, ANDREW |
| 15 | MEISELS, SAMUEL |
| 16 | NEHEZ, VERA |
| 17 | YASKIL, RACHEL |
| 18 | GLASNER, JUDITH |
| 19 | BRUSZT, IVAN |
| 20 | SZEKELY, IREN |
| 21 | VIG, GYORGY |
| 22 | BAR-NIR, MOSHE |
| 23 | SALAMON ROZENCWEIG, OLGA |
| 24 | GOMBOS, GEORGE |
| 25 | BALASZ, ENDRE |
| 26 | WEISS, LILLIAN |
| 27 | EINHORN, ETA |
| 28 | FEUER, JUDITH |
| 29 | WINTER, PAUL |
| 30 | TESSLER, BUROCH |
| 31 | MOLNAR, PETERNE |
| 32 | LUNGER, ALEXANDER |
| 33 | REICH, ELIZABETH |
| 34 | GEZA, TIMAR |
| 35 | SCHWARTZ, SANDOR |
| 36 | BASCH, ESTHER |
| 37 | SIMON, FRANCES |
| 38 | ANGYALOSI, ENDRE |
| 39 | RASMUSEN, EVA |
| 40 | ANGYALOSI, LASZLO |
| 41 | BLUMENTHAL, PETER |
| 42 | WEINBERGER, JOSE GABRIEL |
| 43 | JENEI, SANDORNE |
| 44 | SZIRT, MARTA |
| 45 | GRUNWALD, ANNA |
| 46 | MELLINGER, FRANCISCO |
| 47 | FRISCH, ILONA |
| 48 | LAZAR-FRANCK, SARA |
| 49 | KATZ, GIZELLA |
| 50 | KAISER, JUDIT |

23

| 51 | VASVARI, JANOS |
|----|----------------|
| 52 | FOX, PETER A. |
| 53 | BREUER, ZIGMOND |
| 54 | SHARON, HAIM |
| 55 | HELLER, STEVEN |
| 56 | DE FERENCZI, ANA ROSENTHAL |
| 57 | KLEIN, ELLA |
| 58 | KLEIN, ALEXANDER |
| 59 | MECHLOVITZ, RIFKA |
| 60 | MARKUS, MARGARET |
| 61 | PATAKI-MARC, STEPHAN |
| 62 | HARRISON, EDITH |
| 63 | GREEN, ISRAEL |
| 64 | WEISS, SHARON |
| 65 | LOEWY, GEORGE |
| 66 | LOEWY, VERONICA |
| 67 | BODNAR, ZOLTAN |
| 68 | BODNAR, PIROSKA |
| 69 | BENJAMIN, JUDITH |
| 70 | RETI, ISTVANNE |
| 71 | LAWSON, SHARON J. |
| 72 | DE FIDELHOC, RIVKA DASKAL |
| 73 | HIRSCH, PERI |
| 74 | FRIEDMAN, ASHER |
| 75 | RADOS, ARTURNE |
| 76 | BASHAN, ITZHAK |
| 77 | BASHAN, MIRIAM |
| 78 | GUGI, SANDORNE |
| 79 | VAJDA, DEZSOE |
| 80 | FEHER, TIBORNE |
| 81 | JAKUBOVIC, JIRI |
| 82 | AGOSTON, PAL |
| 83 | RETI, ILONA |
| 84 | HAUER, ARIE |
| 85 | ENGEL, SHMUEL |
| 86 | ENGEL, ZAHAVA |
| 87 | PREIS, MARGARETA |
| 88 | FNICKEL, YAKOV |
| 89 | FNICKEL, EKATERINA |
| 90 | JONAS, JONA |
| 91 | ENGELMAN, MIRIAM |
| 92 | WEINBERGER, CHANA |
| 93 | WEINBERGER, BINYOMIN |
| 94 | HIRSCHLER, RITA |
| 95 | MEISNER, JOZSEFNE |
| 96 | RADNAI, ISTVANNE |
| 97 | KELETI, PETER |
| 98 | FEKETE, SZUNSIZ |
| 99 | FEKETE, JANOS |
| 100 | BARAK BEN-AMOS |
| 101 | FULOP, GEORGE (heir) |
| 102 | HEVESI, DR. EVA (heir) |
| 103 | RADO, JANOS (heir) |
| 104 | KOSA-BANKI, AGNES (heir) |
| 105 | RADONE-LOFFLER, MARIA (heir) |

24

Case 1:06-cv-20464-PAS    Document 7    Entered on FLSD Docket 04/14/2006    Page 30 of 42

| 106 | GLASNER, JUDITH (heir) |
| 107 | WADLER, CHAYA DEBLINGER (heir) |
| 108 | BLISKO, CECELIA DEBLINGER (heir) |
| 109 | ALTMAN, DAVID (heir) |
| 110 | TORMASI, DAVID (heir) |
| 111 | WESTWOOD, JUDITH (heir) |
| 112 | ROSENBERG, SOL (heir) |
| 113 | WEINGARTEN, SARA (heir) |
| 114 | GROSS, JEFFREY (heir) |
| 115 | BASCH, PAUL (heir) |
| 116 | BASCH-RUSSO, FRAN (heir) |
| 117 | BASCH, M. (heir) |
| 118 | TURET, RACHEL (heir) |
| 119 | GABORNE, BARNA (heir) |
| 120 | BLUMENTHAL, SUSAN (heir) |
| 121 | WEISZ, ALEXANDER (heir) |
| 122 | LITTMAN, AUREL (heir) |
| 123 | ILLES, LASZLONE (heir) |
| 124 | VIDA, IMRENE (heir) |
| 125 | GONDOR, MAGDA (heir) |
| 126 | VALYI, GYORGY (heir) |
| 127 | FELDMAN, ELIHU (heir) |
| 128 | KOVACS, TIBOR (heir) |
| 129 | GRUNWALD, LADISLAU (heir) |
| 130 | GROSS, BRIAN (heir) |
| 131 | FOX, PETER (heir) |
| 132 | PORGES, LEO (heir) |
| 133 | SHIMONY, DAVID (heir) |
| 134 | KNAPP, OSZKARNE (heir) |
| 135 | VALYI, GYORGY(heir) |
| 136 | TOLNAI, JUDIT (heir) |
| 137 | MOSKOVITZ, GABRIEL (heir) |
| 138 | LANDESMAN, SLOMO (heir) |
| 139 | MARKUS, MAGGIE (heir) |
| 140 | PAILAS, EVELYN (heir) |
| 141 | GORELICK, BETTY GLUCK (heir) |
| 142 | HOLLANDER, FAYE (heir) |
| 143 | RICKARD, PATRICIA |
| 144 | GILAD, FAYE (heir) |
| 145 | JUHASZ, OTTONE (heir) |
| 146 | RADOS, PETER (heir) |
| 147 | AGOSTON, PAL (heir) |
| 148 | BASHAN, ITZHAK (heir) |
| 149 | BASHAN, MIRIAM (heir) |
| 150 | STERN, ELISABET (heir) |
| 151 | VAJDA, DEZSOENE (heir) |
| 152 | RETI, DAVID (heir) |
| 153 | ZADOR, JULIA (heir) |
| 154 | MEISEL, AGNES (heir) |
| 155 | DERI, GYORGYNE (heir) |
| 156 | FEHER, PETER (heir) |
| 157 | LEVAI, VILMOS (heir) |
| 158 | LOWI, IMRE (heir) |
| 159 | RADNAI, ANDREA FORRAINE (heir) |
| 160 | RADNAI, ISTVANNE (heir) |

25

161         SCHMIDT, TIBOR (heir)
162         KELETI, PETER (heir)

26

**Exhibit B**

**Schedule of Plaintiff Incentive Payments**

| 1 | Edith Klein Amster | $5,000 |
|---|---|---|
| 2 | Francis Bash | $5,000 |
| 3 | Veronika Baum | $5,000 |
| 4 | Alice Besseney | $2,000 |
| 5 | Elisabeth Bleier | $5,000 |
| 6 | Erwin Deutsch | $5,000 |
| 7 | Dr. Joseph Devenyi | $5,000 |
| 8 | Peter Drexler | $5,000 |
| 9 | Barunch Bernhard Epstein | $5,000 |
| 10 | Magda Feig | $2,000 |
| 11 | Michael Fried | $5,000 |
| 12 | Paul Gottlieb | $5,000 |
| 13 | Judith Karmi | $5,000 |
| 14 | Ethel Klein | $5,000 |
| 15 | Mildred Klein | $2,000 |
| 16 | Tamas May | $5,000 |
| 17 | David Mermelstein | $5,000 |
| 18 | Irene Mermelstein | $5,000 |
| 19 | Edith Moore | $5,000 |
| 20 | John J. Rakos | $5,000 |
| 21 | Goerge Rasko | $5,000 |
| 22 | Ana Rosner | $3,000 |
| 23 | Irving Rosner | $5,000 |
| 24 | Georg Moshe Schwarz | $5,000 |
| 25 | Estate of Beorge Sebok | $5,000 |

27

| 26 | Dr. Laszlo Sokoly | $2,000 |
| 27 | Agnes V. Somjen | $5,000 |
| 28 | Olga Steiner | $2,000 |
| 29 | Jonas Stern | $5,000 |
| 30 | Irene Tibor | $5,000 |
| 31 | Andrew Tibor | $5,000 |
| 32 | Agnes Vadasz | $5,000 |
| 33 | Zoltan S. Weiss | $5,000 |
| 34. | Ms. Edith Reiner | $2,000 |

28

# EXHIBIT B

FILED by ___ D.C.

DEC 2 2 2005

J. LARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-1859-CIV-SEITZ

IRVING ROSNER, *et al.*, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

v.

UNITED STATES OF AMERICA,

                Defendant.

## ORDER GRANTING JOINT MOTION FOR ORDER ON SETTLEMENT IMPLEMENTATION

THIS CAUSE came on before the Court on the parties' Joint Motion for Order On

Settlement Implementation. Based on the good cause shown in the Motion, it is hereupon

ORDERED AND ADJUDGED that the Motion be, and the same is, hereby GRANTED, as

follows.

    1.    Paragraph VI.A. of the Settlement Agreement (second paragraph) is hereby

amended in part to provide that the panel "shall select the Recipient Institution by March 31,

2006."

    2.    The Escrow Agent selected by Class Counsel, which shall act as the escrow agent for

the Settlement Fund and Special Funds is Wachovia Bank, National Association, 123 South

Broad Street, Philadelphia, Pennsylvania, 19109, which is pursuant to Section V.B. of the

Settlement Agreement and Paragraph X.8 of the Final Order and Judgment subject to the

continuing jurisdiction and supervision of this Court.

    3.    The Escrow Agent shall disburse from the Settlement Fund or the Special Fund the

following amounts upon the written direction of Class Counsel:



a.  $3.85 million for attorneys' fees and expenses, payable to the Cunco Gilbert & LaDuca LLP Escrow Account, and Cunco Gilbert & LaDuca LLP shall act as collection and disbursement agent and distribute such funds to the three firms appointed as Class Counsel: Cunco Gilbert & LaDuca, LLP, Hagens Berman Sobol Shapiro, LLP, and Dubbin & Kravetz, LLP in accordance with the firms' agreement.

b.  A total of $150,000 for plaintiffs' incentive fees, payable to the named plaintiffs in the amounts specified in Exhibit A.

c.  $500,000, as provided for in Section VI.A. of the Settlement Agreement, shall be disbursed at a future date after a Court Order upon Motion by the Parties in accordance with the recommendation of the panel of historical experts, but shall remain in the Settlement Fund and accumulate interest until such future date.

d.  In light of the foregoing distributions provisions, the funds to be allocated for social service programs (from the Special Fund) in the first year is $4.2 million. In accordance with the Detailed Plan of Allocation filed by the Claims Conference on June 10, 2005 and approved by the Court in its Final Order and Judgment, the escrow agent shall initially disburse a total of $4,093,202.40 to the Claims Conference to be used for social service programs for Hungarian Nazi Victims in need.

e.  The difference between the $4.2 million for programs (plus 1% of the first years' allocation for the Claims Conference's 1% cost reimbursement, i.e. $42,000) and the $4,093,202.40, i.e. $148,797.60, represents approved administrative expenses which may only be paid from interest on the Special Fund. Accordingly, the

2

escrow agent shall, as soon as practicable on a monthly basis after the initial

deposit of the Settlement Fund, transfer accumulated interest (except the interest

allocable to the $500,000 earmarked for the archive project) to the Claims

Conference until it has transferred the sum of $148,797.60 for the first year's

administrative expenses.

    f.    The escrow agent may also deduct its fees from accumulated interest in the first

year according to its agreement with Class Counsel, entered into as of December

21, 2005.

    4.    The panel of experts designated in Paragraph VI.A of the Settlement Agreement

shall be known as the "Committee on the Hungarian Gold Train Archives Fund."

    5.    Up to a maximum of $5,000, interest earned on the sum of $500,000 earmarked in

Section VI.A. of the Settlement Agreement for the archive, between the time Defendant deposits

the Cash Payment until the disbursement to the recipient institution, shall be available for

payment of modest expenses of the panel members.  Class Counsel shall review each such

request and, provided the request has been authorized by a majority of the panel and does not

breach the $5,000 maximum on total expenses, shall submit them to the escrow agent for prompt

payment.

    DONE AND ORDERED in chambers at the United States Courthouse, Miami, Florida,

this _____ day of _December_ , 2005.

                         UNITED STATES DISTRICT JUDGE

3

## Exhibit A

### Schedule of Plaintiff Incentive Payments

| | | |
|---|---|---|
| 1 | Edith Klein Amster | $5,000 |
| 2 | Francis Bash | $5,000 |
| 3 | Veronika Baum | $5,000 |
| 4 | Alice Bossanyi | $2,000 |
| 5 | Elisabeth Bleier | $5,000 |
| 6 | Erwin Deutsch | $5,000 |
| 7 | Dr. Joseph Devenyi | $5,000 |
| 8 | Peter Drexler | $5,000 |
| 9 | Barunch Bernhard Epstein | $5,000 |
| 10 | Magda Feig | $2,000 |
| 11 | Michael Fried | $5,000 |
| 12 | Paul Gottlieb | $5,000 |
| 13 | Judith Karmi | $5,000 |
| 14 | Ethel Klein | $5,000 |
| 15 | Mildred Klein | $2,000 |
| 16 | Tamas May | $5,000 |
| 17 | David Mermelstein | $5,000 |
| 18 | Irene Mermelstein | $5,000 |
| 19 | Edith Moore | $5,000 |
| 20 | John J. Rakos | $5,000 |
| 21 | George Rasko | $5,000 |
| 22 | Ana Rosner | $3,000 |
| 23 | Irving Rosner | $5,000 |
| 24 | Georg Moshe Schwarz | $5,000 |
| 25 | Estate of Beorge Sebok | $5,000 |

| 26 | Dr. Laszlo Sokoly | $2,000 |
| 27 | Agnes V. Somjen | $5,000 |
| 28 | Olga Steiner | $2,000 |
| 29 | Jonas Stern | $5,000 |
| 30 | Irene Tibor | $5,000 |
| 31 | Andrew Tibor | $5,000 |
| 32 | Agnes Vadasz | $5,000 |
| 33 | Zoltan S. Weiss | $5,000 |
| 34. | Ms. Edith Reiner | $2,000 |

# EXHIBIT C

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 06-20464-Civ-Graham/O'Sullivan

JOEL D. JOSEPH,

      Plaintiff,

vs.

SAMUEL J. DUBBIN, et al.,

      Defendants.

_____/

## ORDER TRANSFERRING CASE

**UPON CONSIDERATION** of Defendants' S.D. Fla. Local General Rule 3.9.D Notice of

Similar Action and the entire record in this action, it is hereby

      **ORDERED** that the Clerk transfer this action to the docket of the Honorable Patricia A.

Seitz for all further proceedings.

      **DONE AND ORDERED** in Chambers at Miami, Miami-Dade County, Florida this _____

day of _____, 2006.


                           _____
                           **DONALD M. GRAHAM**
                           **UNITED STATES DISTRICT JUDGE**

Copies furnished to all
counsel or parties on the
attached Service List.
249353.1

# SERVICE LIST

### Joseph v. Dubbin, et al.
### Case No. 06-20464-Civ-Graham/O'Sullivan
### U.S. District Court, Southern District of Florida

Plaintiff Joel D. Joseph
7272 Wisconsin Avenue
Suite 300
Bethesda, Maryland 20814
Telephone: (301) 941-1989

Brian F. Spector, Esq.
E-mail: bspector@kennynachwalter.com
Ismael Diaz (Florida Bar No. 575771)
E-mail: id@kennynachwalter.com
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
**Attorneys for Defendants Samuel J.
Dubbin, Samuel J. Dubbin, P.A., Dubbin &
Kravetz, LLP, Steve W. Berman and
Hagens Berman Sobol Shapiro, LLP**

# EXHIBIT C

CASREF, CLOSED, CMM, MEDIATION, REF_PTRL

# U.S. District Court
## Southern District of Florida (Miami)
### CIVIL DOCKET FOR CASE #: 1:06-cv-20464-PAS

Joseph v. Dubbin, et al                    Date Filed: 02/24/2006
Assigned to: Judge Patricia A. Seitz        Jury Demand: Plaintiff
Referred to: Magistrate Judge Chris M. McAliley    Nature of Suit: 190 Contract: Other
Demand: $0                                  Jurisdiction: Diversity
Cause: 28:1332 Diversity-Breach of Contract

**Plaintiff**

**Joel D. Joseph**                    represented by    **Joel D. Joseph**
                                                        Suite 300
                                                        7272 Wisconsin Avenue
                                                        Bethesda, MD 20814
                                                        PRO SE

V.

**Defendant**

**Samuel J. Dubbin**                  represented by    **Brian F. Spector**
                                                        Kenny Nachwalter.P.A.
                                                        201 South Biscayne Boulevard
                                                        1100 Miami Center
                                                        Miami, FL 33131-4327
                                                        U.S.A
                                                        305-373-1000
                                                        Fax: 372-1861
                                                        Email: bspector@kennynachwalter.com

                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ismael Diaz**
                                                        Kenny Nachwalter, P.A.
                                                        Miami Center
                                                        201 S Biscayne Boulevard
                                                        Suite 1100
                                                        Miami, FL 33131-4327
                                                        305-373-1000
                                                        Fax: 372-1861
                                                        Email: idiaz@kennynachwalter.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

Samuel J. Dubbin, PA                    represented by   **Brian F. Spector**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ismael Diaz**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Dubbin and Kravetz**                  represented by   **Brian F. Spector**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ismael Diaz**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Steve W. Berman**                     represented by   **Brian F. Spector**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ismael Diaz**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Hagens Berman Sobol Shapiro LLP**     represented by   **Brian F. Spector**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ismael Diaz**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/24/2006 | 1 | COMPLAINT filed; FILING FEE $250.00 RECEIPT # 935640 ; Magistrate Judge O'Sullivan (dg, Deputy Clerk) (Entered: 02/28/2006) |
| 02/24/2006 | 2 | SUMMONS(ES) issued for Samuel J. Dubbin (dg, Deputy Clerk) |

| | | (Entered: 02/28/2006) |
|---|---|---|
| 02/24/2006 | 3 | SUMMONS(ES) issued for Samuel J. Dubbin PA (dg, Deputy Clerk) (Entered: 02/28/2006) |
| 02/24/2006 | 4 | SUMMONS(ES) issued for Dubbin and Kravetz (dg, Deputy Clerk) (Entered: 02/28/2006) |
| 02/24/2006 | 5 | SUMMONS(ES) issued for Steve W. Berman (dg, Deputy Clerk) (Entered: 02/28/2006) |
| 02/24/2006 | 6 | SUMMONS(ES) issued for Hagens Berman Sobol (dg, Deputy Clerk) (Entered: 02/28/2006) |
| 04/14/2006 | 7 | NOTICE of Pendency of Other Action. by Hagens Berman Sobol, Steve W. Berman, Dubbin and Kravetz, Samuel J. Dubbin PA, Samuel J. Dubbin (hd, Deputy Clerk) (Entered: 04/14/2006) |
| 04/14/2006 | 8 | MOTION by Hagens Berman Sobol, Steve W. Berman, Dubbin and Kravetz, Samuel J. Dubbin PA, Samuel J. Dubbin (Attorney Brian F. Spector, Ismeli Diaz) for ten minute Hearing /oral argument on Rule 3.9 notice (tb, Deputy Clerk) (Entered: 04/17/2006) |
| 04/14/2006 | 9 | MOTION with memorandum in support by Hagens Berman Sobol, Steve W. Berman, Dubbin and Kravetz, Samuel J. Dubbin PA, Samuel J. Dubbin to dismiss plaintiff's complaint (tb, Deputy Clerk) (Entered: 04/17/2006) |
| 04/14/2006 | 10 | MOTION by All Defendants for ten minute hearing on Rule 3.9.D notice (dg, Deputy Clerk) (Entered: 04/17/2006) |
| 04/20/2006 | 11 | ORDER transferring case to the calendar of the Honorable Patricia A. Seitz ( Signed by Judge Donald L. Graham on 5/19/06 and accepted by Judge Patricia A. Seitz on 4/20/06) [EOD Date: 4/21/06] (ct, Deputy Clerk) (Entered: 04/21/2006) |
| 04/20/2006 | | CASE reassigned to Judge Patricia A. Seitz (ct, Deputy Clerk) (Entered: 04/21/2006) |
| 04/21/2006 | 12 | Certification and ORDER of transfer to Magistrate Judge ( Signed by Magistrate Judge John J. O'Sullivan on 4/21/06) [EOD Date: 4/25/06] (ct, Deputy Clerk) (Entered: 04/25/2006) |
| 04/24/2006 | | Magistrate identification: Magistrate Judge Chris M. McAliley (ct, Deputy Clerk) (Entered: 04/25/2006) |
| 04/27/2006 | 13 | RESPONSE by Joel D. Joseph to [9-1] motion to dismiss plaintiff's complaint (dg, Deputy Clerk) (Entered: 04/28/2006) |
| 05/01/2006 | 14 | ORDER set Scheduling meeting report due for 7/17/06 ( Signed by Judge Patricia A. Seitz on 5/1/06) [EOD Date: 5/2/06] (ct, Deputy Clerk) (Entered: 05/02/2006) |
| 05/03/2006 | 15 | UNOPPOSED MOTION by All Defendants (Attorney ) to extend time to reply to motion to dismiss (ct, Deputy Clerk) (Entered: 05/03/2006) |

| | | |
|---|---|---|
| 05/08/2006 | 16 | ORDER granting [15-1] motion to extend time to reply to motion to dismiss ( Signed by Judge Patricia A. Seitz on 5/8/06) [EOD Date: 5/9/06] (ct, Deputy Clerk) (Entered: 05/09/2006) |
| 05/15/2006 | 17 | REPLY by Samuel J. Dubbin PA, Samuel J. Dubbin to response to [9-1] motion to dismiss plaintiff's complaint (ct, Deputy Clerk) (Entered: 05/16/2006) |
| 07/11/2006 | 18 | UNOPPOSED MOTION by All Defendants (Attorney ) to stay discovery and objection to discovery and objection to discovery obligations imposed by order requiring schedling report with supporting memeorandum of law (dj, Deputy Clerk) (Entered: 07/12/2006) |
| 07/13/2006 | 19 | ORDER granting [9-1] motion to dismiss plaintiff's complaint; plaintiff shall have until and including August 2, 2006 to file amended complaint (Signed by Judge Patricia A. Seitz on 7/13/06) [EOD Date: 7/14/06] (mh, Deputy Clerk) (Entered: 07/14/2006) |
| 07/13/2006 | 20 | ORDER granting [18-1] motion to stay discovery and objection to discovery and objection to discovery obligations imposed by order requiring schedling report with supporting memeorandum of law ( Signed by Judge Patricia A. Seitz on 7/13/06) [EOD Date: 7/14/06] (mh, Deputy Clerk) (Entered: 07/14/2006) |
| 07/17/2006 | 21 | Joint Planning And Scheduling Report by Joel D. Joseph, All Defendants 7/17/06 (mh, Deputy Clerk) (Entered: 07/18/2006) |
| 07/19/2006 | 22 | ORDER referring case to mediation. 15 days to appoint mediator (Signed by Judge Patricia A. Seitz on 7/18/06) [EOD Date: 7/20/06] (mh, Deputy Clerk) (Entered: 07/20/2006) |
| 07/19/2006 | 23 | ORDER REFERRING CASE (PRE-TRIAL) to Magistrate Judge Chris M. McAiley (Signed by Judge Patricia A. Seitz on 7/18/06) CCAP [EOD Date: 7/20/06] (mh, Deputy Clerk) (Entered: 07/20/2006) |
| 07/19/2006 | 23 | ORDER Setting Trial Date, Pretrial Deadlines And Referral to Magistrate Judge; Calendar call set for 1:15 p.m. on 10/24/07; Jury trial set for 10/29/07; Pretrial conference for 9:00 a.m. on 9/20/07; (Signed by Judge Patricia A. Seitz on 7/18/06) [EOD Date: 7/20/06] CCAP (mh, Deputy Clerk) (Entered: 07/20/2006) |
| 07/19/2006 | | CASE REFERRED to Magistrate Judge Chris M. McAliley. (ch) (Entered: 10/26/2006) |
| 07/27/2006 | 24 | FIRST AMENDED COMPLAINT by Joel D. Joseph , (Answer due 8/6/06 for Samuel J. Dubbin, for Samuel J. Dubbin PA, for Dubbin and Kravetz, for Steve W. Berman, for Hagens Berman Sobol ) amending [1-1] complaint (bb, Deputy Clerk) (Entered: 07/31/2006) |
| 07/31/2006 | 25 | NOTICE of selection of Gerald T. Wetherington as Mediator by Hagens Berman Sobol, Steve W. Berman, Dubbin and Kravetz, Samuel J. Dubbin PA, Samuel J. Dubbin, Joel D. Joseph (rb, Deputy Clerk) (Entered: 08/02/2006) |

| 08/02/2006 | 26 | UNOPPOSED MOTION by Hagens Berman Sobol, Steve W. Berman, Dubbin and Kravetz, Samuel J. Dubbin PA, Samuel J. Dubbin, Joel D. Joseph to extend time to file a response to plaintiffs first amended complaint (rb, Deputy Clerk) (Entered: 08/03/2006) |
|---|---|---|
| 08/03/2006 | 27 | ORDER granting [26-1] motion to extend time to file a response to plaintiffs first amended complaint; amended complaint due 8/24/06 (Signed by Judge Patricia A. Seitz on 8/3/06) [EOD Date: 8/4/06] (mh, Deputy Clerk) (Entered: 08/04/2006) |
| 08/24/2006 | 28 | MOTION with memorandum in support by All Defendants to dismiss first amended complaint (bs, Deputy Clerk) (Entered: 08/25/2006) |
| 08/24/2006 | 29 | SEALED DOCUMENT placed in vault (dg, Deputy Clerk) (Entered: 08/25/2006) |
| 08/30/2006 | 30 | ORDER Re; Sealed Filing (DE 29) (Signed by Judge Patricia A. Seitz on 8/30/06) [EOD Date: 8/31/06] (mh, Deputy Clerk) (Entered: 08/31/2006) |
| 09/14/2006 | 31 | UNOPPOSED MOTION by Joel D. Joseph to extend time to respond to motion to dismiss the first amended complaint (mh, Deputy Clerk) (Entered: 09/15/2006) |
| 09/15/2006 | 32 | NOTICE of Filing Order Scheduling Mediation by All Defendants (mh, Deputy Clerk) (Entered: 09/18/2006) |
| 09/18/2006 | 33 | ORDER granting [31-1] motion to extend time to respond to motion to dismiss the first amended complaint Response to motion reset to 10/16/06 for [28-1] motion to dismiss first amended complaint ( Signed by Judge Patricia A. Seitz on 9/18/06) [EOD Date: 9/19/06] (mh, Deputy Clerk) (Entered: 09/19/2006) |
| 09/21/2006 | 34 | ORDER SCHEDULING MEDIATION before Mediator: Gerald T. Wetherington for April 16, 2007 at 10:00 a.m. (Signed by Judge Patricia A. Seitz on 9/21/06) [EOD Date: 9/21/06] (mh, Deputy Clerk) (Entered: 09/21/2006) |
| 10/16/2006 | 35 | RESPONSE in Opposition re 28 Motion to Dismiss filed by Joel D. Joseph. (hd) (Entered: 10/18/2006) |
| 10/16/2006 | 36 | AFFIDAVIT signed by Joel D. Joseph. re 35 Response in Opposition to 28 Motion to Dismiss by Joel D. Joseph. (hd) (Entered: 10/18/2006) |
| 10/23/2006 | 37 | REPLY to Response to Motion re 28 Motion to Dismiss *the First Amended Complaint* filed by Samuel J. Dubbin. (Diaz, Ismeli) (Entered: 10/23/2006) |
| 11/28/2006 | 38 | MOTION to partially lift stay by Joel D. Joseph. (dg) (Entered: 12/01/2006) |
| 11/28/2006 | 39 | Statement of points and authorities in support of 38 MOTION to partially lift stay by Joel D. Joseph (dg) (Entered: 12/01/2006) |
| 12/01/2006 | 40 | RESPONSE in Opposition re 38 MOTION to partially lift stay filed by All Defendants. (Attachments: # 1 Exhibit A)(Diaz, Ismael) (Entered: |

|            |     | 12/01/2006)                                                                                                                                                                                                                      |
|------------|-----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 12/01/2006 | 41  | AMENDED DOCUMENT by All Defendants. Amendment to 40 Response in Opposition to Motion *to Partially Lift Stay (Corrected)*. (Attachments: # 1 Exhibit A)(Diaz, Ismael) (Entered: 12/01/2006)                                          |
| 12/13/2006 | 42  | ORDER denying 38 Motion to PARTIALLY LIFT STAY . Signed by Judge Patricia A. Seitz on 12/13/06. (lk) (Entered: 12/14/2006)                                                                                                          |
| 12/22/2006 | 43  | ORDER denying as moot 8 Motion for Hearing, denying as moot 10 Motion for Hearing, granting 28 Motion to Dismiss first amended complaint. This case is CLOSED. Signed by Judge Patricia A. Seitz on 12/22/06. (lk) (Entered: 12/28/2006) |
| 01/29/2007 | 44  | NOTICE OF APPEAL by Joel D. Joseph as to 43 Order on Motion for Hearing,, Order on Motion to Dismiss Filing fee $ 455.00, receipt number 954028. Copies sent to USCA and Counsel of Record. (nc) (Entered: 02/02/2007)               |
| 02/02/2007 |     | Certified copies of Notice of Appeal, Docket Sheet and Order under appeal to US Court of Appeals re 44 Notice of Appeal (nc) (Entered: 02/02/2007)                                                                                  |
| 02/21/2007 | 45  | NOTICE of Receipt of Notice of Appeal Transmittal Letter from USCA on 2/12/07 as to Joel D. Joseph re 44 appeal USCA number 07-10615-BB (hh) (Entered: 02/22/2007)                                                                  |
| 02/21/2007 | 46  | TRANSCRIPT INFORMATION FORM by Joel D. Joseph re 44 Notice of Appeal. No Transcript Requested. (nc) (Entered: 03/06/2007)                                                                                                           |
| 03/15/2007 | 47  | ORDER of DISMISSAL from USCA pursuant to Appellant's motion to dismiss appeal with prejudice is GRANTED as to 44 Notice of Appeal filed by Joel D. Joseph, Re: USCA# 07-10615-BB. Copy to Judge. (nc) (Entered: 03/16/2007)          |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/16/2008 11:01:36 | | |
| **PACER Login:** cg0189 | **Client Code:** | 6666 |
| **Description:** Docket Report | **Search Criteria:** | 1:06-cv-20464-PAS |
| **Billable Pages:** 4 | **Cost:** | 0.32 |

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re MCI Non-Subscriber | ) | Case No. MDL 1275 |
| Telephone Rates Litigation | ) | |
| | ) | (Judge David R. Herndon) |

## MOTION FOR AN AWARD OF ATTORNEY'S FEE AND/OR A REPRESENTATIVE PLAINTIFF FEE

Joel D. Joseph moves this court for an award of attorney's fee and/or a representative plaintiff fee. Mr. Joseph is an attorney and his affidavit is attached to this motion.

Joseph filed one of the original several cases in the District of Columbia that was consolidated into this case.

Twenty-five million was set aside for attorneys' fees, a substantial amount considering to factors:

1. Not much attorneys' time was spent litigating this case; and

2. The settlement is meagre. MCI overcharged customers approximately $300 million and only has to pay $88 million to plaintiffs. This allows MCI to keep more than two-thirds of its ill-gotten gains.

Mr. Joseph was nominally represented by the Cuneo Group and Milberg Weiss. Mr. Joseph seeks compensation as quantum meruit for the work he performed in bringing his case and, since he was the only plaintiff represented by these two firms, for a reasonable proportion of their legal fees.

1

If the court deems it improper for Mr. Joseph to receive a attorney's fee, he

respectfully requests a payment for being a representative plaintiff.

JOEL D. JOSEPH
7272 Wisconsin Avenue, Suite 300
Bethesda, Maryland 20814
(301) 941-1989

## CERTIFICATE OF SERVICE

I certify that I have mailed a copy of this motion, statement of points and
authorities in support, a proposed order and the affidavit of Joel D. Joseph this 30th day
of September, 2002 to Stephen Katz, Carr, Korin and Tillery, 701 Market Street, Suite
300, St. Louis, MO 63101, Jonathan Cuneo, 317 Massachusetts Avenue, N.E.,
Washington, D.C. 20002, William Lerach, Milberg, Weiss, 401 B St Suite 1600 San
Diego CA 92101, Daniel Girard, Girard & Green, 160 Sansome St., Suite 300, San
Francisco, CA 94104, Cary & Danis, 8182 Maryland Avenue, Suite 1400, St. Louis, MO
63105 and to Levin Middlebrooks, PO Box 12308, Pensacola, FL 32581.

JOEL D. JOSEPH

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re MCI Non-Subscriber | ) | Case No. MDL 1275 |
| Telephone Rates Litigation | ) | |
| | ) | (Judge David R. Herndon) |

## <u>AFFIDAVIT OF JOEL D. JOSEPH</u>

Joel D. Joseph, affirms under the penalty for perjury, that the following facts are accurate and truthful:

1. I am an attorney licensed to practice in the State of Maryland. I am admitted to practice in several federal district courts, and the United States Courts of Appeals for the District of Columbia, Second, Fourth and Eleventh Circuits.

2. I was the only named plaintiff in Civil Action No. 1:98-2919 filed in the United States District Court for the District of Columbia in *Joel D. Joseph v. MCI Telecommunications Corp.* This was one of the seven cases consolidated into the above-captioned case.

3. I spend some forty hours researching this case and at the Federal Communications Commission in Washington, D.C. I prepared legal memoranda and drafted a complaint.

4. I retained the Cuneo Group in Washington, D.C. to represent me in this matter and the Cuneo Group in turn brought Milberg Weiss Bershad Hines and Lerach into the case.

5. I understand that representative plaintiffs have been paid a fee of $5,000. and that the attorneys have been paid millions of dollars in fees.

6.   I have not been paid a representative plaintiff fee or any fee for the legal work that I performed.

7.   I performed more work on this case than either the Cuneo Group or Milberg Weiss, and contributed to the result in this case.

Subscribed and sworn to this 30th day of September, 2002.

JOEL D. JOSEPH
7272 Wisconsin Avenue, Suite 300
Bethesda, Maryland 20814
(301) 941-1989

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re MCI Non-Subscriber | ) | Case No. MDL 1275 |
| Telephone Rates Litigation | ) | |
| | ) | (Judge David R. Herndon) |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THE
MOTION FOR AN AWARD OF ATTORNEY'S FEE AND/OR
A REPRESENTATIVE PLAINTIFF FEE**

The court has wide discretion to determine how attorneys' fees are divided

amongst counsel. See e.g. *Janny v. Cleveland Tankers*, 209 F. Supp. 91 (N.D. Ind. 1962).

As one of seven original plaintiffs, an attorney's fee of one-seventh of the total

fee award would not be unreasonable. This amounts to $3,571,428, a rather large fee.

But the fee of $25 million is also large and could be considered excessive in light of the

poor result achieved and the minimal amount of time invested by counsel.

As an alternative, Mr. Joseph should be entitled to receive an amount equal to

what his attorneys received for their minimal labor. Mr. Joseph researched the matter at

the Federal Communications Commission—neither the Cuneo Group nor Milberg Weiss

spent the effort that Mr. Joseph did in determining that the rates charged were not

approved by the FCC. Neither the Cuneo Group nor Milberg Weiss participated in any

substantial fashion and both owe their entire fees to the efforts of Mr. Joseph.

As another alternative, Mr. Joseph worked approximately 40 hours on the

research and drafting of this case. His hourly rate is $500. His lodestar is therefore

$20,000.00. His lodestar should be multiplied by the same factor as that used to compute

the fees paid to the other attorneys.

As a final alternative, Mr. Joseph should at a minimum receive the $5,000

representative plaintiff award that the other representative plaintiffs have received.

For all of these reasons, the court should order that Mr. Joseph be paid a
reasonable fee for the work and service that he performed.

JOEL D. JOSEPH
7272 Wisconsin Avenue, Suite 300
Bethesda, Maryland 20814
(301) 941-1989

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

In Re MCI Non-Subscriber          )      Case No. MDL 1275
Telephone Rates Litigation        )
                                  )      (Judge David R. Herndon)

## ORDER

Upon consideration of the motion of Joel D. Joseph for an attorney's fee,

IT IS ORDERED THAT THE MOTION IS GRANTED.

The court has wide discretion to determine how attorneys' fees are divided

amongst counsel.

I award Mr. Joseph an attorney's fee of $_____.

This fee shall be paid out of

_____

_____.


_____
UNITED STATES DISTRICT JUDGE

1

# EXHIBIT E

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

OCT 2 8 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST LOUIS OFFICE

| | |
|---|---|
| In re: MCI NON-SUBSCRIBER TELEPHONE RATES LITIGATION | MDL DOCKET NO. 1275 ALL CASES |
| | (Judge David R. Herndon) |

## MEMORANDUM AND ORDER

**HERNDON, District Judge:**

On March 29, 2001, this Court held a hearing on Plaintiffs' motion for final approval of the proposed class action settlement in this case; Plaintiffs' proposed plan of allocation; and the application of Plaintiffs' counsel for an award of attorneys' fees and costs and incentive payments to the Class representatives. The Court approved the class action settlement and entered an order regarding disbursement of attorney's fees and cost award.

After being advised that all of the law firms that appeared on behalf of the Class had agreed among themselves on the allocation of the attorneys' fees awarded, the Court entered an Order that authorized and directed Class Counsel to distribute the Fee Award in accordance with the agreement among them (Doc. 211). The Court also authorized the payment of incentive awards of $5,000 to each of the Class representatives, to be paid from the amount awarded to Class counsel for fees and costs (Doc. 130).

Before the Court is Joel Joseph's motion for an award of attorney's fee

1

225

and/or a representative plaintiff fee (Doc. 221). Joseph asks the Court to award him a portion of the legal fees his attorneys recovered in this case or, alternatively, a representative plaintiff award. The Class responded to Joseph's motion, arguing that Joseph was neither an attorney of record during the time this case was pending, nor a named plaintiff in the consolidated proceedings. The Court agrees with the Class.

First, Joseph is not entitled to any portion of the attorneys' fees his attorneys received as a result of this litigation. Although Joseph is an attorney himself, he was not an attorney of record at any time during this consolidated case. Joseph claims that he researched the case at the Federal Communications Commission, and therefore, he is entitled to compensation for his efforts. However, many plaintiffs independently research their cases both before and after a complaint is filed. The simple fact that Joseph invested some of his own time in researching the case does not entitle him to a portion of attorneys' fees awarded in this case.

Joseph's main argument in support of his motion for attorneys' fees appears to be that his attorneys' work was sub-par. Joseph argues that his attorneys, as well as other attorneys representing the Class, invested a "minimal amount of time" in this case and engaged in "minimal labor." However, as the Class points out, a review of the docket sheet substantiates the amount of time Class Counsel spent litigating this case. Additionally, Joseph attacks the settlement recovery that Class Counsel obtained on behalf of the Class. This is hardly a basis for claiming entitlement to share in attorneys' fees.

Further, Joseph takes issue with the fact that Class Counsel did not

2

move for summary judgment. This is not the proper forum to address such an issue. If Joseph is dissatisfied with his attorneys' representation during this case, perhaps Joseph should take that up in a malpractice action. However, the fact remains that Joseph was never an attorney of record in the consolidated action, and therefore, he is not entitled to any portion of attorneys' fees recovered by his attorneys.

Likewise, Joseph is not entitled to a representative plaintiff award. Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit. **Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998)**. When deciding whether a representative plaintiff award is warranted, courts should consider several relevant factors, including the actions the plaintiff has taken to protect the interests of the Class, the degree to which the Class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation. *Id*.

The Court finds that a representative plaintiff award in favor of Joseph is not warranted. The Judicial Panel on Multidistrict Litigation ("MDL") transferred seven individual cases from various districts to this Court to proceed on the MDL docket. Joseph filed one of these original seven actions. However, when the seven cases were consolidated on the MDL as one single cause of action, Joseph was not one of the plaintiffs named in the consolidated complaint (Doc. 7).[1] Therefore, he did

---

[1]The named Plaintiffs are Bryan Sklar, Ted Beckwith, John Gilley d/b/a John Gilley Movers, Laurence Sass, Jay Copeland, Dorothy Howard White, Convention Rentals, Inc. d/b/a Tidewater Computer Rentals, and CJH, d/b/a Tidewater Computer Rentals.

3

not assume the responsibilities of the Class in this case, such as participating in discovery, cooperating with counsel in the prosecution of the case, or playing an important role in achieving the settlement. After the Class was consolidated, Joseph took no actions to protect the interests of the Class and participated very little, if any, in the actual ongoing litigation.

Therefore, the Court finds that Joseph is not entitled to any portion of attorneys' fees his attorneys recovered in this action. Likewise, Joseph is not entitled to a representative plaintiff award. Accordingly, the Court **DENIES** Joseph's motion for an award of attorney's fees and/or a representative plaintiff fee (Doc. 221).

**IT IS SO ORDERED.**

Signed this 28ᵗʰ day of ____Our____, 2002.

**DAVID R. HERNDON**
**United States District Judge**

4

# EXHIBIT F

**FILED**

JUL 1 8 2003

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

In re: MCI NON-SUBSCRIBER                    MDL DOCKET NO. 1275
       TELEPHONE RATES                       ALL CASES
       LITIGATION

                                             (Judge David R. Herndon)

## MEMORANDUM AND ORDER

**HERNDON, District Judge:**

Before the Court is Joel D. Joseph's motion to require disclosure of attorneys' fee allocation (Doc. 243). On October 28, 2002, the Court entered an Order denying Joseph's request to share in the attorneys' fees awarded Class Counsel in this case (Doc. 225). Joseph now requests that this Court order Class Counsel to disclose how the attorneys' fees were allocated among Class Counsel.

Joseph cites **Reynolds v. Beneficial National Bank, 288 F.3d 277 (7th Cir. 2002)** for the proposition that class action settlements and their attendant attorneys' fees should be a matter of public record. However, **Reynolds** only stated that the Seventh Circuit disapproved of the practice of permitting and encouraging the submission of attorneys' fee applications in camera. **Id. at 286.** In this case, however, the Court accepted briefs and heard argument on the issue of awarding attorneys' fees to Class Counsel. The Court also considered motions to intervene by purported class members objecting to the settlement and to Class Counsel's motion for attorneys' fees. The Court entered an order on April 19, 2001, awarding Class

1

245

Counsel 29% of the $88 million recovered on behalf of the class. Thus, unlike *Reynolds*, the attorneys' fee application, argument, and the total amount of attorneys' fees awarded are a matter of public record in this case. Thus, *Reynolds* is clearly inapplicable to this case.

What Joseph requests in this case goes beyond what *Reynolds* requires. Joseph seeks disclosure of the actual allocation of fees among Class Counsel. On March 22, 2002, the Court entered an order acknowledging that all law firms that had appeared on behalf of the class ("Class Counsel") had agreed among themselves on an allocation of the attorneys' fees awarded on April 19, 2001. MCI took no position on the allocation of the fee award among Class Counsel. Accordingly, the Court authorized and directed Class Counsel to distribute the fee award to Class Counsel in accordance with the agreement among them. The actual allocation of the fees among Class Counsel was never made a matter of public record, nor was it required to be so under *Reynolds*. This Court will not require it now.

Accordingly, the Court **DENIES** Joseph's motion to require disclosure of attorneys' fee allocation (Doc. 243).

**IT IS SO ORDERED.**

Signed this 17th day of ____July____ , 2003.

**DAVID R. HERNDON**
**United States District Judge**

2