UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CUNEO LAW GROUP, P.C. | ) |
| and | ) |
| JONATHAN W. CUNEO | ) |
| v. | ) Case No. 08-00253 (RBW) |
| JOEL D. JOSEPH, | ) |
| Defendant | ) |

# FIRST AMENDED COUNTERCLAIM; JURY TRIAL DEMANDED

### I.

### Factual Allegations

1. Joel D. Joseph came to the Cuneo Law Firm as a client. Cuneo represented Joseph, or more accurately, misrepresented Joseph in this court in *Joseph v. MCI Telecommunications*, 1:98-cv-02919-EGS.

2. The MCI complaint was filed on December 1, 1998 as a class action.

3. The *Joseph v. MCI* case was transferred to the Southern District of Illinois pursuant to an order dated April 26, 1999, pursuant to a ruling of a multi-district litigation panel.

4. Cuneo and his firm breached obligations owed to Joseph as a client as follows:

5. Cuneo violated Rule 1.1 of the District of Columbia Rules of Professional Conduct—Competence. Rule 1.1 provides:

> (a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

1

> (b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

6. Cuneo and his firm did virtually nothing in the Southern District of Illinois to protect the interests of Joseph and the class that he represented, except to collect a substantial legal fee.

7. The MCI case involved MCI charging a fee for telephone calls of approximately $3.00 per minute that was not approved by the Federal Communications Commission (FCC).

8. The total amount of illegal overcharges in that case was approximately $300 million.

9. Joseph researched the issues involved, reviewed the FCC's files and drafted a complaint that was ready for filing.

10. Cuneo delayed in filing the action, and this delay caused the case to be transferred from the District of Columbia.

11. Cuneo failed to file a motion for summary judgment that would have resulted in an award of the full $300 million in actual damages, plus attorneys fees.

12. The MCI case was settled for $88 million, including $25 million for attorneys' fees.

13. Consumers lost more than $212 million as a result of Cuneo's malpractice.

14. Rule 1.4 of the District of Columbia Rules of Professional Conduct — Communication provides:

> (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

15. Cuneo failed to keep Joseph reasonably well informed about the status of his case and expressly and specifically refused to tell Joseph the compensation that Cuneo received.

16. Rule 1.8 of the District of Columbia Rules of Professional Conduct provides:

> (e) A lawyer shall not accept compensation for representing a client from one other than the client unless:

    (1) The client gives informed consent after consultation;
    (2) There is no interference with the lawyer's independence of
professional judgment or with the client-lawyer relationship; and
    (3) Information relating to representation of a client is
protected as required by Rule 1.6. (confidentiality).

 17.  Cuneo accepted compensation from someone other than his client and the client did not give informed consent.

 18. Cuneo did not represent the interests of Joseph in the case, only of interests of his firm;

 19. Cuneo received compensation for this case but refused to tell Joseph of the amount of compensation;

 20. Joseph did not receive any money for serving as a representative plaintiff in a class action.

 21. Joseph continues to receive collection letters regarding illegal charges concerning his account with MCI that was the subject of the lawsuit handled by Cuneo.

 22. Joseph created, researched and drafted complaints for the *Gold Train Case*, the *Leatherman* case and the *Kwikset* case.

 23.  But for Joseph's creation of these cases, Cuneo would not have received the large awards that he and his firm did in those cases.

 24.  Concerning the Gold Train Case Cuneo received approximately $1.5 million.

 25.  Cuneo mislead this court by failing to provide the amount of money involved in the Leatherman case.   Cuneo's fee was approximately $2.3 million.  Joseph's share is approximately $460,000, 20% of the award as per the settlement agreement.

 26.  Cuneo forced Joseph out of his firm in Spring 2002 because Jeff Berman of Hagens Berman stated that "I was trying to make a pig fly" concerning the Hungarian Gold Train case.

27. Cuneo had an arrangement with Hagens Berman and William Lerach of the West Coast division of firm formerly known as Milberg Weiss. At Mr. Cuneo's request Lerach would fire employees, and did fire employees that Cuneo disliked. Hagens Berman was also part of this arrangement.

28. Another reason that Cuneo terminated Joseph's employment, or at least forced him to reduce Joseph's hours (he offered to pay $50 per hour for no more than 60 hours per month, or a maximum of $3,000 per month), was because of the firm's tenuous financial situation.

**29.** Jacob Stein, Cuneo's attorney, told me that Cuneo could not afford to pay the settlement of Joseph's earlier case against Cuneo as a lump sum, and finances forced him to make installment payments.

## II.  First Cause of Action

### Breach of Obligations of Attorney to Client

30. Defendant incorporates by reference paragraphs one through 29 inclusive.

31. Cuneo did not keep Joseph informed about status of the MCI case.

32. Cuneo did not represent the interests of Joseph in the MCI case, only of his firm;

33. Cuneo received compensation for this case, but refused to tell Joseph of the amount of compensation,

34. Joseph did not consent to Cuneo receiving money from anyone other than himself concerning the MCI case.

35. Joseph did not receive any money for serving as a representative plaintiff in a class action.

36. Joseph continues to be harmed in his credit by "debts" to MCI for telephone charges that were the subject of the case brought by Cuneo.

### III. Second Cause of Action:

### Breach of Settlement Agreement

37. Defendant incorporates herein by reference paragraphs one to 36 inclusive

38. Plaintiffs willfully and maliciously breached the settlement agreement by failing to promptly pay Joel D. Joseph twenty percent of the amount received regarding the *Leatherman* case.

39. Defendant did not breach the settlement agreement.

40. Even if defendant breached the settlement agreement, such breach was minor and did not substantially harm plaintiffs.

41. Even if plaintiffs were harmed by defendant's breach of the settlement agreement, the total forfeiture provision in the settlement agreement was an unreasonable liquidated damages provision that did not bear any reasonable relationship to the harm actually incurred.

**42.** The settlement agreement, drafted by plaintiffs' counsel, should be construed against plaintiffs.

IV.                    ### IV. Third Cause of Action:

### Quantum Meruit

43. Defendant incorporates herein by reference paragraphs one through 42 inclusive.

44. Defendant is entitled to a fee of one-third of the total amount received by plaintiffs from the *Hungarian Gold Train* case settlement, from the *Leatherman* case and from the *Kwikset* case.

45. A referral fee of one-third is customary and typical in the industry. Joseph did far more than just refer these cases, he did substantial work on them.

46. But for the efforts of defendant there would have been no *Hungarian Gold Train* case, no *Leatherman* case and no *Kwikset* case.

47. Plaintiffs earned fees of approximately $1.5 million in the Gold Train case and have earned approximately $2.5 million from the *Leatherman* case. Plaintiffs' fee in the *Kwikset* case will be approximately $2.5 million. Total fees in these cases will be more than $6 million for the Cuneo firm from these three cases.

48. Defendant is entitled to a reasonable referral fee for his work in developing the *Hungarian Gold Train* case, the *Leatherman* case and the *Kwikset* case.

49. Defendant referred no less than four of the original clients in the Hungarian Gold Train case to plaintiffs.

50. Each of the referred clients signed a written retainer agreement that provided that each attorney assumed joint legal responsibility for the representation and would be available for consultation with the client.

51. Defendant provided continuing representation to the clients that he brought into the case and consulted with them and with other members of the class while the case was pending.

52. The fee sought by defendant is in proportion to the work performed by defendant.

V.  **V. Fourth Cause of Action:**

**Unjust Enrichment**

53. Defendant incorporates herein paragraphs one through 52 inclusive.

54. Plaintiffs were unjustly enriched by not paying Mr. Joseph a reasonable fee for creating the *Hungarian Gold Train* case, the *Leatherman* case and the *Kwikset* case.

55. Defendant performed substantial services that were performed under circumstances in which the defendants understood and intended that compensation would be paid.

56. Plaintiffs had actual knowledge of the benefit provided to them by defendant.

57. Plaintiffs accepted and retained approximately $4 million in legal fees for work performed on the *Hungarian Gold Train* and *Leatherman* cases.

58. Under the circumstances of the *Hungarian Gold Train* and *Leatherman* cases it would be inequitable for plaintiffs to retain the entire $4 million that they received from these cases without paying defendant fair value for the work and services that he provided.

59. Defendant is entitled to one-third of the fees earned by defendants from the settlement of the *Hungarian Gold Train* case, the *Leatherman* case and the *Kwikset* case, or $2.2 million.

## VI.

### Fifth Cause of Action:

### Unfair Trade Practices/Consumer Protection Procedures Act

60. Defendant incorporates by reference paragraphs one through 59, inclusive.

61. This cause of action is brought pursuant to D.C. Code Section 28-3905(k)(1).

62. Plaintiffs' action in attempting to enforce an invalid liquidated damages clause is an unfair and improper trade practice.

63. Defendant has suffered injury as a direct and proximate result of plaintiffs' unfair and improper trade practice.

## VII.

### Sixth Cause of Action: Intentional Infliction of Emotional Distress

64. Defendant incorporates by reference paragraphs one through 63, inclusive.

65. Plaintiffs' conduct in depriving defendant of his share of the proceeds from the *Leatherman* case was intentional, reckless and in deliberate disregard of the high probability that emotional distress would result to defendant.

66. The plaintiffs' conduct was extreme and outrageous and beyond the bounds of decency in society.

67. The conduct of plaintiffs was malicious, willful and intentional.

68. As a result of the plaintiffs' conduct and actions, the defendant has suffered and will continue to suffer, serve and extreme emotional distress.

## VIII.

### Seventh Cause of Action:  Conversion

69. Defendant incorporates by reference paragraphs one through 68, inclusive.

70. Plaintiffs agreed to pay defendant 20% of the proceeds from the *Leatherman* case.

71. Plaintiffs received $2.3 million for the *Leatherman* case on February 12, 2008, and have exercised dominion and control over these funds, including approximately $460,000 which is the property of defendant.

72. Plaintiffs have refused to pay defendant any part of the money that they owe him and have converted this property, approximately $460,000.00 to their own use.

73. Plaintiffs have converted defendant's property intentionally, without permission or justification.

## IX.

### Request for Relief

WHEREFORE, defendant demands judgment against plaintiffs, jointly and severally,

A.   In the amount of $2.2 million plus costs, interest at the rate of 12% per annum and attorneys' fees and a declaratory judgment that plaintiffs shall pay defendant one-third of all money received regarding the *Kwikset* case within five days of receipt;

    **B.**    An award of treble damages, attorney's fees and punitive damages under D.C. Code Section 28-3905(k)(1)(A);

    **C.**    An award of $1 million for intentional infliction of emotional distress;

    **D.**    Punitive damages of $3 million.

I verify that under the penalty for perjury all factual allegations contained in this counterclaim are accurate and truthful.

 

_____
JOEL D. JOSEPH, Pro Se
1717 Fourth Street, Third Floor
Santa Monica, CA 90401
(310) 394-6600

## JURY DEMAND

Defendant requests a trial by jury.

_____
JOEL D. JOSEPH, Pro Se