## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
THE CUNEO LAW GROUP, P.C.,  )
                      )
     and              )
                      )
JONATHAN W. CUNEO,      )
                      )
          Plaintiffs,  )
     v.               )        Civil Action No. 08-00253 (RBW)
                      )
JOEL D. JOSEPH,        )
                      )
         Defendant.  )
_____)

### Memorandum Opinion

The Cuneo Law Group and Jonathan Cuneo ("the plaintiffs") initiated this action for a declaratory judgment against Joel Joseph ("the defendant") for the alleged material breach of parties' settlement agreement. First Amended Complaint for Declaratory Relief ("Am. Compl.") ¶¶ 43 -45. The defendant denies breaching the settlement agreement and has filed a counterclaim seeking, inter alia, a declaration from the Court that it was in fact the plaintiffs who breached the settlement agreement. First Amended Counterclaim; Jury Trial Demanded ("Am. Countercl.") ¶¶ 37-42. Currently before the Court is the plaintiffs' motion for summary judgment and the defendant's cross-motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(c), and the plaintiffs' motion to dismiss Counts I, III, IV, V, VI, and VII of the defendant's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon careful review of the pleadings filed by the parties, their motions, and all memoranda and exhibits submitted in support of those motions, for the reasons that follow, the Court will grant

summary judgment to the plaintiffs and deny the defendant's cross-motion for partial

summary judgment.  The Court will also grant the plaintiffs' motion to dismiss Counts I,

III, IV, V, VI, and VII of the defendant's counterclaim.

### I. Factual Background[1]

A.    The Relationship Between the Parties

The parties' underlying relationship began in 2001 when the plaintiffs, a law firm

and Mr. Cuneo, who "holds an interest in [the firm,]" initially employed the defendant as

one of the firm's staff attorneys, Am. Compl. ¶ 12; Verified Answer to the First

Amended Complaint and Counterclaim[2] ("Verified Answer") ¶ 12; Memorandum of

Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment as to their

Action for Declaratory Judgment and Plaintiffs' Motion to Dismiss and/or for Summary

Judgment as to Defendant Joseph's Counterclaims ("Pls.' Mem. I") ¶ 2,[3] and later as an

independent contractor, Pl.'s Mem. I,  Affidavit of Jonathan W. Cuneo ("Cuneo Aff.") ¶

2.  While employed by the plaintiffs, the defendant worked on "the preliminary stages"

of three contingency fee cases, the Gold Train, Leatherman, and Kwikset cases.  Pls.'

---

[1] The facts set forth below are either admitted or are not in dispute.

[2] The defendant combined his answer and counterclaim into his Verified Answer to the First Amended Complaint and Counterclaim ("Verified Answer").  The defendant later amended his counterclaim in his First Amended Counterclaim without amending the Verified Answer.  Therefore, when referring to the defendant's answer to the plaintiff's First Amended Complaint for Declaratory Relief, the Court will reference the defendant's initial Verified Answer.

[3] The plaintiffs filed their initial motion for summary judgment on March 27, 2008; however, because the defendant filed an amended counterclaim, the plaintiffs filed a new motion for summary judgment on June 11, 2008.  Their new motion and supporting memorandum incorporate the original arguments advanced in their initial motion and supporting memorandum without further reiteration.  Because the original arguments are incorporated in this manner, the court will have to reference both memoranda in this opinion and distinguish them by referring to the first submission as  "I" and the second submission as "II."

Mem. I, Cuneo Aff." ¶ 2; Am. Compl. ¶ 20; Pls.' Mem. I at 1.  The relationship between

the plaintiffs and the defendant began to deteriorate for a variety of reasons and was

ultimately terminated when the defendant filed a lawsuit against the plaintiffs on August

20, 2001 (the "2001 Lawsuit").  Pls.' Mem. I, Cuneo Aff. ¶ 3 & Exhibit ("Ex.") A

(Complaint, Joseph v. Cuneo Law Group, P.C., No. 1:01CV01755, Oct. 3, 2001) ("2001

Compl.").  In the 2001 Lawsuit, the defendant alleged, inter alia, that the plaintiffs: (1)

were liable for breach of the employment contract between him and the law firm, and (2)

that the plaintiffs were guilty of unjust enrichment and conversion.  Pls.' Mem. I, Cuneo

Aff. ¶ 3 & Ex. A, ("2001 Compl.").  Furthermore, the defendant demanded payment of

any money that the plaintiffs owed him.  Am. Compl. ¶ 15; Verified Answer ¶ 15.  The

plaintiffs refused to pay the funds being requested by the defendant because they had

received a garnishment notice from the District of Columbia, which required that any

payment owed to the defendant be delayed.[4]  Am. Compl. ¶¶ 13-14; Verified Answer ¶¶

13-14.  While the 2001 Lawsuit was in litigation, the defendant filed liens in the

plaintiffs' pending cases and contacted the plaintiffs' various co-counsel in those cases.

Am. Compl. ¶ 16; Verified Answer ¶ 16.  Ultimately, the parties entered into a settlement

agreement on March 15, 2002, resolving the defendant's 2001 Lawsuit.  Pls.' Mem. I,

Cuneo Aff. ¶ 4 & Ex. B (Agreement of Release) (the "2002 Settlement Agreement").

---

[4] The defendant objects to Cuneo's reasoning for withholding payment, asserting that the plaintiffs were holding "[t]he funds . . . in trust for payment of a health insurance policy for [the defendant] and his three sons," and therefore, according to the defendant, "had no right not to pay the insurance premium." Verified Answer ¶ 14.

3

B.    The 2002 Settlement Agreement

The 2002 Settlement Agreement "provided that [the defendant] was to receive 20 percent (20%) of Cuneo's net fees, if any, in three (3) then-pending plaintiffs' contingency fee cases, referred to as the <u>Gold Train</u> Case, the <u>Leatherman</u> Case, and the <u>Kwikset</u> Case."  Am. Compl. ¶ 20; Verified Answer ¶ 20.  The parties included a non-interference clause in the 2002 Settlement Agreement, which states that "[the defendant] shall make no attempt to interfere with the pending cases or cases that follow, nor shall he attempt to file liens or notices of claims, or correspond with the litigants.  If [the defendant] does he has breached the agreement and waives his percentages."  Pls.' Mem. I, Cuneo Aff. ¶ 5 & Ex. B (2002 Settlement Agreement).  The defendant "also agreed in writing to 'release all liens' and 'not file any independent fee applications' and to 'cooperate' with [the plaintiffs] 'reasonably in the prosecution of [the three pending contingency fee] cases.'"  Am. Compl. ¶ 22; Verified Answer ¶ 22.

C.    The Defendant's Alleged Breach of the 2002 Settlement Agreement

The plaintiffs allege that in January 2006, payment was received for the <u>Gold Train</u> case,[5] Am. Compl. ¶ 23, and from those funds the plaintiffs paid and the defendant accepted $240,895 in accordance with the 2002 Settlement Agreement.[6]  Pls.' Mem. I,

---

[5] The defendant states that he believes the plaintiffs received payment in the <u>Gold Train</u> case in December 2005.  Verified Answer ¶ 23.

[6] The defendant never disputes the amount that the plaintiffs assert was forwarded to him pursuant to the 20% he was entitled to receive under the terms of the 2002 Settlement Agreement.  Furthermore, the plaintiffs "withheld $50,000 as a reserve to cover [expenses associated with the disbursement of the settlement agreement], and paid [the defendant] 20% of [the plaintiffs'] fees after such amount was withheld."  <u>See</u> Statement of Material Facts as to which there is No Genuine Issue in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment as to his Breach of Contract Claim ¶ 12.  According to the defendant, he was told by an individual associated with the plaintiff law firm that he would receive the withheld funds "within 90 days."  Verified Answer ¶ 24.

4

Cuneo Aff. ¶ 7; Am. Compl. ¶ 24; Verified Answer ¶ 24.  However, despite accepting

this payment and in disregard of the 2002 Settlement Agreement, the defendant contacted

the plaintiffs' co-counsel in the <u>Gold Train</u> case, demanding an additional 20% "finders

fee" for his work on that case.  Am. Compl. ¶ 26; Verified Answer ¶ 26, 31; Pls.' Mem. I,

Cuneo Aff. ¶ 8.[7]  Upon receipt of the defendant's demand letter, the plaintiffs' co-counsel

in the <u>Gold Train</u> case notified the plaintiffs of the defendant's demand,  Pls.' Mem. I at

2; Cuneo Aff. ¶ 8 & Ex. E (Letter to the defendant from the plaintiffs' counsel, Jan, 19,

2006.), and the plaintiffs informed the defendant that his conduct constituted a material

breach of the 2002 Settlement Agreement, <u>id.</u>  Then, on February 24, 2006, the defendant

filed a complaint against the plaintiffs' co-counsel seeking one-third of their fees from

the <u>Gold Train</u> case.  Pl.'s Mem. I, Cuneo Aff. ¶ 9 & Ex. F (Complaint, <u>Joseph v.

Dubbin</u>, No. 06-20464, Feb. 24, 2006).  On December 22, 2006, the case against the

plaintiffs' co-counsel was dismissed with prejudice, which Joseph appealed.  <u>Id.</u>, Cuneo

Aff. ¶ 9 & Ex. H (Docket, <u>Joseph v. Dubbin</u>, No. 06-20464).  The parties to that lawsuit

then engaged in negotiations, which resulted in a settlement, and the case was dismissed

with prejudice on March 15, 2007.  <u>Id.</u>

On February 12, 2008, the plaintiffs "received payment in the <u>Leatherman</u> Case."

Am. Compl. ¶ 41.  The plaintiffs promptly filed the present lawsuit claiming that the

defendant had "lost . . . entitlement to any share [of] the fee in the <u>Leatherman</u> Case" due

to his prior interference in the <u>Gold Train</u> case.  <u>Id.</u> ¶ 42.  Consequently, pursuant to the

---

[7] The plaintiffs contend that the amount the defendant initially demanded was for an additional finders fee of 20 %, although the defendant does not explicitly admit that he demanded an amount equal to 20%, he never disputes the plaintiffs' contention as to the amount.  Furthermore, the record reflects that he did in fact demand an additional finders fee.

terms of the 2002 Settlement Agreement, the plaintiffs refused to release any of the

proceeds from the <u>Leatherman</u> case to the defendant on the ground that he "waived his

entitlement to a percentage of the <u>Leatherman</u> fee . . . ."  Pls.' Mem. I, Cuneo Aff. ¶13.

D.      The Current Dispute

On February 15, 2008, the plaintiffs filed their initial complaint in this case, and

on February 26, 2008, they filed their amended complaint.  After filing an initial answer

and counterclaim on March 5, 2008, on May 22, 2008, the defendant filed an amended

counterclaim and answer asserting claims of legal malpractice; breach of the settlement

agreement; <u>quantum</u> <u>meruit</u>; unjust enrichment; unfair trade practices under the District

of Columbia Consumer Protection Procedures Act; intentional infliction of emotional

distress; and conversion.  Am. Countercl.  On June 11, 2008, the plaintiffs filed their

motion for summary judgment as to their request for declaratory judgement and their

motion to dismiss or, in the alternative, for motion for summary judgment on the

defendant's counterclaim. The defendant then filed a memorandum on June 23, 2008, in

opposition to the plaintiffs' motions and also a separate cross-motion for partial summary

judgment.

**II. Legal Analysis**

A.      The Plaintiffs' Summary Judgment Motion

To grant a motion for summary judgment under Rule 56(c), this Court must find

that "the pleadings, the discovery, and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must also view the

evidence in the light most favorable to the non-moving party.  <u>Bayer v. U.S. Dept. of the</u>

Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992).  However, the nonmoving party cannot rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted) (some alterations in original).  Therefore, under Rule 56(c), if a party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. Id. at 325.

     1.     The Plaintiffs' Breach of the Settlement Agreement Claim

The plaintiffs contend that they are entitled to summary judgment on their settlement breach claim, arguing that the defendant materially breached the 2002 Settlement Agreement by interfering with the then-pending contingency fee cases, filing a lawsuit against the plaintiffs' co-counsel in one of those cases, and corresponding with the litigants in that case, which violated the terms of the settlement agreement's non-interference clause.  Am. Compl. ¶¶ 44-45.  The defendant responds that he did not materially breach the 2002 Settlement Agreement because he contacted only "co-counsel" and not the actual parties.  Verified Answer ¶¶ 2, 25-26, 31.  He further asserts that "even if he did [breach the agreement], the paragraph in question [in the 2002 Settlement Agreement] . . . constitute[s] an illegal liquidated damages clause and [is therefore] invalid." Verified Answer ¶¶ 2, 31, 42, 44.  The Court's first task is to determine what the parties intended when they executed the non-interference clause of the 2002 Settlement Agreement.

a.    The Terms of the Non-Interference Clause of the 2002
Settlement Agreement

The parties dispute the meaning of the terms <u>litigants</u> and <u>pending</u> contained in

the 2002 Settlement Agreement.  The defendant contends the term "litigants" does not

include lawyers and the term "pending" means a case that has not been "settled."[8]

Defendant's Opposition to the Motion for Summary Judgment and the Motion to Dismiss

the Counterclaim and Statement of Points and Authorities in Support of the Motion for

Partial Summary Judgment ("Def.'s Opp'n I") at 3.[9]  On the contrary, the plaintiffs argue

that "the term 'litigants' was intended to include [both the] parties and their attorneys"

because "[n]one of the defendants in the pending cases were natural persons[,]" as

"[t]hey were the United States and two corporations," and therefore, the only way the

defendant "could have corresponded with a party defendant would be through its

attorney."  Pls.' Mem. I at 10.  Furthermore, the plaintiffs contend that the term

"pending" includes all cases covered by the settlement agreement, even if a case was

"administratively closed,"[10] so long as the settlement remained outstanding and the case

_____

[8] Although the defendant never adopts the term <u>administratively closed</u>, it is the Court's
understanding that the defendant is asserting that once a case has been "settled" and is closed, it is no
longer in a pending status.

[9] Like the plaintiffs, <u>see</u> <u>supra</u> at n.2, the defendant filed his initial memorandum opposing
plaintiffs' motion for dismissal or summary judgment on April 14, 2008.  After the plaintiffs filed a new
motion for summary judgment or dismissal, the defendant filed a new memorandum in opposition to that
motion on June 23, 2008, incorporating the arguments made in his original memorandum without actually
further reiterating them. The Court will therefore have to reference both memoranda and will distinguish
them by referring to the first submission as "I" and the second submission as "II."

[10] The case that was the subject of the settlement agreement was also assigned to the judge in this
case at the time of the settlement.  Cases are administratively closed by this judge solely for statistical and
case management purposes.  Cases in this status usually have been settled but remain under the Court's
supervision and can be administratively opened in the event problems arise with the settlement and the
Court's intervention becomes necessary.

was still under the Court's jurisdiction, which was the status of the case the parties had agreed to settle.  Id. at 10-11.

Settlement agreements "are in the nature of contracts."  America v. Preston, 468 F. Supp. 2d 118, 122 (D.D.C. 2006) (quoting Makins v. District of Columbia, 277 F.3d 544, 546-47 (D.C. Cir. 2002) (applying contract law to a settlement agreement dispute)). Thus, "[t]he enforceability of a settlement agreement is governed by [ ] principles of contract law."  Village of Kaktovik v. Watt, 689 F.2d 222, 230 & n.62 (D.C. Cir. 1982) (referring to United States v. ITT Cont'l Banking Co., 420 U.S. 223, 238 (1975)); see also Lloyd v. Mukasey, 568 F. Supp. 2d 2, 16 (D.D.C. 2008); Simon v. Circle Assocs., Inc., 753 A.2d 1006, 1012 (D.C. 2000).

When construing a contract to determine whether an interpretation of its terms is reasonable, courts "consider[] the intent of the parties entering the agreement and whether a reasonable person in the position of the parties, knowing the circumstances surrounding the agreement and the usages that either party knew or should have known, would find it reasonable."  C&E Servs., Inc. v. Ashland Inc., 498 F. Supp. 2d 242, 265 (D.D.C. 2007).  "A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract . . . and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." Unfoldment, Inc. v. D.C. Contract Appeals Bd., 909 A.2d 204, 209 (D.C. 2006) (internal citation and quotation marks omitted).

Whether a contract is ambiguous is a question of law.  Id.  A contract is "not ambiguous where the court can determine its meaning without any other guid[ance] than a knowledge of the simple facts on which, from the nature of language in general, its

meaning depends." <u>Wash. Props., Inc. v. Chin, Inc.</u>, 760 A.2d 546, 548 (D.C. 2000) (internal citation and quotation marks omitted).  On the other hand, "if there is more than one interpretation that a reasonable person could ascribe to the contract, while viewing the contract in context of the circumstances surrounding its making, the contract is ambiguous." <u>Gryce v. Lavine</u>, 675 A.2d 67, 69 (D.C. 1996).

Here, the issue of whether the parties intended the terms <u>litigants</u> to include lawyers and <u>pending</u> to include the implementation stage of the settlement distribution must be derived from the language of the 2002 Settlement Agreement and what a reasonable person in the position of the parties would have intended each term to mean. The pertinent part of the 2002 Settlement Agreement states: "Joel Joseph shall make no attempt to interfere with the pending case or cases that follow, nor shall he attempt to file liens or notices of claim, or correspond with the litigants.  If he does he has breached the agreement and waives his percentages."  Pl.'s Mem. I, Cuneo Aff. ¶ 4 & Ex. B (2002 Settlement Agreement).

The plaintiffs' argument that the parties intended the term "litigants" to also include the attorneys representing the parties is persuasive.  The three lawsuits covered by the 2002 Settlement Agreement involved class action suits against the United States and two corporations.  Plaintiffs' Reply in Support of their Motion for Summary Judgment as to their Action for Declaratory Judgment and Motion to Dismiss and/or for Summary Judgment as to Defendant Joseph's Counterclaims ("Pls.' Reply I") at 4.[11]

---

[11] The Court notes that the plaintiffs assert that the three contingency fee cases involved the United States and two corporations, and the defendant never disputes this contention.  Furthermore, the plaintiffs include a copy of the Final Order and Judgment in the <u>Gold Train</u> case, which illustrates that <u>Gold Train</u> was in fact against the United States.  <u>See</u> Pl.'s Mem. I, Cuneo Aff., Ex. C (Final Order and Judgment).

Therefore, the only plausible  means of corresponding with the defendants would necessarily have been through their attorneys.  Consequently, a reasonable person in the position of either the plaintiffs or the defendant, all of whom were attorneys, would have understood that the term <u>litigants</u>  included the attorneys representing the parties. The defendant's assertion that the term litigants excluded the attorneys, absent any such exclusionary language, totally lacks credibility.

Additionally, the plaintiffs' argument that the parties intended the term "pending cases" to include "administratively closed" cases covered by the 2002 Settlement Agreement while the settlement remained outstanding is equally persuasive.  Pls.' Mem. I at 10-11.  The context in which the 2002 Settlement Agreement was executed is an important consideration.  <u>See</u> <u>C&E Servs.</u>, 498 F. Supp. 2d at 265 (stating that a court must consider "the intent of the parties entering the agreement and whether a reasonable person in the position of the parties, <u>knowing the circumstances surrounding the agreement and the usages that either party knew or should have known, would find [the term pending cases] reasonable</u>.") (emphasis added) (citations omitted).  Both parties were aware of the cases that were covered by the agreement,  Pl.'s Mem. I, Ex. B (Cuneo Aff.) ¶ 7 ("The terms set forth in the attached exhibits are part of this release") & Ex. A (listing "the <u>Gold Train</u>, <u>Leatherman</u>, and <u>Kwikset</u> cases as well as any directly related litigation" as the cases covered by the settlement agreement), and there is no indication in the agreement that some unspecified event would exempt any of these cases from the agreement's coverage.  Therefore, any reasonable person would interpret the term <u>pending cases</u> to include all three cases until such time as the conditions of the settlement agreement were satisfied.  The defendant's efforts to inject non-existent limiting

11

language, specifically that a case that has been settled and closed is no longer "pending," Def's Opp'n I at 3, into the agreement echo the efforts of the plaintiff in <u>Howell ex rel. D.H. v. District of Columbia</u> and must be rejected for the same reason here. <u>See</u> 522 F. Supp. 2d 57, 63 (D.D.C. 2007) (noting that "[t]he plaintiff bases her entire breach of contract argument on language that simply does not appear in the settlement agreement . . . .").

In <u>Howell</u>, the court rejected the plaintiff's claim that the defendant breached a settlement agreement. <u>Id.</u> While the settlement agreement itself did not include a specific time frame during which the defendant would provide the agreed-to services, the notes of the resolution meeting indicated that the defendant would require "at least 90 days" to provide the services. <u>Id.</u> The court stated that, "although the [language in the] settlement agreement [] ma[de] no mention" or express limitation of the time frame during which the defendant would provide the services, the court would accept the "settled usage" of the express terms that the parties memorialized in their meeting, not the limiting language that the plaintiff alleged. <u>Id.</u> Therefore, the plaintiff could not inject her proposed limiting language into the agreement.

In this case, the defendant attempts to limit the meaning of the term <u>pending cases</u> just as the plaintiff in <u>Howell</u> attempted to impose an unexpressed limitation on the phrase "at least 90-days" in her settlement agreement to mean that after ninety days the defendant was in breach. <u>Id.</u> The <u>Howell</u> Court rejected the plaintiff's attempts to "torture" the agreement's terms to benefit her reasoning and, instead, "honor[ed]" the accepted language of the terms of the contract. <u>Id.</u> This Court agrees with the court's reasoning in <u>Howell</u>, concluding that the term <u>pending cases</u>, in the face of specific cases

being expressly identified in the agreement, leaves no room for any interpretation other than the parties were referring to the cases identified in the agreement, and that these cases would remain subject to the terms of the agreement until such time as the conditions of the agreement were satisfied.  Therefore, the Court must "honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract . . . and will not torture words to import ambiguity where the ordinary meaning leaves not room for ambiguity." Id. at 63 (internal citation and quotation marks omitted, emphases added).

          b.      <u>Did the defendant's actions constitute a material breach of the 2002 Settlement Agreement?</u>

The plaintiffs argue that the defendant materially breached the 2002 Settlement Agreement by "deliberately"  interfering with the <u>Gold Train</u> case despite repeated warnings by the plaintiffs. Pls.' Mem. I at 10.  The defendant contends that he did not breach the 2002 Settlement Agreement, but that even if he did, "such breach was minor and did not substantially harm [the] plaintiff[s]."  Am. Countercl. ¶ 40.

If the defendant engaged in conduct that constituted a material breach of the 2002 Settlement Agreement, conduct that "go[es] to the essence and frustrate[s] substantially the purpose for which the contract was agreed to by the injured party," then under the terms of the settlement agreement, he is not entitled to any payments provided by the agreement.  <u>Draim v. Virtual Geosatellite Holdings, Inc.</u>, 522 F.3d 452, 454-55 (D.C. Cir. 2008) (quoting <u>Keefe Co. v. Americable Int'l, Inc.</u>, 755 A.2d 469, 475 (D.C. 2000). "[W]hether a material breach has occurred is generally a question of fact[]" unless "there is only one reasonable conclusion," with the result being that the "court must address

what is ordinarily a factual question as a question of law."  23 Williston on Contracts §

63:3 (4th ed. 2009); see also America, 468 F. Supp. 2d at 122.

> In determining whether a material breach has occurred, the Court must consider:
>
> the extent to which [the] plaintiff[s] will be deprived of the benefit which
> [they] reasonably expected under the contract; the extent to which the
> plaintiff[s] can be adequately compensated for the part of that benefit of
> which [they] will be deprived; the extent to which the defendant will
> suffer forfeiture; the likelihood that the defendant will cure his failure,
> taking account of all the circumstances including any reasonable
> assurances; and the extent to which the behavior of the defendant
> comports with standards of good faith and fair dealing.

America, 468 F. Supp. 2d at 125 (citing Greyhound Lines, Inc. v. Bender, 595 F. Supp.

1209, 1224 (D.D.C. 1984)).  The Court may also consider the extent to which "the

contract has been performed at the time of the breach[,]" whether the breach was willful

rather than "by negligence or by extraneous circumstances[,]" and whether "the breach

was quantitatively serious."  Greyhound, 595 F. Supp. at 1224 (internal citation and

quotation marks omitted).

Here, the question that must be answered is whether the defendant's

communication with the plaintiffs' co-counsel went to the essence of the agreement, and

thus, interfered with or substantially frustrated the purpose for which the 2002 Settlement

Agreement was reached.  The plaintiffs contend that the non-interference clause was

added to the 2002 Settlement Agreement due to the defendant's "prior conduct," which

included filing liens in other cases in which the plaintiff law firm was involved as

counsel.  Pls.' Mem. I at 8.  The defendant disputes the plaintiffs' contention, but does

not offer an alternative argument as to why the parties agreed to include the non-

interference clause.  Def.'s Opp'n I at 1.  The Court finds that the plaintiffs' position is

the only reasonable explanation for the inclusion of the clause in the absence of any other explanation provided by the defendant.  Moreover, the prior history between the parties also supports the plaintiffs' position, illustrated by the fact that in 2001 the plaintiffs took exception to the defendant's behavior at that time, which consisted of the defendant filing liens and contacting the plaintiffs' co-counsel in their pending cases.  Am. Compl. ¶ 16. To prevent the defendant from engaging in similar behavior, the parties entered into the 2002 Settlement Agreement.  See Pls.' Mem. I, Cuneo Aff. ¶ 5.  These circumstances logically support the plaintiffs' position that the non-interference clause was included in the settlement agreement because of the defendant's behavior during the course of the prior lawsuit between the parties.  As further support for the plaintiffs' position, the last sentence in paragraph six of the 2002 Settlement Agreement makes it strikingly clear that the non-interference requirement was essential to the continued validity of the 2002 Settlement Agreement.  Pls.' Mem. I at 6.  Specifically, the language states that if the defendant attempted to interfere with the pending cases, attempted to file liens or notices of claims, or corresponded with the litigants in the cases that were covered by the agreement, "he [will have] breached the [2002 Settlement] Agreement and waiv[ed] his percentages" of the fees agreed to in the agreement  Id.

The plaintiffs assert that the defendant improperly interfered in the Gold Train case, Pls.' Mem. I, Cuneo Aff. ¶ 9, when he deliberately contacted their co-counsel on several occasions despite the language of the 2002 Settlement Agreement prohibiting such behavior.  As noted earlier, the defendant demanded a 20% fee from the plaintiffs' co-counsel in one of the three cases covered by the settlement agreement for work he performed in that case even though he had already received $240,895 in accordance with

the settlement agreement.  Pls.' Mem. I at 2.  The defendant was made aware by the plaintiffs that his actions were not in compliance with the 2002 Settlement Agreement, but he nonetheless continued to communicate with the plaintiffs' co-counsel, disregarding multiple letters from the plaintiffs informing him that he was in material breach of the 2002 Settlement Agreement by doing so.  Pls.' Mem. I, Cuneo Aff., Ex. E. (Letter from the plaintiffs' counsel to the defendant, Feb. 10, 2006.)

In <u>America</u>, the court found that the defendant breached a settlement agreement which contained a provision stating that "all inquiries [about the plaintiff] from prospective employers received by [the defendant's agency] shall be referred to and handled by the Agency's Office of Human Resources." 468 F. Supp. 2d at 123.  The court found that the defendant breached the settlement agreement when two of the defendant's employees failed to refer calls inquiring about the plaintiff to the human resources department "as required by . . . the settlement agreement." <u>Id.</u> at 124.  The court noted that "the provision  [at issue] requir[ed] an employee of the defendant to have no substantive communications with prospective employers, and to immediately forward calls from such persons to its Human Resources Department." <u>Id.</u>  The Court further pointed out that "[t]here [was] no question that [the employees] reasonably believed that the caller [who was making an inquiry about the plaintiff] was in fact a prospective employer and they still did not comply with that requirement." <u>Id.</u> The court, therefore held that the defendant had breached the settlement agreement.

Here, the settlement agreement contains express language forbidding the defendant from "fil[ing] any independent fee applications, and [failing to] . . . cooperate with the Cuneo Law Group reasonably in the prosecution of these cases," or "mak[ing]

[any] attempt to file liens or notices of claim, or correspond with the litigants," Pls.'
Mem. I, Cuneo Aff., Ex. B, just as the settlement agreement in <u>America</u> prohibited the
defendant's agency from failing to refer inquiries about the plaintiff to the agency's
human resources department.  Moreover, whereas the defendant in <u>America</u> only had
"reasonabl[e] belie[f]" that the defendant was in breach of the settlement agreement, 468
F. Supp. 2d at 124, the plaintiffs in this case actually warned the defendant that he was
breaching the settlement agreement.  Pls.' Mem. I, Cuneo Aff. ¶ 8.  Thus, the Court is
compelled to find that the defendant materially breached the 2002 Settlement Agreement.

        The magnitude of the breach cannot be considered minor because the defendant's
conduct went further than simply communicating with <u>litigants</u>, as he subsequently filed
a claim against the plaintiffs' co-counsel in the <u>Gold Train</u> case in the federal District
Court in Miami, suing not for just 20% as he previously demanded on January 10, 2006,
from the plaintiffs' co-counsel in that case, Pls.' Mem. I, Cuneo Aff. ¶ 8, but rather  "1/3
of their fees."  Pls.' Mem. I at 2.  And when the defendant filed suit against the plaintiffs'
co-counsel, "[t]o avoid further interference and disruption to the <u>Gold Train</u> case," the
plaintiffs "agreed to indemnify [their] co-counsel against [the defendant's] suit.
Statement of Material Facts as to which there is No Genuine Issue in Support of
Plaintiffs' Opposition to Defendant's Motion for Summary Judgment as to His Breach of
Contract Counterclaim ("Pls.' Stmt.") ¶ 9.  [However, the plaintiffs also] retained counsel
to defend the suit in Miami[, and] Miami counsel succeeded twice in having [the
defendant's] suit dismissed for failure to state a claim, the second time with prejudice.
<u>Id.</u>  [The plaintiffs] ultimately paid a sum of money to settle the case on behalf of [their]
co-counsel." <u>Id.</u>  As a result of the defendant pursuing the Miami litigation, the plaintiffs

17

incurred "out-of-pocket costs, including the settlement, but excluding the time spent and the plaintiffs' overhead costs, were in excess of $35,000." Id.  And in addition to the plaintiffs' monetary expenses, they expended nearly one year defending against the Miami case. Pl.'s Mem. I, Cuneo's Aff. ¶ 9 & Ex. H (Docket, Joseph v. Dubbin, No. 1:06-cv-20464).  These expenditures of time and money were exactly what the plaintiffs sought to avoid through the execution of the 2002 Settlement Agreement.  Nonetheless, the defendant insists that the Court should disregard his actions, even if they amounted to a breach of the settlement agreement, and focus on the extent of the harm he will suffer if the Court enforces the 2002 Settlement Agreement's forfeiture clause.

Although the defendant disagrees, Def.'s Opp'n I at 5, the extent of his loss resulting from the forfeiture provided in the settlement agreement is but one of eight factors that the Court may consider when assessing the materiality of a breach.  See America, 468 F. Supp. 2d at 125 (delineating factors that a court is to consider when determining whether there has been a material breach of an agreement).  Accordingly, while  the defendant's loss from the forfeiture would exceed $400,000, this factor alone is insufficient to defeat the plaintiffs' forfeiture claims.  See S. Brooke Purll, Inc. V. Vailes, 850 A.2d 1135, 1139 (D.C. 2004) (rejecting the trial court's determination that a forfeiture clause was an invalid penalty because it was completely disproportionate to the contractor's actual loss and instead finding that the "burden was on the owner"of the house being renovated to show that the clause was "disproportionate to the contractor's anticipated damages in the event of a breach")(emphasis added).  This is particularly true in this case because any loss sustained by the defendant would have been occasioned by his own conduct.  As previously demonstrated, the defendant knowingly and deliberately

acted in a manner that was directly at odds with the non-interference clause of the 2002

Settlement Agreement.  While courts will not enforce forfeiture provisions that constitute

a penalty, such provisions will be upheld where it is otherwise appropriate to do so, as the

Neuffer v. Bakery & Confectionary Workers International Union of American case

demonstrates.  307 F.2d 671, 671-73 (D.C. Cir. 1962).  In Neuffer, a plaintiff

unsuccessfully sought the resumption of pension payments from his union after violating

a provision under which individuals forfeited all benefits upon being found in violation

of the Union's constitution.  Id.  The court in Neuffer held that the plaintiff was not

entitled to his pension because he had voluntarily brought himself within the terms of an

express forfeiture clause, noting that while a trivial offense might not justify complete

forfeiture, the plaintiff's efforts to induce the Union's members to join a rival union did

not qualify as trivial.  Id. at 672-73.  Similarly, in this case, the defendant's anti-forfeiture

argument fails because he voluntarily brought himself within the terms of the forfeiture

clause and his non-compliant conduct was not trivial; in fact, it frustrated a critical

component and objective of the 2002 Settlement Agreement.

In addition, the defendant's behavior was not a breach based on a mere

technicality; rather, his behavior caused the plaintiffs to spend more than $35,000

defending against  the Miami litigation, which took nearly a year to resolve.  On this

record, the Court can only conclude that the plaintiffs were deprived of a critical benefit

for which they had bargained when they entered into the settlement agreement with the

defendant and that the defendant's actions therefore amounted to a material breach of the

2002 Settlement Agreement.

19

        c.      <u>Was the non-interference clause a liquidated damages provision?</u>

The defendant relies on <u>District Cablevision Ltd. Partnership v. Bassin</u>, 828 A.2d 714 (D.C. 2003), for the proposition that "voiding [his] $460,000 fee [would] consititute[] an illegal penalty" because the amount "bears no reasonable relationship to the actual costs incurred by [the plaintiffs]," which he contends at most totaled "$12,500." Def.'s Opp'n I at 5. The plaintiffs argue, on the other hand, that the 2002 Settlement Agreement is not an unlawful liquidated damages penalty because "[i]t states no amount, percentage, or other formula. It does not state that [the defendant] owes [the plaintiffs] anything in the event of a breach." Pls.' Mem. I at 12.

The defendant's reliance on <u>Bassin</u> is misplaced. <u>Bassin</u> states, as the defendant accurately quotes in his opposition memorandum, that a penalty occurs:

> when a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a <u>minor</u> breach . . . 828 A.2d at 724 (citation and internal quotation marks omitted) (emphasis added).

However, the 2002 Settlement Agreement does not specify a single sum in damages that the plaintiff would receive if the agreement was breached; instead, the settlement agreement simply states that the defendant will forfeit his percentages if he does not comply with paragraph six (the non-interference clause) of the 2002 Settlement Agreement. In addition, as indicated above, the breach occasioned by the defendant's conduct was not <u>minor</u>, but to the contrary was significant. Therefore, the <u>Bassin</u> proscription is not applicable to the facts presented in this case.

As previously noted, part of the 2002 Settlement Agreement states that "Joseph shall make no attempt to interfere with the pending cases or cases that follow, nor shall he attempt to file liens or notices of claim, or correspond with the litigants.  If he does he has breached the agreement and waives his percentages."  Pls.' Mem. I, Cuneo Aff., Ex. B.  In assessing whether a provision in a contract amounts to a liquidated damages clause, the Court's first inquiry is whether the clause serves as a remedy for the breach of the contract.  See Red Sage Ltd. P'ship v. Despa Deutsche Sparkassen Immobilien-Anlage-Gasells-Chaft MBH, 254 F.3d 1120, 1125 (D.C. Cir. 2001).  To determine if a contractual clause is a remedy, District of Columbia law requires that courts look to the written language of the contract which governs the dispute, "unless it is not susceptible of a clear meaning."  Id. (internal citation and quotation marks omitted).

In Red Sage, a District of Columbia  restaurant sought a declaration from the court that its landlord breached an exclusive-use contract that was part of its lease.  Id. at 1122.  The restaurant alleged that its landlord breached the agreement by leasing space to a specialty cake shop in the same building.  Id.  Furthermore, the restaurant claimed that another clause in the lease agreement reduced its monthly rent by 50% during the period while the competing-use business operated on the premises.  Id. at 1123.  Specifically, the clause in question stated that "rent . . . shall be abated" by 50% if the landlord violated his obligations under the contract.  Id.  Additionally, the contract stated that the rent abatement "shall not limit any other remedies which [the t]enant may have against [the l]andlord for violating its obligations under this Section."  Id. (emphasis added).  While the restaurant claimed that this was not a liquidated damages clause, and was instead a readjustment of its rent based on changed conditions, the court concluded that

21

the language created a liquidated damage clause because it indicated the parties' intent to provide a remedy in the event the lease was breached as a result of space in the building being leased to a competing business.  Id. at 1125

       As in Red Sage, the language used in this case in the 2002 Settlement Agreement indicates that the non-interference clause was intended to be a liquidated damages clause. To reiterate, the clause reads, in part, that "Joseph shall make no attempt to interfere with the pending cases or cases that follow, nor shall he attempt to file liens or notices of claim, or correspond with the litigants.  If he does he has breached the agreement and waives his percentages."  See Pls.' Mem. I at 6 (emphasis added) (citing 2002 Settlement Agreement ¶ 6).  The clause in Red Sage used nearly identical language, such as use of the terms "shall be" and "shall not."  254 F.3d at 1125.  The language in the settlement agreement indicates that a remedy has been provided in the event of a breach, i.e. the defendant  "waives his percentages." Pls.' Mem. I at 6.  While the plaintiffs argue that the non-interference clause does not state an "amount, percentage[,] or other formula" and does not state that the defendant owes the plaintiffs "anything in the event of a breach," Pls.' Mem. I at 12, there is no requirement in the law that such clauses do so in order to qualify as a liquidated damages clause.  Moreover, the non-interference clause does refer to percentages that the defendant would have received in the three cases if there had been no breach of the settlement agreement.  As a result, the non-interference clause was designed to act as a remedy to redress the types of breaches designated in the clause.  Therefore, the non-interference clause is a liquidated damages clause, and the Court must now determine whether the clause is enforceable.

d.      Is the non-interference clause enforceable?

District of Columbia "jurisprudence has been tolerant of liquidated damages clauses unless they are demonstrated unreasonable." S. Brooke Purll, Inc., 850 A.2d at 1138.  Thus, under District of Columbia law, contractual clauses providing for liquidated damages in the event of a contractual breach are unenforceable only when the remedy provided is deemed a penalty.  See Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 724 (D.C. 2003) (holding that a liquidated damages clause specifying a single sum for all contractual breaches that bore no "reasonable" relationship to actual damages was unenforceable as a penalty); Red Sage, 254 F.3d at 1126 (citing Davy v. Crawford, 147 F.2d 574, 575 (D.C. Cir. 1945) (holding that while "parties to a contract may agree in advance to a sum certain which shall be forfeited as liquidated damages for breach of the contract," if that "agreement is for a penalty it is void")).

Courts examine a number of variables when assessing whether a particular liquidated damages clause amounts to a penalty.  For instance, a liquidated damages clause will not be deemed a penalty if the contracting parties reasonably believed that any damages arising from the breach of the contract would be difficult to ascertain, and thus determined that such a provision was a "reasonable protection against uncertain future litigation."  Order of Am. Hellenic Educ. Progressive Ass'n v. Travel Consultants, Inc., 367 A.2d 119, 126 (D.C. 1976); see also Red Sage, 254 F.3d at 1127 (citing Davy, 147 F.2d at 575); Barnette v. Sayers, 289 F. 567, 570 (D.C. Cir. 1923) ("Uncertainty in amount and difficulty of ascertainment of damages are regarded as supporting the view that a contract provides for liquidated damages rather than a penalty . . . .").  Also, "[so] long "as a liquidated sum bears a reasonable relation to the damages foreseeable at the

23

time of contracting the clause is enforceable." S. Brooke Purll, Inc., 850 A.2d at 1138

(internal brackets omitted) (quoting Christacos v. Blackie's House of Beef, 583 A.2d

191, 197 (D.C. 1990) (citing Burns v. Hanover Ins. Co., 454 A.2d 325, 327 (D.C.

1982))); see also Ashcraft & Gerel v. Coady, 244 F.3d 948, 955 (D.C. Cir. 2001) (citing

Restatement (Second) of Contracts § 356(1) (1981)) (explaining that damages may be

liquidated in a contract "but only at an amount that is reasonable in [] light of the

anticipated or actual loss caused by the breach . . . .")); Davy, 147 F.2d at 575 ("damages

stipulated in advance should not be more than those which at the time of execution of the

contract can be reasonably expected from its future breach . . . . ").  Further, if the

liquidated damages clause was "the product of fair arm's length bargaining, particularly

between sophisticated parties, . . . [greater] latitude [is] afforded the contracting parties to

argue as they wish on the remedies for a breach." Dist. Cablevision, 828 A.2d at 723-24

(citations omitted); Red Sage, 254 F.3d at 1129 (noting that under District of Columbia

law, courts "are generally reluctant to disturb terms agreed upon by [sophisticated]

parties").  Thus, if a liquidated damages clause bears no reasonable relation to

foreseeable damages, does not serve as a reasonable protection against uncertain future

litigation, or "appears" to make the "default of the party against whom it runs more

profitable to the other party than performance would be," then the clause "will be void as

a penalty."  Order of Am. Hellenic Educ. Progressive Ass'n, 367 A.2d at 126.

        In Red Sage, the Circuit Court held the liquidated damages clause enforceable

under District of Columbia law, reasoning that at the time the parties signed the

agreement they could have reasonably believed that damages arising from the breach

would be difficult to ascertain due to the fact that isolating lost sales caused entirely by a

competitor is difficult to determine. 254 F.3d at 1127. Moreover, the court found that the 50% rent abatement was not "plainly without reasonable relation to any probable damage which may follow a breach." Id. (quoting Davy, 147 F.2d at 575). The court reasoned that because "the rent abatement provision" encompassed "a wide variety of competing uses" that could constitute a breach, both parties could have reasonably anticipated that damages might be higher or lower than 50% of the monthly rent, and therefore ultimately agreed upon a single formula intended to capture "a wide range of possible damages." Red Sage, 254 F.3d at 1128. The Circuit Court determined that such a design was not "unreasonable as a matter of law." Id. The court also found that because of the uncertainty of potential future damages, "the provision [did] not guarantee Red Sage a certain windfall in case of a breach." Id. Furthermore, because the contract was negotiated by sophisticated parties, which the Circuit found "perhaps most important," id. at 1129, it concluded that "the rent abatement provision in Red Sage's lease [was] enforceable as a matter of law," id. at 1130.

In Ashcraft & Gerel, 244 F.3d at 949, the plaintiff law firm sued a former employee, an attorney, for a breach of his employment contract and sought damages under the liquidated damages clause of the plaintiff's employment contract, id. at 949, which totaled $400,000 at the time of the alleged breach, id. at 950. The court rejected the defendant's challenge to the reasonableness of the provision, in part because it was "triggered" only upon a "material" breach, and also because the amount recoverable under the provision was not deemed unreasonable under District of Columbia law, given the fact that it increased every year in conjunction with the defendant's increasing value to the firm. Id. at 955. The court took note of the fact that the plaintiff was not "only the

head of the [firm's] Boston office, but . . . he was [also] the only lawyer in that office

with substantial experience in the firm's Boston practice areas[, and c]onsequently [] the

firm [could] reasonably argue that his termination for cause would likely be disruptive

and create both considerable losses and expenses while the firm sought to replace him[,

which] a firm partner [estimated would result in lost] business opportunities ... [of]

between $1 million and $1.5 million." See id. (internal citation and quotation marks

omitted).

  In S. Brooke Purll, Inc., a contractor filed a counterclaim seeking liquidated

damages pursuant to a contract clause, which stated that in the event of a breach,

liquidated damages would be 35% of the full contract price.  850 A.2d at 1136.  In

holding this liquidated damages provision enforceable, the District of Columbia Court of

Appeals found that the percentage in the provision was not disproportionate to the actual

damages, which, according to the evidence, was within 1.67% to 10% of the contractor's

expected profit.  Id. at 1139.

  Similarly, the District of Columbia Court of Appeals held in Order of American

Hellenic that a liquidated damages provision was enforceable because of the difficulty in

determining the amount of damages that would be sustained in the event of a breach, and

that the "reasonable estimate of the [plaintiff's] net profit" approximated the minimum

sum of $100,000 selected by the parties as the liquidated damages amount was close in

value to what the actual damages may have been.  367 A.2d at 127.

  All of the cases discussed above  support the conclusion that the non-interference

clause in the parties' 2002 Settlement Agreement is an enforceable liquidated damages

clause.  Just as damages were too difficult to assess in Red Sage, S. Brooke Purll, Inc.,

26

and <u>Order of American Hellenic</u> when the agreements in those cases were executed, the extent of the damages that would be occasioned by a breach resulting from the defendant's interference with the three then-pending class action lawsuits would have been difficult, if not impossible to assess when the settlement agreement was executed for several reasons.  First, before a settlement of those three lawsuits was attained, it would have been entirely speculative to assume that any funds would be acquired, and if so, in what amount, as the fees the plaintiffs would have been awarded and the share the defendant would receive hinged entirely on the outcome of the three unresolved contingency fee cases.  Second, as the non-interference clause itself recognized, the nature of any breach could occur in a number of different ways, e.g., any "attempt to interfere with the pending cases or cases that follow," any "attempt to file liens or notice of claims," or "correspond with the litigants."  Pl.'s Mem. I, Cuneo Aff. ¶5 & Ex. B (2002 Settlement Agreement).  And, the nature of a breach could quite possibly have varying degrees of impact on the settlement process and therefore the prospects of whether settlements in the pending cases would occur, and if so, at what amounts. Assessing these variables before they occurred with any degree of accuracy would have amounted to nothing more than a game of chance at best.

Additionally, the defendant's loss of his percentage of the legal fees bore a reasonable relation to the potential damages the plaintiff could suffer as a result of a breach caused by the defendant.  If the defendant's interference led to an unfavorable outcome in any of the pending cases, then obviously the plaintiffs would incur a monetary loss, and considering the fees ultimately acquired by the plaintiffs in two of the cases–$3.85 million in the <u>Gold Train</u> case, <u>id.</u>, Cuneo Aff. ¶ 7, and $2,190,982 in the

27

<u>Leatherman</u> case, <u>id.</u> ¶¶ 11-12–it is evident that the damages the plaintiffs would potentially sustain could have far exceeded the amounts provided by the liquidated damages provision.   The District of Columbia Court of Appeals in <u>Ashcraft & Gerel</u> and <u>Order of American Hellenic</u> concluded that the liquidated damages provisions in those cases provided reasonable estimations of the actual damages that would be incurred, and the facts of this case provide no basis to depart from those rulings.   Not only has the defendant failed to make any showing that the liquidated damages provision did not follow the guidance provided in <u>Red Sage</u> and the legal authority upon which it relied, but his argument that the actual damages sustained by the plaintiffs was minimal, as compared to the actual liquidated damages amount, is irrelevant.   The fact remains that the extent of the damages could not be reasonably calculated when the settlement agreement was executed and  the plaintiffs were deprived of a material benefit they bargained for, causing them to expend more than $35,000 and considerable time defending against and resolving the defendant's interfering behavior.

Finally, while the defendant cites <u>District Cablevision</u> as support for his position that the non-interference clause is unenforceable, the ruling in that case actually undermines his position.  In <u>District Cablevision</u>, two consumers on behalf of a class of cable television subscribers brought an action against the District Cablevision Limited Partnership claiming they were charged excessive late payment fees of $5.00 each for failure to make timely monthly payments for their television service.  828 A.2d at 717-18.  The late fee was originally $2.00, but in 1990, District Cablevision "unilaterally" increased the fee to $5.00 without any analysis or estimate to determine the actual damages  incurred as a result of customers failing to pay their bills on time.  <u>Id.</u> at 718.

28

Rather, the increase was implemented "simply to 'motivate' subscribers to pay in a timely fashion."  Id.  On appeal, the court found that based on the evidence presented during the trial, a jury could reasonably find that the "charge[s were] arbitrary, excessive, [and] designed . . . [to take] advantage of many thousands of individual customers," effectively "ma[king] their cumulative defaults millions of dollars more profitable to [District Cablevision] than their timely performance would have been."  Id. at 725. Moreover, the increase having been unilaterally imposed by District Cablevision, the court found that it was not the product of fair arm's length bargaining between sophisticated parties.  Id. at 723-24. In contrast to what occurred in District Cablevision, here, as lawyers and a law firm, the parties were sufficiently sophisticated to appreciate what they were agreeing to when the 2002 Settlement Agreement was executed, and the non-interference clause of the settlement agreement was not unilaterally imposed by the plaintiffs, but rather was the product of negotiation between the parties.  Thus, there can be no claim by the defendant that the clause was the product of unfair bargaining. Accordingly, District Cablevision actually supports the conclusion that the non-interference clause in the 2002 Settlement Agreement is an enforceable liquidated damages provision.

B.      The Plaintiffs' Motion to Dismiss the Defendant's Counterclaims

The defendant's counterclaim asserts the following claims: legal malpractice (Count I)[12], breach of the settlement agreement (Count II), quantum meruit (Count III),

---

[12] In the defendant's amended counterclaim he titles his "first cause of action" as a claim for "Breach of Obligations of Attorney to Client."  Am. Countercl. ¶ 30.  However, in the parties subsequent filings, they both refer to the claim as one for legal malpractice; therefore, the Court will take the liberty of

(continued...)

unjust enrichment (Count IV), unfair trade practices under the District of Columbia

Consumer Protection Procedures Act (the "D.C. Consumer Act")(Count V), intentional

infliction of emotional distress (Count VI), and conversion (Count VII).  The plaintiffs'

Federal Rules of Civil Procedure Rule 12(b)(6) motion seeks dismissal of  all of these

claims.

   A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether

a party asserting a claim has properly stated a claim upon which relief may be granted.

Woodruff v. DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000).  For a counterclaim to survive

a Rule 12(b)(6) motion, it need only provide "a short and plain statement of the claim

showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and accords the

opponent "fair notice of what the claim is and the grounds on which it rests," Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted).  "Although detailed

factual allegations are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to

provide the grounds of entitlement to relief, a [party asserting a claim] must furnish more

than labels and conclusions or a formulaic recitation of the elements of a cause of

action."  Hinson ex rel N.H. v. Merritt Educational Ctr., 521 F. Supp. 2d 22, 27 (D.D.C.

2007) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555).  Or, as the

Supreme Court more recently stated, "[t]o survive a motion to dismiss, a [counterclaim]

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009)

(quoting Twombly, 550 U.S. at 570).  Furthermore, a claim is facially plausible "when [a

---

[12](...continued)
continuing to address the claim as both parties have.

party asserting a claim] pleads factual content that allows the court to draw a reasonable inference that the [opposing parties are] liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). Moreover, under Rule 12(b)(6), the Court "must treat the [counterclaim's] factual allegations as true and must grant [the party asserting a claim] the benefit of all reasonable inferences [that can be derived] from the facts alleged." Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotation and citation omitted).  Finally, factual challenges are not permitted under Rule 12(b)(6); instead, the Court may only consider the factual allegations set forth in the [counterclaim], any documents attached as exhibits thereto (or incorporated therein), and matters subject to judicial notice in weighing the merits of the motion.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  The Court's focus is therefore restricted to the facts as alleged by the [party asserting a claim], which must be sufficient "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

The plaintiffs argue that the 2002 Settlement Agreement precludes the defendant from pursuing his counterclaims for legal malpractice (Count I), quantum meruit (Count III), and unjust enrichment (Count IV).  Pls.' Mem. I at 14-16.  The defendant responds, arguing that the "[p]laintiffs' breach of the settlement agreement reopens the underlying claims."  Def.'s Opp'n I at 5.  In addition, the plaintiffs assert that the defendant has failed to state viable claims with regards to his unfair trade practices (Count V), intentional infliction of emotional distress (Count VI), Pls.' Mem. I at 17-20, and conversion (Count VII) claims, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and/or to Dismiss Defendant Joseph's First Amended Counterclaim ("Pls.' Mem. II") at 5.  The defendant counters this point by also

31

arguing stating that the plaintiffs "breach of the settlement agreement reopens the underlying claims."  Def.'s Opp'n I at 5.[13]

The defendant submitted a copy of the 2002 Settlement Agreement with his Verified Answer, <u>see</u> Verified Answer, Exs. 1 (Exhibit A, 2002 Settlement Agreement) & 2 (Agreement of Release, 2002 Settlement Agreement),[14] and he asserts a breach of contract claim, which arises out of that agreement.  Am. Countercl. ¶¶ 25, 37-42. Therefore, consideration of the 2002 Settlement Agreement for the purpose of addressing the plaintiffs' dismissal motion will not convert the motion into one for summary judgment under Federal Rule of Civil Procedure 56(c).  <u>E.E.O.C.</u>, 117 F.3d at 624. Accordingly, the Court will consider the parties' 2002 Settlement Agreement in addressing the plaintiffs' Rule 12(b)(6) challenge.

1.       <u>Is the 2002 Settlement Agreement a bar to the defendant's legal malpractice, quantum meruit, and unjust enrichment claims?</u>

The 2002 Settlement Agreement stems from a lawsuit the defendant in this action brought in this Court against the plaintiffs in 2001 seeking compensation for work he performed in the same three contingency fee cases while employed as a staff attorney, and later as a contract attorney, by the plaintiffs.  In that lawsuit, the defendant asserted claims for, <u>inter</u> <u>alia</u>, "breach of contract, <u>quantum</u> <u>meruit</u>, unjust enrichment, and promissory estoppel.  Pls.' Mem. I, Cuneo Aff., Ex. A (2001 Compl.) at 1.  As noted

_____

[13]The defendant also asserts that his "claim regarding malpractice is not time barred as [he] continues to suffer harm."  <u>Id.</u>  For the reasons expressed later, <u>infra</u> at 33 n.15, the Court need not address the defendant's statute of limitations argument because he is foreclosed from pursuing his malpractice claim under the terms of the 2002 Settlement Agreement.

[14] The Court has taken the liberty of assigning numbers to the defendant's exhibits in his opposition memorandum and to the exhibits in his Verified Answer as he has failed to do so.

above, in 2002, the parties reached an agreement settling those claims (the 2002

Settlement Agreement), and providing for the defendant to receive twenty percent of the

net fees the plaintiffs acquired in the three pending contingency fee cases.  Further, the

defendant agreed to release all liens, not file any independent fee applications, not to

make contact with the litigants in the three pending cases, and to cooperate with the

plaintiffs in the prosecution of the those cases.  As the Court has already explained, the

defendant breached the parties' settlement agreement, and moreover, as will be

explained later, infra at 38-39, the defendant, having first breached the settlement

agreement, cannot maintain his breach of contract claim against the plaintiffs in this

action.

     Earlier, the Court noted that "[a]n agreement to settle a legal dispute is a contract.

Each party agrees to extinguish those legal rights it sought to enforce through litigation

in exchange for those rights secured by the contract."  Green v. Small, No. Civ.A.

05-1055(ESH), 2006 WL 148740 *8 (D.D.C. Jan. 19, 2006) (quoting Village of

Kaktovik, 689 F.2d at 230).  If a party breaches the settlement agreement, "the non-

breaching party may choose either to enforce the agreement or to rescind it and sue on

the original claims."  Hazel v. WMATA, Civ.A. No. 02-1375 (RWR), 2006 WL

3623693 *9 (D.D.C. Dec. 4, 2006).

     Here, when the defendant agreed to resolve his case by entering into the 2002

Settlement Agreement with the plaintiffs, he forfeited his legal right to a determination

on the merits of his legal malpractice, quantum meruit, and unjust enrichment claims.[15]

---

[15] Specifically, the defendant and the plaintiffs agreed to "make a full and final settlement and
(continued...)

<u>Green</u>, 2006 WL 148740 *8.  In exchange, the defendant received the plaintiffs' binding promise to pay him 20% of the net fees they received from the three pending contingency fee cases referenced in the agreement, provided the defendant did not breach the 2002 Settlement Agreement.  Moreover, the 2002 Settlement Agreement clearly bars the defendant from bringing these claims.  The plain language of the agreement states that: "[t]he parties intend to make a full and final settlement and release of any and all claims of any type whatsoever that they do or may have against each other . . . ."  Pls.' Mem. I, Cuneo Aff. ¶ 4 & Ex. B (2002 Settlement Agreement).  The agreement further states that "[t]he parties release each other of any and all claims of any type whatsoever including but not limited to the civil action in the civil division of the United States District Court for the District of Columbia."  <u>Id.</u>  Thus, the 2002 Settlement Agreement, by its own terms, precludes the Court from entertaining the defendant's legal malpractice, <u>quantum</u> <u>meruit</u>, and unjust enrichment counterclaims.  Moreover, contrary to the defendant's position, nothing the plaintiffs have done merits a different result.

---

[15](...continued)
<u>release of any and all claims of any type whatsoever that they do or may have against each other</u> and they acknowledge that there is good and valuable consideration for this Agreement." Pls.' Mem. I, Cuneo Aff., Ex. B. (emphasis in original).  Clearly, the claims being asserted in Counts I, III, and IV of the defendant's counterclaim arose out of events that occurred before the defendant initiated the lawsuit in 2001 and could have been pursued in that action, as  in fact two of the three Counts were.  However, the defendant knowingly abandoned those claims and any other future claims he could have pursued in consideration for a 20% interest in the net fees the plaintiffs acquired in the three pending contingency fee cases.

2.      Has the defendant failed to allege a counterclaim of unfair trade
        practice pursuant to the District of Columbia Consumer Protection
        Procedures Act?

The defendant's unfair trade practice claim is based on his theory that the 2002 Settlement Agreement's non-interference clause is an unfair and improper trade practice under the D.C. Consumer Act, D.C. Code § 28-3901 (2001).  Am. Countercl. ¶¶ 60-62. The plaintiffs and the defendant both advance arguments concerning their perspectives of what is a "trade practice" under the D.C. Consumer Act.  The defendant argues that the term must be interpreted broadly and when construed from this perspective "the [2002 Settlement Agreement] between [the plaintiffs] and [the defendant] was incidental to the supply of legal services to consumers and comes within the broad reach of the D.C. Consumer . . . Act."  Def.'s Opp'n I at 6.  The plaintiffs respond that the defendant reads the term too broadly and that "[w]hile it may be true the [the plainitffs are] in the business of providing consumer legal services, the dispute between [the parties,] which the Settlement Agreement resolved[,] concerned the employment relation between [the parties] and only indirectly the provision of those legal services."  Pls.' Reply I at 10. The Court agrees with the plaintiff that the defendant has failed to state a claim under the D.C. Consumer Act.

The defendant's theory is that the plaintiff's action in attempting to enforce an invalid liquidated damages clause is an unfair and improper trade practice under the D.C. Consumer Act.  Am. Countercl. ¶ 62.  Therefore, the defendant's claim hinges on the Court finding that the non-interference clause is invalid, a proposition that the Court has already rejected.  See supra Part III.A.3.  Thus, the defendant's claim must be dismissed.

35

Even in absence of the Court's finding that the non-interference clause is an enforceable liquidated damages provision, the defendant's counterclaim would nevertheless have to be dismissed because under the D.C. Consumer Act the term "trade practice" does not apply to the 2002 Settlement Agreement in any respect.  The Act defines "trade practice" as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services."  D.C. Code § 28-3901(6).  The Act defines a "consumer" as "a person who does or would purchase . . . or receive consumer goods or services . . . or a person who does or would provide the economic demand for a trade practice[,]" and "as an adjective, 'consumer' describes anything, without exception, which is primarily for personal, household or family use[.]"  Id. § 28-3901(2).  Finally, the Act defines "merchant" as "a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice."  Id. § 28-3901(3).  Here, the defendant's actions, in regards to the settlement agreement, cannot by any stretch of the imagination be construed as purchasing activity, but instead involved negotiations between attorneys and their subsequent execution of an agreement settling their dispute.  As such, the plaintiffs' participation in the process that brought about the settlement agreement did not involve them in providing the defendant with any consumer services, and thus the defendant's claim falls outside the scope of a consumer-merchant relationship, which the D.C. Consumer Act regulates.  See Ford v. Chartone, Inc., 908 A.2d 72, 81 (D.C. 2006) (stating that "the [D.C. Consumer Act] was designed to police trade practices arising

only out of consumer-merchant relationships") (internal citation and quotation marks omitted).

Finally, the defendant cites <u>Banks v. District of Columbia Department of Consumer and Regulatory Affairs</u>, 634 A.2d 433 (D.C. 1993), as support for the viability of his unfair trade practice claim; however, this case is distinguishable from <u>Banks</u>. In <u>Banks</u>, the court found that providing legal services was a trade practice within the definition of the Act. <u>Id.</u> at 437. However, in that case, the defendant provided legal advice to an individual in no capacity other than that of someone purporting to be an attorney to a layman who sought and paid for legal advice. <u>Id.</u> at 435. As previously stated, the present case, by contrast, concerns a former employee of the plaintiffs who, following the termination of his employment as an attorney, negotiated and executed a settlement agreement with his former employer. Accordingly, the plaintiffs cannot be said to have "ma[d]e available," or "provide[d] information about, a service[]" that is "part[] of the economic output by society[,]" as the Court in <u>Banks</u> found had occurred in that case. <u>Id.</u> at 437.

> 3.   <u>Should the defendant's intentional infliction of emotional distress counterclaim be dismissed because he has failed to assert extreme and outrageous conduct by the plaintiffs?</u>

The plaintiffs argue that the defendant's intentional infliction of emotional distress counterclaim should be dismissed because the defendant fails to provide a "description of the emotional distress supposedly suffered," a description of the effect of the distress upon him, and an explanation for how a "contract dispute involving payment of a sum of money in a business context" amounts to "outrageous" conduct that goes "beyond all possible bounds of decency[.]" Pls.' Mem. I at 20. The defendant argues

37

that he has adequately asserted a claim for intentional infliction of emotional distress in
his counterclaim.  Def.'s Opp'n I at 7.  Specifically, he states that the plaintiffs "acted
unreasonably and in bad faith in failing to pay the sum due as agreed in the settlement
agreement," id., and that this "conduct was truly outrageous and should not be justified
in a civilized society" because they had "no valid argument for failing to pay [him],
other than to punish him for recovering compensation from other lawyers for a case that
he created," id. at 8.

      An intentional infliction of emotional distress claim "requires a showing of (1)
extreme and outrageous conduct on the part of the defendant which (2) intentionally or
recklessly (3) causes the plaintiff[, here the defendant,] severe emotional distress."
Khan v. Parsons Global Servs., Ltd., 521 F.3d 421, 428 (D.C. Cir. 2008) (quoting
Darrow v. Dillingham & Murphy, LLP., 902 A.2d 135, 139 (D.C. 2006)); see also
Kaseem v. Wash. Hosp. Ctr., 513 F.3d 251, 255 (D.C. Cir. 2008).  The alleged conduct
must be "so outrageous in character, and so extreme in degree, as to go beyond all
possible bounds of decency."  Williams v. Fed. Nat'l Mortg. Ass'n, Civ.A. No. 05-
1483(JDB), 2006 WL 1774252* 9 (D.D.C. June 26, 2006) (citing Duncan v. Children's
Nat'l Med. Ctr., 702 A.2d 207, 211 (D.C. 1997)).  The plaintiff may not merely state
"labels and conclusions" in an attempt to meet the necessary standard.  Grandison v.
Waskenhut Servs., Inc., 514 F. Supp. 2d 12, 18 (D.D.C. 2007) (dismissing claim because
the plaintiff merely "allege[d], in conclusory fashion, that [the defendant's] actions in
terminating [the plaintiff] were 'extreme and outrageous and willfully performed [and]
caused severe emotional distress to [the plaintiff]'").

In Williams, the Court held that the complaint failed to state a claim for intentional infliction of emotional distress, where the plaintiff alleged that the defendants had "active[ly], conspiratorial[ly], malicious[ly], and secretive[ly] attempt[ed] to curtail or terminate [the plaintiff's] prospective and ongoing business relationships." 2006 WL 1774252 *10. The complaint also stated that the defendants intended through their actions to damage "[the plaintiff's] personal and business reputation," by having "refused to contract with her because of her race and engaged in a campaign to prevent others from doing business with her." Id. Despite these allegations, the court found that the defendants' conduct failed to rise to the level required to satisfy a claim for intentional infliction of emotional distress. Id.

Furthermore, in Tiefenbacher v. AARP, No. 05-1802(CKK), 2006 WL 1126841 at *1 (D.D.C. April 27, 2006), the court found that plaintiff's allegations that her employer humiliated her through demeaning and vulgar expletives, made obscene and sexually offensive statements, terminated plaintiff's employment without providing her severance or vacation pay, and escorted her from the premises like a common criminal were, even if true, were not sufficient to support a finding of extreme and outrageous conduct, id. at *4. Likewise, in Duncan v. Children's National Medical Center, 702 A.2d 207 (D.C. 1997), the District of Columbia Court of Appeals affirmed the trial court's dismissal of the plaintiff's intentional infliction of emotional distress claim, where the plaintiff alleged that after becoming pregnant her employer "forc[ed] her to continue to either work in [a job position], where her fetus would be exposed to radiation, or to lose her job," id. at 211, finding that the employer's conduct was "not

sufficiently 'outrageous' as a matter of law to sustain the cause of action . . . .," id. at 212.

In this case, the defendant's counterclaim is based on his assertion that he was denied the payment of money owed to him.  None of the allegations presented in support of the defendant's counterclaims even rise to the level of the defendants' actions in Tiefenbacher or Duncan, which the courts in both cases deemed insufficient to show extreme and outrageous conduct.  Id.  Further, as the court in Tiefenbacher noted, claims for intentional infliction of emotional distress have been denied under even more severe facts than were present in that case.  See 2006 WL 1126841 at *4 (citing Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997)).

Similar to the plaintiffs in the cases discussed above, the defendant has failed to demonstrate that if his allegations are proven true, he is entitled to relief.  Even assuming the accuracy of his allegation that the plaintiffs intentionally, recklessly, and deliberately "depriv[ed the] defendant of his share of proceeds from the Leatherman case," Am. Countercl. ¶ 65, not only was the withholding a justifiable response to the defendant's breach of the settlement agreement, but the plaintiffs' conduct cannot be described, as a matter of law, to have been extreme and outrageous to such a degree as to cause the defendant severe emotional distress. See Williams, 2006 WL 1774252 at *10.  In other words, "[the plaintiff's] alleged conduct is not atrocious and outside the bounds of civilized society under District of Columbia law.  In the commercial arena and elsewhere, it is commonplace that . . . contracts fail to materialize for [numerous] reasons," and such conduct "does not rise to the level of outrageous behavior required to support a claim for intentional infliction of emotional distress." Id.  And this is

40

especially true here, where it was the defendant's own conduct that precipitated the

plaintiffs' legitimate response about which the defendant is complaining.  Accordingly,

the defendant has failed to allege facts sufficient to maintain his counterclaim for

intentional infliction of emotional distress.

        4.     <u>Should the defendant's conversion counterclaim be dismissed for failure to state a claim?</u>

The plaintiffs argue that the defendant's conversion counterclaim fails because

"the failure to pay a sum of money pursuant to a contract, even if wrongful, does not

constitute a . . . conversion."  Pls.' Mem. II at 5.  The defendant contends that the

plaintiffs unlawfully "exercised control, and continued to exercise control" of money

that is due to him pursuant to the 2002 Settlement Agreement.  Defendant's

Memorandum in Opposition to the Motion for Summary Judgment and/or to Dismiss the

First Amended Counterclaims and in Support of his Motion for Partial Summary

Judgment ("Def.'s Mem. II") at 3.  Both parties rely on <u>Curaflex Health Services, Inc. v.</u>

<u>Bruni</u>, 877 F. Supp. 30 (D.D.C. 1995) and <u>Government of Rwanda v. Rwanda Working</u>

<u>Group</u>, 227 F. Supp. 2d 45 (D.D.C. 2002) to support their respective positions.

Conversion is "any unlawful exercise of ownership, dominion or control over the

personal property of another in denial or repudiation of his rights thereto."  <u>Curaflex</u>,

877 F. Supp. at 32 (quoting <u>Duggan v. Keto</u>, 554 A.2d 1126, 1137 (D.C. 1989)).  "One

may be liable for conversion to a person who is in possession of property or who has the

right to immediate possession of the property."  <u>Id.</u> (citation omitted).  To establish a

claim of conversion when money is the object of the claim, a plaintiff must have "the

right to a specific identifiable fund of money."  <u>Id.</u>  However, a claim for conversion of

money may not be maintained to enforce a contractual obligation for payment of money. Calvetti v. Antcliff, 346 F. Supp. 2d 92, 106 (D.D.C 2004); see also Curaflex, 877 F. Supp. at 32 (citing Scherer v. Laborers' Int'l Union of N. Am., 746 F. Supp. 73, 84 (N.D. Fla. 1988) (rejecting the plaintiff's conversion claim because her action was "for recovery of an ordinary debt based on a [employment] contract")).

In Curaflex, a contractual relationship existed between the plaintiff and the defendants that required the plaintiff to provide products and services to the defendants' patients regardless of whether the patients paid the defendants. 877 F. Supp. at 31. The defendants, in returned for the products and services, were obligated to pay the plaintiff 70% of the revenues it billed for those goods and services. Id. at 33. The plaintiff argued that the defendant corporation was obligated under the parties' contract "to segregate from its general revenue all amounts it received for services [the plaintiff] rendered, to deposit the segregated funds into a separate designated lock box account and to transfer the lock box to [the plaintiff]." Id. at 32. The plaintiff was then to retain 70% of the funds for itself and transfer the remaining funds to the defendant corporation. Id. at 33. Based on this arrangement concerning the handling of the funds, the plaintiff alleged "that the [contract] clearly and unambiguously created in [the plaintiff] a property right to a specific and identifiable fund of money[,]" and that when the defendant corporation failed to act in compliance with how the money for the plaintiff's services was to be handled and ultimately delivered to the plaintiff, "it converted [the plaintiff's] property." Id. The court rejected the plaintiff's position, concluding that the defendant's failure to transfer the funds to the plaintiff was a breach of the contract between the parties, but not a conversion of those funds. Id. The court reached this

42

conclusion because it found that "[w]hile the monies in the lock box were a specific, identifiable fund," the plaintiff had no "immediate right to possession or control of the [money,]" as its "ability to gain possession or control of the funds in the lock box was wholly contingent on [the defendant corporation] meeting its obligation [under the contract] to instruct the bank [where the lock box was maintained] to transfer the funds from the lock box to [the plaintiff's] . . . bank account." Id. Therefore, the court found that the plaintiff could not maintain its conversion claims "[a]s a matter of law." Id.

In Rwanda, a contractual relationship also existed between the plaintiff and the defendant, which required the plaintiff to pay the defendant a specific sum of money for work that would then be performed on behalf of the plaintiff. 227 F. Supp. 2d at 50, 63. The plaintiff paid the defendant $28,000 and $55,000 as specified in two separate contracts, however, the defendant failed to use the funds in a manner that would benefit the plaintiff as anticipated by the terms of the contracts. Id. The plaintiff therefore demanded that the defendant return the money that was paid to him pursuant to the contracts. Id. Because the defendant had received a specific identifiable sum of money from the plaintiffs, did not perform the services required by the contract, and did not return the money when requested to do so by the plaintiffs, the court held that the defendant unlawfully converted the plaintiff's money. Id.

The facts in this case more resemble those in Curaflex. First, when the 2002 Settlement Agreement was executed, there was no specified amount of money the defendant was entitled to receive under the agreement, rather he was entitled to receive a specific percentage of an unspecified sum based on the fees the plaintiffs might be awarded if the three cases covered by the settlement agreement settled. See Curaflex,

43

877 F. Supp. at 32-33 (the amount of funds Curaflex would be entitled to receive would be based on an unspecified sum of services paid by the defendants' patients).   Second, the defendant had no ownership interest in, or even control or possession over the funds that are the object of the dispute in this case.  See id. (The funds were delivered to the defendants and never made their way to the plaintiff).  In Rwanda, by contrast, the money originated with the plaintiff, the plaintiff paid the funds to defendant, and then the plaintiff demanded the return of the money because the defendant failed to do what he was hired to do according to the terms of the parties' two contracts.  227 F. Supp. 2d at 62.  Here, the money the defendant claims was diverted did not originate with him but came, or would have come, from a third party.  This Court is in total agreement with the conclusions reached by its colleagues in both Curaflex and Rwanda, as it is clear why on the facts of those cases its colleagues ruled as they did.  Finding remarkable similarities between the facts in this case and Curaflex, as compared to the distinct dissimilarities between the circumstances in Rwanda, the Court finds that the defendant cannot maintain his conversion counterclaim.  As the Court in Curaflex observed, 877 F. Supp. at 33, 35, what the defendant is asserting here is a claim for breach of contract, not conversion.

    C.    The Defendant's Motion for Partial Summary Judgment on his Breach of Contract claim.[16]

The defendant seeks partial summary judgment on his second counterclaim for the plaintiffs' alleged breach of the 2002 Settlement Agreement.  Defendant's Motion

---

[16] The defendant also requested summary judgment on his conversion claim.  The request is being denied for the same reason the plaintiffs are entitled to dismissal on their Rule 12(b)(6) motion.

for Partial Summary Judgment at 1.  Specifically, he argues that the "[p]laintiffs

willfully and maliciously breached the settlement agreement by failing to promptly pay

[him] twenty percent of the amount received regarding the <u>Leatherman</u> case."  Am.

Countercl. ¶ 38.  The plaintiffs argue, on the other hand, that the defendant has "fail[ed]

to demonstrate that he is entitled to summary judgment" because they "ha[ve] already

demonstrated that summary judgment should be granted in [their] favor" and the

defendant's summary judgment request "concerns the identical issue."  Memorandum of

Points and Authorities in Opposition to Defendant's Motion for a Partial Summary

Judgment at 3.  The Court agrees with the plaintiffs.

 A party's material breach of a settlement agreement generally excuses the other

party's obligation to perform its end of the bargain under the agreement.  <u>Hazel</u>, 2006

WL 3623693 *9.  Thus, under contract law, the party that first breaches the contract may

not recover for the subsequent failure of the other party to perform.  <u>Ashcraft & Gerel</u>,

244 F.3d at 952) ("[A] party to a contract may defend [a breach of contract claim] on the

ground that there existed . . . a legal excuse for non-performance . . ."); 14 Williston on

Contracts §43:5 (4th ed.) ("[T]he party first in default under a bilateral contract cannot

recover for the subsequent failure of the other party to perform."); Restatement (Second)

of Contracts § 237 (1981); Restatement (Second) of Contracts §241 cmt. e (1981) ("A

material failure of one party gives the other party the right to withhold further

performance"); <u>see also</u> <u>Steel v. Isikoff</u>, 130 F. Supp. 2d 23, 32 (D.D.C. 2000).  Here,

because the defendant materially breached the 2002 Settlement Agreement, <u>see</u> <u>supra</u>

Part III.A.2., the plaintiffs were relieved of their duty to pay him 20% of the net fees

they acquired in the <u>Leatherman</u> and <u>Kwikset</u> cases, as would have been required by the

2002 Settlement Agreement.  This case is therefore distinguishable from those cases where the record raises questions as to whether an injured party was relieved of its contractual duties when the other party had breached only some of its obligations.  See Manganaro Corp. v. HITT Contracting, Inc., 193 F. Supp. 2d 88, 98 (D.D.C. 2002) (stating that a party who has performed certain obligations under a contract may demand that the other party honor the contract provided that the demanding party's lack of performance was not material to the contract.  "The corollary is that if a party has materially breached the contract in a manner that goes to the very root of the contract, he cannot then terminate his performance and demand that the other party perform."); see also 14 Williston on Contracts § 43:6 (4th ed.) ("Material failure of performance under a contract calling for an exchange of performances will suspend or discharge the other party's duty to perform").  Here, because defendant breached the non-interference clause of the 2002 Settlement Agreement, which was a material component of the settlement agreement, see supra Part III.A.2., the plaintiffs were no longer obligated to pay the defendant based on the agreement.  See Ferguson v. Caspar, 359 A.2d 17, 25 (D.C. 1976) (affirming trial court and finding that "by [the appellants] own conduct, [they] precluded their right to obtain specific performance of the contract" when they failed to comply with a material obligation of the agreement).

## IV. Conclusion

For the foregoing reasons, the Court concludes that the defendant materially breached the 2002 Settlement Agreement, while on the other hand no breach of the agreement was committed by the plaintiffs.  Therefore, the plaintiffs' motion for summary judgment on their claim for breach of the 2002 Settlement Agreement is

46

**GRANTED**.  In addition, the plaintiffs' motion to dismiss Counts I, III, IV, V, VI, and VII of the defendant's seven counterclaims is **GRANTED**.  Finally, the defendant's motion for partial summary judgment on his breach of contract and conversion counterclaims is **DENIED**.

　　　**SO ORDERED**.[17]

REGGIE B. WALTON
United States District Judge

---

[17] This Memorandum Opinion is being issued to explain the reasoning underlying the Order issued on March 27, 2009, which is now a final appealable order.